# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JOSE FAMANIA, GILBERTO FAMANIA,
MYRNA FAMANIA, and IDALIA ALERS,

      Plaintiffs,

      v.

WHITNEY PLACE AT NATICK, INC.,
      Defendant.

CIVIL ACTION No. 05-10996-WGY

## DEFENDANT'S AMENDED LOCAL RULE 56.1 STATEMENT[1]

Defendant Whitney Place at Natick, Inc. submits this Local Rule 56.1 concise statement of material facts of record as to which Defendant contends there is no genuine issue to be tried.

1.      On October 21, 2002, (Plaintiff's Memorandum in Support of Their Opposition to Defendant's Motion for Summary Judgment states the date as October 12, 2002, p.1) The Plaintiffs, Jose, Gilberto and Myrna Famania, siblings, (GF5/19-21) and Idalia Alers, a former roommate of Gilberto, (GF 5/24;IA 11/23; 12/8) filed a charge of national origin discrimination against Whitney Place at Natick, Inc. (IA 14; Contrast 13/21; 14/19.)

2.      Plaintiffs were all born in Puerto Rico (GF 5/1;IA 12/9; 22/16; MF 9/14; JF 6/12) and as a matter of law are United States citizens, (GF 5/12; 12/9; MF 9/14; JF 6/12.) Gilberto and Myrna are fluent in English. (GF 6-7/2; 8/21; Deposition conducted in English – Translator released 57/14; 58/16; 61/24 – 62/3. 73/14 – 24; Myrna Famania Deposition in English, (see

---

[1] References to transcript citations and exhibits shall be as follows:
      Gilberto Famania (GF P/L")
      Myrna Famania ("MFP/L")
      Idalia Alers ("IAP/L")
      Michel LaRouche ("MLP/L")

above Gilberto testifies Myrna during his employment acted as translator English to

Spanish/Spanish to English).  Jose and Idalia speak limited English. (IA 6 11/12; JF 7/7 – 8/7;

28/17-29-2; 30.)

3.     Whitney Place is an Alzheimer's Assisted Living Center, with nursing facilities

and a child and adult day care center.  ML 13/6-14; 25/2; 41/24; 42/6; 26/18; 19-20 – Plaintiff's

Local Rule 56.1 Statement ¶8; Joint Statement pursuant to Local Rule 16.1(D), Background.

(MF 24/7-26/4.)  The charge of discrimination was directed against the Whitney Place English

Language Rule found in its handbook.

That rule reads:

>     "ENGLISH LANGUAGE REQUIREMENT
>
>     An essential function of the job for all employees working in areas
>     accessible to residents and families is that they must speak English
>     as a courtesy to our residents.  The Company considers this rule as
>     a necessary service of our business.  Employees working with
>     residents or resident's guests who speak a language other than
>     English may, with the resident's and/or guest's permission,
>     communicate with them in a language other than English.
>     Violation of this rule may lead to disciplinary action, up to and
>     including termination."

Amended Complaint ¶17, 18 Answer to Amended Complaint ¶17-18.4.

4.     At no time did any of the Plaintiffs suffer an adverse employment action on the

basis of said ruling.  (GF 56/19-24; 57/2; 10/6; 10/21; 14/18; 15/7; 25/7; 33/24; 40/7; 44/20;

45/1; 47/21)  (IA 17/22; 18/10;)  (MF 21-11; JF 38; 39-40.)  (JF 33-37; 40/15; 45/10-12.)  They

never received any discipline (GF 10/6; 10/21; 14/18; 15/7; 25/7; 25/2; 33/24; 40/7; 44/20; 45/1;

47/21).  (IA 17/20; 17/22; 18/10; 18/14.)  (MF 21/11; 22/14; 22/16; 23/18.) or suffered any

adverse employment action on the basis of said rule. (IA 17; 18/10; 18/14; 21/2.)  (MF 22/13.)

(JF 33; 34/2.)  As the testimony clearly establishes when speaking Spanish in areas accessible to

residents or their families, they were either simply "reminded" to speak English, (GF 56/19-24; 10/16; 10/21; 13/10; 45/5; 57-2.)  (IA 17 19/22.)  (MF 10/24; 11/13-12/2; 12/10; 12/16; 21/22; 33-34.)  (JF 31/23.) told "Shsh",  (GF 32/14; 39/8.) or told "not so loud."  (MF 13/6; 15/8; 15/20; 16/21.)

5.      At the time they filed their charge Gilberto Famania and Idalia Alers has been terminated for cause.[2]  (GF 51/6;  Contrast Plaintiff's Local Rule 56.1 Statement ¶7.)

6.      Jose Famania is also a former employee of Whitney Place.  Although 49 years old, he claims the only job he has ever worked was at Whitney Place.  (JF 6/9; 15/6; 22/5.)  He had that job for less than two (2) years (J. Famania Dep. 24.)  (JF 11; 22.)  Jose Famania suffered an unwitnessed injury while at Whitney Place.  (JF 24-12; 24/16.)   Following his alleged injury on May 16, 2002, he never returned to work.  (JF 26/9.) However, he did receive a $7,500 lump sum workers compensation award from Whitney Place's Workers' Compensation Carrier.  (JF 26-27, Exhibit No. 3.) (JF 26-27, Exhibit No. 3.)  Jose has never returned to work for any other employer.  (JF 20/15.)

7.      Myrna remains in the employ of Whitney Place.  Although initially hired as a housekeeper (M. Famania Dep. 4), she has been promoted to a patient care assistant.

8.      Whitney Place is a 53 bed nursing facility, with an additional 88 assisted living apartments, an adult day care, specializing in providing 24/7 care for Alzheimer's patients.  (In addition, there is a child care center (Larouche 13/5-14).  Alzheimer's patients are a very sensitive population whose change in routine can and does have significant ramifications

---

[2] Although Gilberto was terminated for cause, denied unemployment compensation, contested his denial, offered testimony at his Massachusetts Department of Employment & Training Appeal Hearing , the appeal with denies, and he received a written decision, Gilberto denies any memory of the basis of his termination or of the DET decision. GF 54/22-56/14.

(Larouche 42/2-9)  See also MF 24/7-26-4.  Residents of Whitney Place are English speaking. (Larouche 42/15.)

9.      Whitney Place adopted an English Language Rule applicable to areas where patients and their guests have access (English Language Rule).  (Amended Complaint ¶17.) With few exceptions residents and guests have access to almost the entire Whitney Place facility (Larouche 40).

10.     Each of the Plaintiffs were born in Puerto Rico  and at all times are citizens of the United States.  See ¶2, Infra.

11.     At all relevant times, none of the Plaintiffs received any verbal or written warnings (IA 18/10; 18/14; 20/21; 21/8; 2/12; 24/5; 24/4; 24/24.) or discipline for speaking Spanish in a resident access area at Whitney Place.  (GF 10/6; 10/21; 14/18; 15/7; 25/7; 33/24; 40/7; 44/20; 45/1; 47/21.)

12.     At all relevant times, none of the Plaintiffs received either a verbal or written warning or other discipline for speaking Spanish in a non-resident access area.  (GF 10/6; 10/21; 14/18; 15/7; 25/7; 13/10; 33/24; 40/7; 44/20; 45/1; 47/21; 45/5; 32/14; 39/8.)

13.     At all relevant times, none of the Plaintiffs suffered any adverse employment action for speaking Spanish in a resident access area.  (GF 10/6; 10/21; 14/18; 15/7; 25/7; 13/10; 33/24; 40/7; 44/20; 45/1; 45/1; 47/21; 45/5; 32/14; 39/8.)

14.     At all relevant times, none of the Plaintiffs suffered any adverse employment action for speaking Spanish in a non-resident access area. (GF 10/6; 10/21; 14/8; 15/7; 25/7; 13/10; 33/24; 40/7; 44/20; 45/1; 47/21; 45/5; 32/14; 39/8.)

15.    Plaintiffs fail to identify any preferential treatment to persons of Brazilian descent as compared to each of the Plaintiffs.  (IA 26; 37/1-39  (MF 18; 20/2.)  (JF 34/23; -36; 38-41.)


                              Respectively submitted,

                              WHITNEY PLACE AT NATICK, INC.

                              By its attorneys,


                              /s/ Richard D. Wayne_____
                              Richard D. Wayne, BBO #518200
                              Brian E. Lewis, BBO #643717
                              Hinckley Allen Snyder, LLP
                              28 State Street
                              Boston, MA  02109-1775
Dated:  February 27, 2006     (617) 345-9000

-5-

## <u>CERTIFICATE OF SERVICE</u>

I, Richard D. Wayne, certify that the foregoing *DEFENDANT'S AMENDED LOCAL RULE 56.1 STATEMENT* will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered on February 27, 2006.

/s/ Richard D. Wayne

Case 1:05-cv-10996-WGY   Document 34-2   Filed 02/27/2006   Page 1 of 22

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

1                  **UNITED STATES FEDERAL DISTRICT COURT**

2                    **EASTERN DISTRICT OF MASSACHUSETTS**

3

4                                       **NO. 05 10996 WGY**

5

6       — — — — — — — — — — — — — — — — — — — — — — — —**\***

7      **JOSE FAMANIA, GILBERTO FAMANIA, MYRNA FAMANIA AND**

8      **IDALIA ALERS,**

9                              **Plaintiffs**

10     **VS.**

11     **WHITNEY PLACE AT NATICK, INC.,**

12                             **Defendant**

13      — — — — — —— — — — — — — — — — — — — — — — — — —**\***

14

15

16            **DEPOSITION OF GILBERTO FAMANIA, taken on**

17     **behalf of the Defendant, taken pursuant to Notice**

18     **under the Massachusetts Rules of Civil Procedure,**

19     **before Kim M. Romaine, Notary Public and**

20     **Shorthand Reporter in and for the Commonwealth of**

21     **Massachusetts at the Office of Hinckley, Allen &**

22     **Snyder, 28 State Street, Boston, Massachusetts,**

23     **on Tuesday, January 10, 2006 commencing at 10:20**

24     **a.m.**

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

2

1   APPEARANCES:
2
3   ON BEHALF OF DEFENDANT:
4
5   RICHARD WAYNE, ESQ.
6   Hinckley, Allen & Snyder
7   28 State Street
8   Boston, Massachusetts 02109
9   617/345-9000
10
11  ON BEHALF OF PLAINTIFFS:
12
13  JOAN M. ALTAMORE, ESQ.
14  Law Office of Joan M. Altamore
15  258 Elm Street
16  Roslindale, Massachusetts 02131
17  617/686-1719
18
19  ALSO PRESENT:
20  Alberto Mendez
21
22
23
24

3

1           I N D E X
2   DEPOSITION OF:        GILBERTO FAMANIA
3   EXAMINATION BY MR. WAYNE ...........PAGE 5
4           ...........PAGE 73
5   EXAMINATION BY MS. ALTAMORE .........PAGE 71
6
7
8
9           E X H I B I T S
10  No.      Description     Page
11  1        Complaint       5
12  2        Packet          7
13  3        Interrogatories 8
14  4        Application     70
15  5        Document        73
16  6        Document        74
17
18
19
20
21
22
23
24

4

1              P R O C E E D I N G S
2        GILBERTO FAMANIA, the witness, ALBERTO
3   MENDEZ, the interpreter, having been duly
4   cautioned and sworn, after producing satisfactory
5   identification, testified upon their oath as
6   follows:
7        - - - - - - - - - - - -
8        MS. ALTAMORE: In terms of
9   objections, we are going to reserve until the
10  time of trial.
11       MR. WAYNE: Except as to form.
12       MS. ALTAMORE: Yes.
13       MR. WAYNE: So we can agree on that.
14  In regard to motions to strike, those should be
15  made presently and in regard to reading and
16  signing the deposition, how would you prefer?
17       MS. ALTAMORE: We can pretty much
18  turn it over. We are in a crunch. So I can turn
19  it around in a one-week period. I will review
20  it, I will review it with him. We'll go through
21  it.
22       MR. WAYNE: Okay.
23       MS. ALTAMORE: I would say a one-week
24  period because again, we are in a short-time

5

1   period.
2        MR. WAYNE: Thank you. Could I have
3   this exhibit marked please?
4        (Exhibit No. 1 marked
5        for identification).
6   EXAMINATION BY MR. WAYNE:
7   Q. I will slide this over to you. Could you
8   please state your name for the record?
9   A. Gilberto Famania Rodriguez.
10  Q. And where were you born?
11  A. Puerto Rico.
12  Q. And have you always been a United States
13  citizen?
14  A. Yes.
15  Q. Do you know an individual by the name of Jose
16  Famania?
17  A. Yes.
18  Q. And who is that person?
19  A. It is my brother.
20  Q. Do you know an individual by the name of Myrna
21  Famania?
22  A. It is my sister.
23  Q. Do you know an individual by the name of
24  Idalia Alers?

2 (Pages 2 to 5)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

6

1   A.  Yes.  She is a friend of mine.
2   Q.  Now, are your parents still alive?
3   A.  Yes.
4   Q.  What is your father's name?
5   A.  Julio Enrica Rodriguez Famania.
6   Q.  And do you know his place of birth?
7   A.  Salinas, Puerto Rico.
8   Q.  Your mother's name?
9   A.  Gloria Stera Rodriguez.
10  Q.  Do you know her place of birth?
11  A.  Ailonito, Puerto Rico.
12  Q.  I would like you to refer to document 1,
13     Exhibit 1.  I would like you to refer to the last
14     page.  Under the words respectfully submitted on
15     the second line it says Alberto Famania.  Is that
16     your signature?
17  A.  Yes.
18  Q.  And prior to signing this document, did you
19     read it?
20  A.  Yes.
21  Q.  In regard to paragraph 7, which is on page 2,
22     it states, "Plaintiff, Gilbert Famania, is
23     Hispanic, a national of Puerto Rico and is fluent
24     in Spanish and English."

7

1   A.  Yes.
2   Q.  Is that true?
3   A.  Yes.
4          MR. WAYNE:  Could I have this marked
5       as Exhibit 2?
6          (Exhibit No. 2 marked
7           for identification).
8       BY MR. WAYNE:
9   Q.  In reference to the document that has been
10     marked as Exhibit 2, entitled Plaintiff's
11     Memorandum of Law and Opposition of Defendants'
12     Motion to Dismiss, could you please turn to page
13     5?  Underneath the term respectfully submitted on
14     line 2 it says Gilberto Famania.  Is that your
15     signature?
16  A.  Yes.
17  Q.  Prior to signing this document, did you read
18     it?
19  A.  Yes.
20  Q.  Did you read it in English?
21  A.  Yes.
22  Q.  Going back to Exhibit Number 1, you testified
23     that you read this document prior to signing the
24     document, correct?

8

1   A.  Yes.
2   Q.  Did you read it?
3   A.  Yes.
4   Q.  Did you read it in English?
5   A.  Yes.
6          MR. WAYNE:  Would you mark this as
7       Exhibit 3?
8          (Exhibit No. 3 marked
9           for identification).
10      BY MR. WAYNE:
11  Q.  I will slide that to you.  Document 3 is
12     stamped draft.  The caption is Plaintiff Gilberto
13     Famania's Answers to Whitney Place at Natick's
14     First Set of Interrogatories.  Have you seen this
15     document before?
16  A.  Yes.
17  Q.  And where did you previously see this
18     document?
19  A.  My lawyer passed it to me.
20  Q.  And prior to today, have you read this
21     document?
22  A.  Yes.
23  Q.  Did you read it in English?
24  A.  Yes.

9

1   Q.  Now, in regard to interrogatory 2, that
2       question asks, "State the full name, residential
3       address, business addresses and telephone numbers
4       of all witnesses and persons known to you to have
5       to knowledge of facts relating to allegations in
6       the amended complaint and or defenses and
7       affirmative defenses asserted in this
8       litigation."  One of the persons that you stated
9       would have such knowledge is an individual by the
10      name of Jack Curtain.  What information would
11      Mr. Curtain have in regard to your claims in your
12      complaint?
13         MS. ALTAMORE:  I'm sorry.  Can you
14      repeat the question?
15         MR. WAYNE:  Can you just read it back
16      please?
17         (Question read back).
18  A.  He has no information about my complaint.
19  Q.  Can you state that again please?
20  A.  Excuse me?
21  Q.  Could you restate your answer?
22  A.  He don't have no information about this case.
23  Q.  Can you explain then why you included Mr.
24     Curtain's name if he has information about the

3 (Pages 6 to 9)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

10

1    complaint?
2    A.  Because he was my boss by that time.  He one
3    time told me -- I guess that was 2000 -- I guess
4    in like June 2000 he told me to don't speak
5    English -- I mean Spanish.
6    Q.  Do you remember where you were standing at
7    that time?
8    A.  At that time I was in the third floor with
9    George Santiago.  We were doing a room.  We were
10   painting a room and getting it ready for the
11   residents.
12   Q.  What did you say in response to Mr. Curtain?
13   A.  He don't speak English.  I have to explain
14   everything to him in Spanish.  He says he is
15   going to get in trouble if he heard me talking in
16   Spanish to him.  So he told me to speak English.
17   Q.  And what did you say in response to Mr.
18   Curtain at that time?
19   A.  Nothing.  I just laughed and say okay.  The
20   other guy, George, he don't speak English.
21   Q.  Did Mr. Curtain say anything else at that
22   time?
23   A.  No.
24   Q.  Did Mr. Curtain take any negative action

11

1    against you because you spoke Spanish to Mr.
2    Santiago at that time?
3    A.  No.
4    Q.  Another person -- Strike that.
5        Did Mr. Curtain -- Strike that.
6        In regard to your complaint, the complaint
7    that you signed and filed in court and is listed
8    as Exhibit 1, can you state for me your
9    complaint?
10       MS. ALTAMORE:  Objection.
11   A.  I put in the complaint because we are not
12   allowed to speak Spanish in the break area and
13   sometimes in the lobby when no residents are
14   around.
15   Q.  Do you recall when you were hired, the date
16   when you were hired?
17   A.  Yes.
18   Q.  When was that?
19   A.  2000, month two.
20   Q.  So February?
21   A.  February 2000.
22   Q.  Okay.  I want to draw your attention to the
23   answer to interrogatory 3.  Interrogatory 3 asks,
24   "If you claim that Whitney Place's English

12

1    language rule was applied in a discriminatory
2    manner to you, describe with specificity each
3    incident when the English language rule was
4    applied in a discriminatory manner to you.
5        In so describing (a) state the date, time and
6    place where the English language rule was applied
7    in a discriminatory manner to you;
8        (b) state the name of the person who applied
9    the English language rule in a discriminatory
10   manner to you;
11       (c) what was stated by that person applying
12   the English language rule in a discriminatory
13   manner;
14       (d) your response to that person;
15       (e) the action, if any, taken against you and
16   its impact on your terms and conditions of
17   employment;
18       (f) identify all witnesses to the incidents."
19       Did you review that question before answering
20   it?
21   A.  Yes.
22   Q.  Did you understand the question?
23   A.  Yes.
24   Q.  Now, in regard to your answer it says, "Two

13

1    months after being hired, plaintiff was speaking
2    Spanish with a coworker, Daisy Santiago, during
3    the early afternoon in the hallway on the second
4    floor.  Plaintiff and Daisy were speaking about
5    their jobs and other private matters.  Louise,
6    another Whitney Place employee, came out of a
7    small office in the area and approached plaintiff
8    and Daisy.  Louise told the two not to speak
9    Spanish here.  No residents were present."
10       Would that conversation have taken place in
11   April of 2000 if you say you were hired was
12   February?
13   A.  Yes.
14   Q.  The second floor hallway, is that in the
15   nursing home section of the building?
16   A.  Yes.
17   Q.  Do you know Daisy's last name?
18   A.  Santiago.
19   Q.  Is she related to George Santiago?
20   A.  Yes.  She was his girlfriend.
21   Q.  To the best of your knowledge, if you know,
22   did Mr. Santiago strike Daisy Santiago?
23       MS. ALTAMORE:  Objection.
24   A.  I don't know.

4 (Pages 10 to 13)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

14

1   Q.  Do you know whether Mr. Larouche testified on
2       behalf of Daisy in a court proceeding?
3               MS. ALTAMORE: Objection. Relevance.
4       BY MR. WAYNE:
5   Q.  If you know?
6   A.  I don't know.
7   Q.  You state that Louise is the person who came
8       out of an office and approached you and Daisy,
9       correct?
10  A.  Yes.
11  Q.  Do you know what Louise's last name is?
12  A.  Pecora.
13  Q.  Do you know what her job title was?
14  A.  She is I believe in charge of the residents.
15      I'm not sure at this moment.
16  Q.  Okay. You state that Louise told you and
17      Daisy not to speak Spanish there, is that
18      correct?
19  A.  Yes.
20  Q.  Do you recall anything else that Louise said
21      to you at that time?
22  A.  That's all. That is what she said.
23  Q.  Okay.
24  A.  No residents around when this accident

15

1       happened.
2   Q.  Did you make any response when Louise told you
3       not to speak Spanish in this area?
4   A.  No. I have respect for the other people.
5   Q.  Did Louise take any action against you for
6       speaking Spanish in that location?
7   A.  No.
8   Q.  To the best of your knowledge, did Louise take
9       any action against Daisy for speaking Spanish at
10      that time?
11  A.  No.
12  Q.  Was there anything else said between yourself,
13      Louise and Daisy during that incident?
14  A.  No. Nothing else.
15  Q.  Further answer to interrogatory 3 states,
16      "During the course of his employment, plaintiff
17      was working with George Santiago on Thayer (third
18      floor) and they were speaking Spanish. Frit
19      approached plaintiff and Mr. Santiago and told
20      them they were not allowed to speak Spanish here
21      because of the residents. She then walked away.
22      No residents were present in the area where the
23      work was being done." In regard to that
24      statement that I just read, do you recall when

16

1       that incident occurred, the date?
2   A.  I guess it was in November 2000.
3   Q.  And what is the full name of the individual
4       you identify as Frit, F-R-I-T?
5   A.  I don't know the last name, but Frit, she is
6       the person in charge to show the rooms to the
7       residents.
8   Q.  Do you recall anything else that was said at
9       that time by Frit to you?
10  A.  No.
11  Q.  Did you say anything to Frit in response?
12  A.  No.
13  Q.  Did Mr. Santiago say anything?
14  A.  No.
15  Q.  Did Frit take any action against you after
16      that incident?
17  A.  No. Just he make a comment to me and he say,
18      why are we not allowed to speak Spanish when
19      there is nobody around. That is the only comment
20      he gave to me. That is all.
21  Q.  That was Mr. Santiago speaking with you?
22  A.  Yes.
23  Q.  Do you recall, if any, what your answer was to
24      Mr. Santiago at that time?

17

1   A.  Excuse me?
2   Q.  Do you know or do you recall if you responded
3       to Mr. Santiago's comment?
4   A.  No.
5   Q.  Of your personal knowledge, do you know
6       whether there was any action taken against Mr.
7       Santiago for speaking to you in Spanish at that
8       time?
9   A.  At that time?
10  Q.  In regard to that incident.
11  A.  No.
12  Q.  You further state, "During the course of his
13      employment, plaintiff was with Michael Larouche,
14      who was trying to find the source of a water leak
15      on Thayer. Carmen, a fellow employee, who spoke
16      no English, only Spanish, was present.
17      Apparently, Carmen had left water running. Mr.
18      Larouche informed plaintiff and Carmen that it
19      was not polite to speak Spanish in front of him.
20      Plaintiff informed Mr. Larouche that Carmen did
21      not speak English. No residents were present."
22      Do you recall when that incident occurred?
23  A.  That was in 2001, November.
24  Q.  Why do you recall that that incident occurred

5 (Pages 14 to 17)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 18 | | 20 | |
|---|---|---|---|
| 1 | in 2001 in November? Why do you believe that it | 1 | A. Then we walked to the elevator, and he keeps |
| 2 | occurred in 2001 in November? | 2 | telling me, it's not polite to speak Spanish in |
| 3 | A. Because I was there. That happened to me. | 3 | front of me with Carmen. I say again, she don't |
| 4 | Q. Why do you recall that it happened in November | 4 | speak English. She speaks Spanish. By that time |
| 5 | of 2001? | 5 | no residents are around when this happened. |
| 6 | A. I don't understand the question. | 6 | Q. Now, before Mr. Larouche informed you that it |
| 7 | Q. Is there any reason why you are identifying | 7 | was not polite to speak Spanish in front of him, |
| 8 | that -- that you can identify it as specifically | 8 | did he say anything else to you at that time? |
| 9 | occurring in 2001 in November? | 9 | A. No. |
| 10 | A. You want me to explain what happened that day? | 10 | Q. Did Mr. Larouche come to that location because |
| 11 | Q. I want you to explain why you believe it | 11 | of the leak? |
| 12 | occurred in November of 2001. | 12 | A. Yes. We went together. We were looking for |
| 13 | A. I don't understand the question. Sorry. | 13 | the leak from the second floor to the third |
| 14 | Q. Let me state the question another way. Why do | 14 | floor. |
| 15 | you believe that it occurred in November 2001 as | 15 | Q. And at that time was Mr. Larouche your |
| 16 | opposed to September 2001? | 16 | supervisor? |
| 17 | A. I don't understand the question. Sorry. | 17 | A. Yes. |
| 18 | Q. Why do you believe that this event occurred in | 18 | Q. At that time were you employed by Whitney |
| 19 | November of 2001 as opposed to any other date? | 19 | Place in some type of maintenance capacity? |
| 20 | A. Because I was there. That happened to me. | 20 | A. Maintenance and housekeeping. |
| 21 | Q. Mr. Famania, I'm not questioning whether the | 21 | Q. And prior -- excuse me. What floor in Thayer |
| 22 | event occurred. I'm asking you a question as to | 22 | did this incident occur? |
| 23 | why you recall that it occurred in a specific | 23 | A. This happened in Broadmore. |
| 24 | month in a specific year. | 24 | Q. So where it says -- in regard to three where |

| 19 | | 21 | |
|---|---|---|---|
| 1 | A. Sorry. I don't understand the question. | 1 | it says the water leak was in Thayer, are you now |
| 2 | Q. At any time did you write down on a piece of | 2 | amending that to say it was in Broadmore? |
| 3 | paper that the event occurred in November of | 3 | A. It was in Broadmore. |
| 4 | 2001? | 4 | Q. And what floor is Broadmore? |
| 5 | A. No. | 5 | A. Third floor. |
| 6 | Q. Did you keep a diary regarding events that | 6 | Q. Prior to going to the third floor, Broadmore, |
| 7 | occurred at work? | 7 | were you and Mr. Larouche near his office? |
| 8 | A. No. | 8 | A. Yes. We was in the lobby, in the office. |
| 9 | Q. Okay. | 9 | Q. Was it Mr. Larouche who informed you that |
| 10 | A. That was one of the worst accidents that | 10 | there may be a leak? |
| 11 | happened to me with Mike Larouche. | 11 | A. Yes. |
| 12 | Q. Do you recall Carmen's last name? | 12 | Q. After Mr. Larouche informed you that there was |
| 13 | A. Rosa. | 13 | a leak, did you and Mr. Larouche try to locate |
| 14 | Q. You state here that, "Mr. Larouche informed | 14 | the source of the leak? |
| 15 | plaintiff and Carmen that it was not polite to | 15 | A. Yes. |
| 16 | speak Spanish in front of him." Do you recall | 16 | Q. Were you doing that together with Mr. |
| 17 | Mr. Larouche saying anything else in regard to | 17 | Larouche? |
| 18 | this incident? | 18 | A. Yes. We went together to the second floor, |
| 19 | A. I say, how am I going to communicate with her | 19 | then we went to the third floor. |
| 20 | if she don't speak English. So he tells me | 20 | Q. Did you get up to the third floor by means of |
| 21 | again, it's not polite to speak Spanish to her in | 21 | the elevator? |
| 22 | front of me. | 22 | A. The elevator. |
| 23 | Q. And what did you say in response to Mr. | 23 | Q. When you got to the -- when you got off the |
| 24 | Larouche at that time? | 24 | elevator on the third floor, did you see Carmen |

6 (Pages 18 to 21)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

22

1   right away?
2   A.  No.
3   Q.  Prior to seeing Carmen, what did Mr. Larouche
4       and you do?
5   A.  We looked in the closet and then when we
6       opened the closet, the water hole was open,
7       running water.  So we looked for Carmen.  I
8       brought Carmen to show her and explain to her
9       that we have a leak in the second floor, and when
10      I started to explain to Carmen in Spanish, that
11      is when Mike told me it's not polite to speak
12      Spanish in front of him.
13  Q.  Do you recall what you were saying to Carmen
14      at the time before Mike said it wasn't polite?
15          MS. ALTAMORE:  Objection.  Asked and
16      answered.  Go ahead.
17      BY MR. WAYNE:
18  Q.  Do you recall what you were saying to
19      Carmen --
20  A.  Yes.
21  Q.  -- before Mr. Larouche?
22  A.  I told Carmen, Carmen, you got to -- we have a
23      water leak on the second floor because you left
24      the water running.

23

1   Q.  Do you remember anything else that you said to
2       her at the time?
3   A.  No.
4   Q.  Did Carmen say anything in response to what
5       you said?
6   A.  No.  Carmen is very quiet person.  She don't
7       talk too much.  She say okay.  That's it.
8   Q.  After Mr. Larouche told you that it wasn't
9       polite to speak Spanish in front of him, did he
10      take any action against you for speaking Spanish
11      in front of him?
12  A.  No.  He was mad at me because I was talking in
13      Spanish to Carmen.  So when we went down to the
14      elevator he gave me some attitude because he was
15      mad because I'm talking in Spanish to Carmen.  I
16      repeated to him, she don't speak English.  She
17      speaks Spanish.  I have to explain it to her in
18      Spanish.
19  Q.  What else did Mr. Larouche say that you --
20      Strike that.
21      What did Mr. Larouche say to you when you said
22      you needed to speak to her in Spanish because she
23      didn't speak English?
24  A.  It's not polite to speak Spanish in front of

24

1   me.  He said that again.  That is all.  We walked
2   out of the elevator and went to do my job.
3   Q.  Do you recall what you did after that?  You
4       said to do your job.  What did you have to do
5       after that?
6   A.  My job?
7   Q.  Yes.
8   A.  I have some, you know, stuff to do like clean
9       rooms, paint, fix rooms, change light bulbs.
10      Stuff like that.
11  Q.  Were you given a list on a regular basis of
12      duties that you had to do at the facility?
13  A.  Yes.
14  Q.  Were those lists in English?
15  A.  Yeah.  In English.
16  Q.  And in regard to Mr. Larouche, did
17      Mr. Larouche speak Spanish?
18  A.  No.
19  Q.  Do you know whether Mr. Larouche spoke any
20      other language aside from English?
21  A.  No.
22  Q.  After the second time that Mr. Larouche stated
23      to you that it was not polite to speak Spanish in
24      front of him, did he bring up that incident at

25

1   any other time?
2   A.  No.
3   Q.  Of your own personal knowledge, do you know
4       whether Mr. Larouche took any action against
5       Carmen for speaking Spanish to you in regard to
6       that incident?
7   A.  No.
8   Q.  In further answer to interrogatory 3, you
9       stated, "During the course of his employment,
10      plaintiff had cause to be on Wilson (second
11      floor) speaking Spanish to a coworker.  Plaintiff
12      was approached by a nurse who told him not to
13      speak Spanish.  Several feet away from plaintiff
14      were several Brazilian employees speaking in
15      Portuguese.  The nurse did not approach those
16      Portuguese speaking employees."  Do you recall
17      the date that that incident occurred?
18  A.  No.
19  Q.  Do you recall the name of the nurse?
20  A.  No.
21  Q.  Okay.
22  A.  It's hard for me to remember everything.
23      Every single detail.
24  Q.  Do you recall the name of the Brazilian

7 (Pages 22 to 25)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

26

1    employees?
2    A.   One is Marcelo. I don't remember right now
3    his last name, but he was one of the Brazilians
4    who was working in there at that time with his
5    brother. I don't remember his brother name's.
6    They were brothers working in there and they are
7    Brazilian.
8    Q.   Do you know what the job title of the nurse
9    was aside from being a nurse?
10   A.   She was the nurse in charge of the floor.
11   Q.   Do you recall the name of the person to whom
12   you were speaking Spanish at the time?
13   A.   It was Jeffrey. He was with me in
14   maintenance.
15   Q.   Could Jeffrey speak English?
16   A.   Yes. Both language.
17   Q.   Was Jeffrey fluent in English?
18   A.   Yes.
19   Q.   Was Jeffrey fluent in Spanish?
20   A.   Yes.
21   Q.   Okay.
22   A.   At that time, no residents around when this
23   happened.
24   Q.   Now, you stated that one of the Brazilian

27

1    employes was Marcelo?
2    A.   Marcela.
3    Q.   Is that a he or a she?
4    A.   He.
5    Q.   Do you recall was he speaking to his brother
6    at that time?
7    A.   No. He was talking to the other Brazilians.
8    I say he got a brother who works in there too.
9    He was speaking in Portuguese with the other
10   Brazilians. Nobody said anything to these guys,
11   you know.
12   Q.   Do you recall the name of the other person,
13   the other Brazilians who were speaking to
14   Marcelo?
15   A.   No.
16   Q.   Do you recall how far away from you Marcelo
17   and the Brazilians were at the time the nurse
18   approached you and told you not to speak Spanish?
19   A.   25, 30 feet.
20        MR. WAYNE:   Off the record.
21        (Break taken).
22        (Discussion off the record).
23        MR. WAYNE:   Attorney Altamore and I
24   went off the record to have a discussion. The

28

1    purpose of the discussion was the continuing
2    necessity to have a translator present today.
3    What we agreed to would be that based upon the
4    testimony that has been given so far in today's
5    deposition that we do not believe a translator
6    would be needed to go back and clarify certain of
7    the answers. We both reserve the right however
8    in going forward that if we find that we either
9    need some clarification of past answers or
10   prospective answers that we ask going forward
11   that each of us reserve the right to bring back a
12   translator and neither of us will object to that.
13   What we are going to try to do is finish up the
14   deposition today in English. If there are
15   questions that either of us believe need further
16   clarification that would be aided by a
17   translator, we will ask Mr. Famania to come back
18   at a later date to clarify those answers or to
19   assist him in understanding the question.
20        MS. ALTAMORE:   I am in agreement with
21   that. We had that discussion and it's a mutual
22   agreement.
23        MR. WAYNE:   We are going to release
24   the translator.

29

1         (Whereupon Mr. Mendez left
2         the proceedings).
3    BY MR. WAYNE:
4    Q.   Before the break, you testified that you
5    recall there were several Brazilian employees
6    speaking Portuguese approximately 25 feet from
7    where you were standing, correct?
8    A.   Yes.
9    Q.   Do you recall how many Portuguese employees
10   there were or Portuguese speaking employees?
11   A.   Between six and eight.
12   Q.   Do you recall anything about the nurse's name?
13   A.   No.
14   Q.   Do you know whether the nurse heard them
15   speaking a non-English language at that time?
16   A.   Sorry. Can you repeat the question again?
17   Q.   Do you know whether the nurse heard these
18   people speaking a non-English language at that
19   time?
20   A.   Yeah.
21   Q.   And how do you know that the nurse heard them
22   speaking in a non-English language?
23   A.   It was the same, like, from 25, 30 feet from
24   me and they were -- the Brazilians were talking

8 (Pages 26 to 29)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

30

1    one to the other in Portuguese because they
2    working in PCA. What else? CNA. So they
3    communicate to each other like that.
4    Q. Okay.
5    A. It's okay for Brazilians but not for Spanish
6    people.
7    Q. How do you know that the nurse heard them
8    speaking in Portuguese?
9    A. Because, like I said, they was like 25, 30
10   feet away from me. It was the same spot from the
11   nurse to the Brazilians. They had their dining
12   room to the nurse station. That is across the
13   hall right there. If your turn to your left or
14   right, all the rooms right there for residents
15   and they are working together and they are
16   talking Portuguese even inside the rooms. Nobody
17   says anything to the Brazilians.
18   Q. Now, in regard to the fact that the Portuguese
19   employees -- Strike that.
20      That the Brazilian employees were speaking
21   Portuguese, did you bring to the nurse's
22   attention that the Brazilian employees were
23   speaking Portuguese 25 feet away?
24   A. No, sir. No.

31

1    Q. Okay.
2    A. We just make comment, Jeffrey and me, why it's
3    okay for the Brazilians to talk in Portuguese and
4    it's not okay for us to speak Spanish.
5    Q. Did you say that to the nurse?
6    A. No. Jeffrey. This was my coworker.
7    Q. And Jeffrey said that to the nurse at this
8    time?
9    A. No.
10   Q. Did he just say it to you?
11   A. Yes. We just make comment, you know.
12   Q. At some later date, did you speak to
13   Mr. Larouche and ask him why the nurse allowed
14   the Brazilian employees to speak Portuguese on
15   that floor?
16   A. No. Another person who would complain because
17   other people speak other languages, you know,
18   that is not my problem. That's the nurse or the
19   boss to say something. Not me. So I am not the
20   kind of person who points and say, Mike, what
21   happened to this guy. No. That is not me.
22   Q. So is it fair to say that you never complained
23   to anyone other than Jeffrey that the Brazilians
24   were allowed to speak Portuguese and it was

32

1    unfair that you had to speak English?
2    A. Yes. We make a comment to each other. You
3    know, most of the coworkers. Daisy Santiago,
4    Myrna, George Santiago, Jeffrey. We always
5    making comments why they don't say anything to
6    the Brazilians and we are not allowed to speak
7    Spanish. Even when no residents are around or
8    sometimes when we take the break in the lunchtime
9    downstairs there are no residents in there. It's
10   just workers. Sometimes we are not allowed to
11   speak Spanish in there. All depends who is
12   taking the break over there. We are not allowed
13   to speak Spanish. If we talk Spanish they go
14   shsh.
15   Q. Now, in regard to making complaints about the
16   Brazilians speaking Portuguese and you not being
17   allowed to speak Spanish, did you ever make that
18   complaint to any manager of Whitney Place?
19   A. No. Not me. Like I say, another kind of
20   person.
21   Q. Now, you say in answer to interrogatory 3 that
22   during the beginning of your employment,
23   "Plaintiff was in the residents' dining room
24   beginning the process of painting the walls. No

33

1    residents were present. Plaintiff was told by
2    Jack Curtain not to speak Spanish. Plaintiff
3    states he has no knowledge of the English
4    language rule." You indicated earlier that you
5    believed you began employment in February 2000,
6    correct?
7    A. Yes.
8    Q. Did this incident occur sometime around
9    February of 2000?
10   A. Yes. No. That was after. So that was in
11   April.
12   Q. When Mr. Curtain told you not to speak
13   Spanish, was there anybody else present?
14   A. George Santiago.
15   Q. Was Mr. Santiago helping you paint?
16   A. Yes. There was some maintenance. That is
17   when Jeffrey say I get in trouble if they hear
18   you guys talking in Spanish. He was, you know, a
19   good person. One of a kind. Nice person. Not a
20   mean person or nothing like that.
21   Q. When Mr. Curtain told you not to speak
22   Spanish, did he take any other action against
23   you?
24   A. No. Like I say, he was one of a kind. Nice

9 (Pages 30 to 33)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

34

1    person. He was not like a boss. He was like a
2    brother. You know, if you need something he was
3    there for you.
4    Q.  You state that in answer to interrogatory 3,
5    "Plaintiff states that on the day he was
6    terminated he was working in the dining room next
7    to Wilson with a coworker. Plaintiff and the
8    coworker were speaking Spanish. No residents
9    were present. Jeffrey and Michael Larouche
10   approached the two and told them not to speak
11   Spanish." When you say the dining room next to
12   Wilson, what floor is that?
13   A.  Second floor.
14         MS. ALTAMORE: Just as a matter of
15   point, that answer was corrected on the
16   interrogatories that was handed to you today.
17         MR. WAYNE: I will go through that
18   also. I appreciate that.
19         BY MR. WAYNE:
20   Q.  Do you recall where you were speaking Spanish
21   on the second floor in Wilson?
22   A.  Yes.
23   Q.  Where was that?
24   A.  In the dining room.

35

1    Q.  Okay.
2    A.  No residents around. When you are going to
3    paint a wall or you are going to fix it, they
4    take everybody out of the dining room.
5    Q.  When you talk about the dining room, you are
6    talking about the second-floor residents' dining
7    room?
8    A.  Yes.
9    Q.  You refer to an individual named Jeffrey. You
10   say, "Jeffrey and Michael approached the two and
11   told them not to speak Spanish." Do you know
12   Jeffrey's last name?
13   A.  No.
14   Q.  Is this a different Jeffrey than the Jeffrey
15   you spoke about before?
16   A.  Same Jeffrey.
17   Q.  So this is the Jeffrey who speaks Spanish and
18   English?
19   A.  Yes.
20   Q.  Jeffrey was a coworker of yours?
21   A.  Yes.
22   Q.  Meaning that he was a maintenance person?
23   A.  Yes.
24   Q.  Do you recall anything else that Mr. Larouche

36

1    said to you at that time?
2    A.  That was the time when I was with Jeffrey. He
3    would say that, and then he told me he was the
4    one -- he is the quarterback and he was the one
5    who is running the show and then he pushed me in
6    the shoulder with his finger, and that is when he
7    tell me, I'm the quarterback. I'm the one who is
8    running the show. Then he walked away. I told
9    him, don't touch me. He walked away from me.
10   Q.  Why did he -- Strike that.
11         When he told you that he was the quarterback
12   and running the show, what did you say to him in
13   response?
14   A.  I said to him, don't touch me because he
15   pushed me with a finger in my shoulder. So I
16   told him, don't touch me. He walked away from
17   me.
18   Q.  Before Mr. Larouche approached, what did he
19   say? Strike that.
20         What were you doing?
21   A.  We were fixing a wall in the dining room on
22   Wilson on the second floor.
23   Q.  Did you have a work order to fix the wall in
24   the dining room on the second floor?

37

1    A.  Yes.
2    Q.  Did you ask Mr. Larouche why he said to you
3    that he was the quarterback?
4    A.  No.
5    Q.  Do you know why Mr. Larouche said that?
6    A.  No. No idea.
7    Q.  Was Mr. Santiago supposed to be working with
8    you at that time?
9    A.  No.
10   Q.  Was Mr. Larouche concerned that Mr. Santiago
11   had been given another job assignment that
12   morning? Is that why he said to you that --
13         MS. ALTAMORE: Objection.
14         BY MR. WAYNE:
15   Q.  Is that why he said to you that he was the
16   quarterback?
17   A.  No.
18   Q.  To clarify the record, is it your
19   understanding that Mr. Santiago was supposed to
20   be working with you in that dining room at the
21   time fixing the wall?
22   A.  No. That could be another day but not the
23   same day. When this happened, this happened with
24   Jeffrey. There are so many incidents that

10 (Pages 34 to 37)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

38

1    happened to me with Mike. Most of the time I was
2    working with George and sometimes with this guy
3    Jeffrey. This is another accident that happened
4    to me with Mr. Larouche.
5    Q.  In addition to what you've testified to and
6    what you've answered in the draft
7    interrogatories, were there any other incidents
8    in which you were told not to speak Spanish?
9    A.  Yup.
10   Q.  What other incidents? Can you tell me the
11   other incidents?
12   A.  One I was in Thayer with Daisy Santiago and
13   Jennifer Carlson, she approached us and she said,
14   don't speak Spanish. We was in the dining room
15   in Thayer. No residents around when this
16   happened.
17   Q.  Where is Thayer located?
18   A.  That is on the third floor. She got an office
19   in Thayer.
20   Q.  When we talk about the dining room, that is
21   the residents' dining room on the third floor?
22   A.  Yes. No residents around.
23   Q.  Can you recall any other incidents in which
24   you were told not to speak Spanish while employed

39

1    by Whitney Place?
2    A.  In the break room downstairs, when we take the
3    break, there was Jennifer Carlson and -- what is
4    the name? I don't remember the name right now.
5    (Witness reviewing document). Fred. It was
6    Fred. We talking in Spanish. They say shsh. We
7    were talking in Spanish. That means what? Don't
8    speak Spanish in here. We are taking the break
9    downstairs with no residents because the dining
10   room is full of workers.
11   Q.  When did that occur?
12   A.  I believe I guess this is 2000 and I guess in
13   September.
14   Q.  And at that time, did you know that there was
15   a rule at Whitney Place limiting the times and
16   places that you could speak Spanish?
17   A.  No.
18   Q.  At that time that they said shsh to you when
19   they heard you speaking Spanish in the break
20   room, were you working under the supervision of
21   Mr. Larouche at that time?
22   A.  No.
23   Q.  Were you --
24   A.  Jack Curtain.

40

1    Q.  After this incident occurred, did you approach
2    Mr. Curtain and tell him about this incident?
3    A.  Again, another kind of person.
4    Q.  After that incident occurred in the break
5    room, did Whitney Place take any action against
6    you for speaking Spanish in the break room?
7    A.  No.
8    Q.  In addition to the incidents that you've
9    previously testified to, are there any other
10   incidents in which you were told not to speak
11   Spanish while employed by Whitney Place?
12   A.  In the third floor, in Broadmore, I was
13   talking with Daisy Santiago. We were talking in
14   the dining room. I believe this was in the
15   morning and no residents around and we were
16   talking in Spanish. She goes, don't speak
17   Spanish. She always say, don't speak Spanish.
18   She just walk away from us.
19   Q.  Do you recall the date that that incident
20   occurred?
21   A.  No.
22   Q.  When you say the dining room, that is the
23   residents' dining room?
24   A.  Yes.

41

1    Q.  Okay.
2    A.  No residents at that time in the dining room.
3    That is when you getting ready the breakfast for
4    the residents. So the residents are in the
5    rooms.
6    Q.  After you were told during that incident not
7    to speak Spanish, was any other action taken
8    against you by her, by Ms. Pecora?
9    A.  No.
10   Q.  Could Daisy speak English?
11   A.  No.
12   Q.  Aside from the incidents that you have
13   testified to, are there any other incidents that
14   you recall in which you were told not to speak
15   Spanish?
16   A.  I don't remember right now, no.
17   Q.  Are there any other incidents that you can
18   testify to that you recall that you have not
19   testified to in which you were reminded not to
20   speak Spanish?
21   A.  There are so many, but they pass already three
22   years, and I don't remember every single detail.
23   There was many more than those accidents. There
24   are more than those. It's so many years that,

11 (Pages 38 to 41)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

42

1    you know, it's hard for me to remember every
2    single detail.
3    Q.  Did you ever receive -- other than being
4    reminded not to speak Spanish, was any other
5    action taken against you when you spoke Spanish?
6    A.  No.  Just Mike Larouche, he was mad at me that
7    day when he told me to be polite, don't speak
8    Spanish in front of him with Carmen when she
9    don't speak English.
10   Q.  Aside from the incidents that you've testified
11   to, were there any other events in which you saw
12   a person employed by Whitney Place tell someone
13   other than yourself to stop speaking Spanish?
14   A.  Can you repeat that question again please?
15   Q.  In other words, you were not told not to speak
16   Spanish, but you observed another Spanish
17   speaking person being told not to speak Spanish?
18   A.  I was told, don't speak Spanish.
19   Q.  But did you ever observe an employee of
20   Whitney Place walking up to another Spanish
21   speaking person?
22   A.  Yes.  Pecora.
23   Q.  And whom did she tell?
24   A.  To Daisy Santiago, George Santiago, Myrna

43

1    Famania.
2    Q.  And in regard to the incident between Ms.
3    Pecora and Daisy, were those incidents different
4    than the incidents that you've previously
5    testified?
6    A.  Different.
7    Q.  And where did the incident with Daisy occur?
8    A.  Where?
9    Q.  Yes.
10   A.  It was in Thayer.
11   Q.  That is the third floor?
12   A.  Third floor.
13   Q.  You observed Ms. Pecora coming up to Daisy and
14   telling her not to speak Spanish?
15   A.  Yes.
16   Q.  To whom was Daisy speaking Spanish?
17   A.  She was talking to Myrna Famania. That is
18   Myrna's floor where she works, PCA.
19   Q.  And where on the third floor did this
20   conversation occur?
21   A.  In the back of the hallway where they have
22   like some furniture for the residents to relax in
23   there, but there are no residents around.
24   Q.  What do you remember Ms. Pecora saying to

44

1    Daisy and Myrna?
2    A.  Don't speak Spanish because they are going to
3    confuse the residents.  There are no residents
4    around.
5    Q.  And did Myrna respond to Ms. Pecora at that
6    time?
7    A.  No.
8    Q.  Did she say anything?
9    A.  We had a lot of respect for those people.
10   Q.  Why did you have respect for Louise Pecora?
11   A.  Well, when you are Spanish and you come to
12   this country, you look at the other people,
13   American people, like more respect, and if they
14   say something to you, sometimes you are afraid to
15   get in trouble, get fired or something like that.
16   So you have more respect, and you don't give any
17   like answer why you say that.
18   Q.  Do you know whether Ms. Pecora spoke Spanish?
19   A.  No.
20   Q.  Do you know whether Ms. Pecora took any action
21   against Daisy?
22   A.  No.
23   Q.  Do you know whether she took any action
24   against Myrna about that incident?

45

1    A.  No.
2    Q.  Were there any other incidents that you
3    observed involving Daisy when someone reminded
4    her not to speak Spanish?
5    A.  No.
6    Q.  In regard to George Santiago, do you recall
7    any different incidents where you observed Mr.
8    Santiago being told not to speak Spanish other
9    than what you've testified to?
10   A.  No.
11   Q.  In regard to Myrna and aside from this event
12   involving Daisy and Ms. Pecora, do you recall any
13   other time that Myrna was told not to speak
14   Spanish?
15   A.  Yes.  By Jennifer Carlson.
16   Q.  Where did that occur?
17   A.  That is in Broadmore.
18   Q.  Broadmore?
19   A.  Yes.
20   Q.  I don't want to confuse you, but let me just
21   go back to the last issue.  At the time that you
22   saw Ms. Pecora approach Daisy Santiago and Myrna
23   Famania and remind them not to speak Spanish, do
24   you recall what date that occurred?

12 (Pages 42 to 45)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 46 |
| --- |

1  A.  I believe that was in 2001. I guess that was
2   in July.
3  Q.  Now, going back now to Myrna and Jennifer
4   Carlson on Broadmore, what floor is that?
5  A.  Broadmore, that was the third floor. Just one
6   wall, one door to cross. One hall from Thayer to
7   Broadmore.
8  Q.  So the third floor is divided in two; one side
9   is Broadmore and one side is Thayer?
10  A.  Yes.
11  Q.  So this incident occurred on the third floor
12   on the Broadmore side?
13  A.  Yes.
14  Q.  And it involved Myrna and Jennifer Carlson.
15   Do you recall what happened at that time?
16  A.  She told Myrna to don't speak Spanish. She
17   was the person in charge of recreation.
18  Q.  Do you recall -- Strike that.
19    At that time was Myrna speaking Spanish?
20  A.  Yes.
21  Q.  To whom?
22  A.  No residents around.
23  Q.  Do you know to whom she was speaking?
24  A.  Daisy Santiago.

| 47 |
| --- |

1  Q.  Okay.
2  A.  She was housekeeping. So you open one door
3   and you kind of go the other.
4  Q.  And at this point in time, do you recall what
5   exactly Jennifer Carlson said to Myrna and Daisy
6   in regard to speaking Spanish?
7  A.  Like, don't speak Spanish because you confuse
8   the residents. No resident around when this
9   accident happened.
10  Q.  After you -- where were you standing when this
11   happened?
12  A.  I was doing one room. Cleaning a room. One
13   of the residents had an accident, so I was with
14   machine cleaning the rug.
15  Q.  Did Myrna respond?
16  A.  Nothing.
17  Q.  Did Daisy respond?
18  A.  No.
19  Q.  Do you know whether Ms. Carlson took any
20   further action against Myrna?
21  A.  No.
22  Q.  Do you know whether Ms. Carlson took any
23   action against Daisy as a result of that
24   incident?

| 48 |
| --- |

1  A.  No.
2  Q.  Do you recall any other incidents involving
3   Myrna being told not to speak Spanish?
4  A.  No.
5  Q.  Do you recall any other Spanish speaking
6   employees being told not to speak Spanish, any
7   other incidents that you have not testified to?
8  A.  No.
9  Q.  Are you presently employed?
10  A.  Yes.
11  Q.  By whom are you employed?
12  A.  By Natick High School. Town of Natick. I
13   have three years working in the town, in the
14   school system.
15  Q.  And who is your supervisor there?
16  A.  Peter Henderson.
17  Q.  What is his telephone number?
18  A.  I don't remember at this time.
19  Q.  Is Mr. Henderson an employee of the Natick
20   School System?
21  A.  Yes.
22  Q.  How much are you presently getting paid at
23   your job at the Natick School System?
24  A.  Right now or when I start?

| 49 |
| --- |

1  Q.  Right now.
2  A.  14.60.
3  Q.  And approximately when did you start, your
4   date of hire?
5  A.  2002, December 16th to present, to now.
6  Q.  How much money were you making at the time
7   that you started?
8  A.  13.40.
9  Q.  Prior to becoming employed by Natick High
10   School, did you have a job?
11  A.  Yes.
12  Q.  By whom were you employed at that time?
13  A.  Before Natick High School?
14  Q.  Yes.
15  A.  Sunlife in Newton and a nursing home by Jack
16   Curtain. I was part time only, weekends,
17   maintenance.
18  Q.  How long did you have that job?
19  A.  Like five months.
20  Q.  Did you leave that job to take the job at
21   Natick High School?
22  A.  Yes.
23  Q.  Okay.
24  A.  Better benefits, more money.

13 (Pages 46 to 49)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

50

1   Q.   Approximately how much money did you make a
2       week at Sunlife?
3   A.   400, 450, something like that. It was only
4       part time on weekends.
5   Q.   Prior to working at Sunlife, do you recall if
6       you had a job?
7   A.   Well, before I have a job with Sara Goods.
8       That was in '98, to 2000.
9   Q.   So that was a position prior to the time that
10      you went to Whitney Place?
11  A.   Yes.
12  Q.   But between the time that you left Whitney
13      Place and the time that you went to Sunlife, did
14      you have employment?
15  A.   Cumberland Farms. It was their warehouse in
16      Westboro I believe.
17  Q.   Do you recall your dates of employment with
18      Cumberland Farms?
19  A.   I don't understand the question.
20  Q.   Do you recall when you were hired by
21      Cumberland Farms?
22  A.   Yes.
23  Q.   What date was that?
24  A.   That was 2002. Like March 2002.

51

1   Q.   Were you employed by Cumberland Farms at the
2       same time that you were working for Whitney
3       Place?
4   A.   No.
5   Q.   Okay.
6   A.   I got fired in 2002 at Whitney Place.
7   Q.   So you were terminated from Whitney Place. Do
8       you recall what date that was?
9   A.   February 2002.
10  Q.   You believe it was February 2002?
11  A.   I guess. Right? Yeah.
12  Q.   How long was it between the time that you were
13      terminated from Whitney Place and the time you
14      began working at Cumberland Farms?
15  A.   I don't remember at this time.
16  Q.   Okay. Do you recall whether it was longer
17      than a month?
18  A.   No.
19  Q.   Were you employed full time or part time at
20      Cumberland Farms?
21  A.   Temporary for three months and after you get
22      hired like full time.
23  Q.   So you were hired as a temporary employee
24      originally?

52

1   A.   Yes.
2   Q.   Did you leave Cumberland Farms to be employed
3       by Sunlife?
4   A.   No. To Natick High School.
5   Q.   Did you work at -- were you working two jobs,
6       Cumberland Farms and Sunlife, at the same time?
7   A.   That was a part-time job at Sunlife for me.
8   Q.   But what about Cumberland Farms?
9   A.   Not when I was working at Cumberland Farms.
10      When I worked at the high school I was working
11      Sunlife part-time job, weekends; and Monday
12      through Friday I work in the high school.
13  Q.   Were you working at Sunlife before you went to
14      Natick High School?
15  A.   Yeah.
16  Q.   And you were working at Cumberland Farms
17      before you went to work at Natick High School?
18  A.   Yes.
19  Q.   Were you working at Cumberland and Sunlife at
20      the same time?
21  A.   No.
22  Q.   Okay. Did you leave Cumberland Farms to work
23      at Sunlife?
24  A.   No.

53

1   Q.   What happened at Cumberland?
2   A.   To work at Natick High School.
3   Q.   Okay. You testified that you were terminated
4       at Whitney Place. What was the basis of your
5       termination?
6   A.   I don't know. I don't have -- he never gave
7       me explanation, Mike, when he fired me. He just
8       say, I was looking at you like group leader but
9       you disappointed me. Give me your key. Give me
10      your walkie-talkie. You are fired. That's it.
11      No reason. He didn't explain nothing to me.
12      Just give me key, walkie-talkie and fire me.
13  Q.   At the time of your termination, on the date
14      of your termination, had there been a mock
15      inspection of Whitney Place?
16  A.   Say that again.
17  Q.   Had Whitney Place employed a person to do an
18      inspection of Whitney Place? Do you recall that?
19  A.   No.
20  Q.   The answer is you don't recall?
21  A.   I don't understand the question.
22  Q.   Okay. On the date that you were terminated,
23      did you have a meeting with Mr. Larouche prior to
24      your termination?

14 (Pages 50 to 53)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

54

1   A.  He told me at lunchtime, he go, at two o'clock
2       I want to see you downstairs in my office.  So he
3       was there with other maintenance worker but that
4       was Jeffrey.  I don't remember.  I don't remember
5       the name of the other person right now.
6   Q.  Did you have a meeting in Mr. Larouche's
7       office concerning some issue that arose that day?
8   A.  That is what he told me.  He just closed the
9       door and told me, I was looking at you like a
10      group leader but you disappointed me.  Give me
11      the keys.  Give me walkie-talkie.  You are fired.
12      No explanation.  No reason.  He don't say why.
13      He don't give me no warning.  Nothing.  He just
14      fired me just like that.
15  Q.  There was another person in the room at the
16      time?
17  A.  Yes.  I don't remember the name right now.
18      Another maintenance.  I believe he is still
19      working for Mike Larouche.
20  Q.  Was there was any other person present?
21  A.  No.
22  Q.  After you were terminated from Whitney Place,
23      did you file a claim for unemployment?
24  A.  Yes.

55

1   Q.  Did you receive unemployment benefits?
2   A.  No.  I was denied.  I went to Worcester for a
3       hearing and I lost the case.  It was Mike and
4       Bill McKinley for the witnesses for the case over
5       there.
6   Q.  Was there any other person who was a witness?
7   A.  On my side, George Santiago.
8   Q.  In addition to George Santiago and
9       Mr. McKinley and Mr. Larouche, was there any
10      other person present?
11  A.  No.
12  Q.  Do you know why you were denied unemployment?
13  A.  At this time I don't remember.
14  Q.  You said you went to Worcester for a hearing?
15  A.  Yes.
16  Q.  And was there a hearing officer who conducted
17      the hearing?
18  A.  Yes.
19  Q.  Did he write a decision?
20  A.  I don't remember it.  Yeah.
21  Q.  Okay.
22  A.  It's so many years.  I've been through a lot
23      of problems and good things and I don't remember.
24  Q.  Do you recall whether you read the decision?

56

1       Did you read a decision?
2   A.  I don't remember if it was me or my lawyer or
3       my wife.  I don't remember.  After I was hired by
4       the Natick High School I was so happy, you know.
5       I lost all my credit cards when that happened to
6       me.  My credit cards, everything, my credit.  I
7       have five kids to support.  Not easy for me.
8   Q.  Do you have any recollection in regard to what
9       the decision stated?
10  A.  I don't remember.
11  Q.  Do you recall whether the decision stated that
12      you used profanity and cursed at Mr. Larouche and
13      another manager at Whitney Place?
14  A.  No.  Well, I don't remember.
15  Q.  In regard to the times that you were reminded
16      not to speak Spanish, did you seek any medical
17      treatment?
18  A.  No.
19  Q.  In regard to being reminded not to speak
20      Spanish, do you remember aside from being
21      reminded and told, don't speak Spanish, do you
22      recall any other action that employees of Whitney
23      Place took against you?
24  A.  No.

57

1   Q.  Aside from reminding you?
2   A.  No.
3   Q.  Did you ever have a discussion with Mr.
4       Larouche about being told not to speak English
5       aside from what you testified to when he told you
6       not to speak Spanish?
7   A.  No.
8   Q.  Did you ever explain to Mr. Larouche that you
9       spoke Spanish only when the person you were
10      speaking to couldn't speak English?
11  A.  Yeah.
12  Q.  You told that to him?
13  A.  Yes.  He was using me for interpreter.  That
14      is why he was looking to me like a group leader
15      because I was the one who was interpreter for the
16      other coworkers.  He complained.  He calling me
17      on the radio.  I was the translator for the other
18      people, like George, like Daisy and other workers
19      like Carmen, Rosa.
20  Q.  Approximately how many persons employed at
21      Whitney Place while you were employed there only
22      spoke Spanish?
23          MS. ALTAMORE:  Objection.  Go ahead.
24  A.  I don't remember.

15 (Pages 54 to 57)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

58

1  Q.  Based upon what you just stated, would it be
2     fair to say that when Mr. Larouche needed someone
3     who could speak Spanish and English to
4     communicate to Spanish workers that he would call
5     you to act as his interpreter?
6  A.  Yes.
7  Q.  Okay.
8  A.  After that, then when he hired Jeffrey he was
9     the only interpreter too because he speaks both
10    languages.
11 Q.  So when there was -- when Mr. Larouche needed
12    to communicate with persons who did not speak
13    Spanish -- English he would -- and they only
14    spoke Spanish, he would utilize either you or
15    Jeffrey.
16 A.  Yes.  Even Jack, he used to use Myrna when she
17    was a housekeeping before she moved to PCA to
18    translate for the other coworkers.
19 Q.  Myrna now is a what?
20 A.  PCA.
21 Q.  Which is a patient care assistant?
22 A.  Yes.
23 Q.  But when you were working there Myrna was in
24    housekeeping?

59

1  A.  Housekeeping.
2  Q.  When you started at Whitney Place were you in
3     housekeeping?
4  A.  Jack hired me for housekeeping and using me in
5     maintenance too.  I was hired for housekeeping,
6     but he was using me for both jobs.
7  Q.  And at some point in time, did you only do
8     maintenance rather than housekeeping?
9  A.  Yes.
10 Q.  And --
11 A.  Just in case of emergency, they using me for
12    housekeeping.  Like cleaning a rug if the
13    residents have an accident or something like
14    that.  They was using me in there, but most of
15    the time I was doing maintenance.
16 Q.  During the period that you were employed at
17    Whitney Place, did you ever receive a raise?
18 A.  One quarter.  9.25, 9.50 in two years.
19 Q.  Did you consider it a promotion to go from
20    housekeeping to maintenance?
21 A.  Yup.
22 Q.  Okay.
23 A.  From housekeeping to maintenance, right?
24 Q.  Yes.

60

1  A.  Yes.
2  Q.  Now, in regard to Myrna, was Myrna employed by
3     Whitney Place before you were employed by Whitney
4     Place?
5  A.  Yes.
6  Q.  Approximately how long has Myrna been employed
7     by Whitney Place?
8  A.  Seven, eight years.  Since the company opened.
9     She was one of the first persons who get hired.
10 Q.  To the best of your knowledge, is Myrna still
11    employed by Whitney Place?
12 A.  Yes.
13 Q.  At the time you left the employ of Whitney
14    Place, was Myrna still in housekeeping?
15 A.  No.  She was already moved to PCA.
16 Q.  Did Myrna ever communicate to you that she
17    considered the move from housekeeping to PCA a
18    promotion?
19 A.  Yes.
20 Q.  Has Myrna ever communicated to you that since
21    you left the employee of Whitney Place she has
22    received wages, wage increases?
23 A.  No.
24 Q.  Did you ever observe Myrna translating for

61

1     Jack from English to Spanish and Spanish to
2     English?
3  A.  Yes.  When I was there, yes, for Daisy
4     Santiago, for Rosa, Carmen and another Rosa.  I
5     forgot the last name.  If he was -- Myrna -- like
6     I say, after that Jeffrey came and he was using
7     Jeffrey too.
8  Q.  And have you and Myrna spoken about this
9     lawsuit?
10 A.  Yeah.
11 Q.  In regard to the lawsuit, what damages have
12    you suffered?
13 A.  I lost all my credit cards.
14        MS. ALTAMORE:  Objection.
15 A.  Child support, my family, suffering because I
16    have five kids.
17 Q.  Now, in regard to your losses as a result of
18    this lawsuit, why are you saying that you lost
19    your credit cards because you were asked or you
20    were reminded on occasion to speak English rather
21    than Spanish?
22        MS. ALTAMORE:  Objection.  You can
23    answer.
24 A.  That's when I got fired by Mike Larouche.

16 (Pages 58 to 61)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

62

1    Then went to unemployment and declined against me
2    and --
3    Q.   How did being reminded not to speak Spanish
4    result in your losing your credit cards?
5    A.   I don't understand the question.
6    Q.   Well, I believe you testified that -- when I
7    asked you what damages you suffered in relation
8    to the lawsuit, you said that you lost your
9    credit cards, you had problems with your family,
10   you lost your job, is that correct?
11   A.   Yes.
12   Q.   And I am asking you in regard to being
13   reminded not to speak Spanish, how did that
14   relate to you losing your job?
15   A.   No.
16   Q.   Is there no relationship between --
17   A.   Between what happened to me?
18   Q.   Being reminded --
19   A.   No. Lost my -- no. I put the complaint
20   before I get fired. Before I got fired I put the
21   complaint for discrimination. That was before I
22   got fired by Mike. Like three weeks or a month
23   before that happened I was okay in my job. One
24   day for no reason he fired me just like that. No

63

1    warning. Nothing.
2    Q.   Do you recall any other instances in which
3    Mike told you not to speak Spanish because it was
4    not polite aside from the ones you've testified
5    to? Do you recall any other instances in which
6    Mr. Larouche stated to you that you should stop
7    speaking in Spanish in front of him because it
8    was not polite?
9    A.   The one with Jeffrey and Wilson, the break
10   room and the dining room.
11   Q.   And you also testified I believe to one
12   involving Carmen Rosa. Was there any other
13   instances that you remember?
14   A.   Right now?
15   Q.   Yes.
16   A.   I don't remember right now.
17   Q.   Okay.
18   A.   There have been so many years that I don't
19   remember every single detail.
20   Q.   Do you know an individual by the name of
21   Marlon?
22   A.   Who?
23   Q.   Marlon, do you know someone by that name?
24   A.   Marlon?

64

1    Q.   Marlon or Marla who worked at Whitney Place?
2    A.   No.
3             MS. ALTAMORE:  Male or female.
4             MR. WAYNE:  I don't know.
5    BY MR. WAYNE:
6    Q.   In regard to Jose Famania, you testified that
7    he is your brother?
8    A.   Yes. He is my brother.
9    Q.   During the period of time that you were
10   employed at Whitney Place, Jose was also employed
11   at Whitney Place?
12   A.   Yes.
13   Q.   At some point in time, if you know, did your
14   brother Jose claim that he was injured at work?
15   A.   Yeah.
16   Q.   And, if you know, at some point in time, did
17   Jose file a claim for worker's compensation?
18   A.   I don't know.
19   Q.   Do you know anything about Jose's worker's
20   compensation claim?
21   A.   No.
22   Q.   Do you know whether Jose ever received any
23   money arising from his worker's compensation
24   claim?

65

1    A.   No. That is his life.
2    Q.   Do you know whether Jose has a job at the
3    present time?
4    A.   No.
5    Q.   How often do you speak to Jose?
6    A.   Once in a while.
7    Q.   Do you speak to Jose about the lawsuit?
8    A.   Yes.
9    Q.   And what do you say to Jose about the lawsuit?
10   A.   Nothing. We are just waiting to see what
11   happens.
12   Q.   When was the last time that you spoke to Jose
13   about the lawsuit?
14   A.   Last week.
15   Q.   Do you recall what you said to Jose last week
16   about the lawsuit?
17             MS. ALTAMORE:  Objection.
18   BY MR. WAYNE:
19   Q.   Do you recall the conversation you had with
20   Jose last week about the lawsuit?
21   A.   No.
22   Q.   No recollection?
23   A.   No.
24   Q.   When was the last time you spoke to Myrna

17 (Pages 62 to 65)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 66 | |
|---|---|
| 1 | about the lawsuit? |
| 2 | A.  Like two weeks ago. |
| 3 | Q.  Do you recall what you said to Myrna about the |
| 4 | lawsuit? |
| 5 | A.  No.  Just my lawyer went to the house for |
| 6 | the -- |
| 7 | MS. ALTAMORE: Objection.  You can |
| 8 | answer. |
| 9 | BY MR. WAYNE: |
| 10 | Q.  Do you recall what you said to Myrna about the |
| 11 | lawsuit? |
| 12 | A.  I don't understand the question.  That is why |
| 13 | I can't answer. |
| 14 | Q.  Well, did you have a conversation with Myrna |
| 15 | two weeks ago about the lawsuit? |
| 16 | A.  About the papers, when the lawyer went to |
| 17 | Jose's house to -- |
| 18 | Q.  Is that what you recall discussing with Myrna, |
| 19 | that the lawyer went to visit you? |
| 20 | A.  Yeah. |
| 21 | Q.  Do you recall anything -- |
| 22 | A.  I don't want to talk about this.  It gives me |
| 23 | so much stress.  I don't want to be here.  I am |
| 24 | here for what happened to me, this discrimination |

| 67 | |
|---|---|
| 1 | against me but I am happy with my job.  I'm |
| 2 | working.  I have a good life right now so far. |
| 3 | Everything is going good for me. |
| 4 | Q.  Does thinking about the lawsuit give you |
| 5 | stress? |
| 6 | A.  What happened to me with Whitney Place, that |
| 7 | gives me stress. |
| 8 | Q.  Does the lawsuit give you stress? |
| 9 | A.  What happened to me with Whitney Place, you |
| 10 | know, don't let me speak Spanish, that gives me |
| 11 | stress.  That made me feel like -- I don't know |
| 12 | -- bad.  Every time I remember what happened to |
| 13 | me in that place I feel down. |
| 14 | Q.  Do you feel any stress about the lawsuit? |
| 15 | A.  About what happened to me at Whitney Place. |
| 16 | Q.  So you don't feel any stress about the |
| 17 | lawsuit?  You feel no stress about the lawsuit? |
| 18 | A.  Can I talk to my lawyer? |
| 19 | Q.  If you answer the question you can talk to |
| 20 | your lawyer. |
| 21 | A.  Yeah. |
| 22 | MR. WAYNE: Do you want to take a |
| 23 | break? |
| 24 | MS. ALTAMORE: Just a quick one. |

| 68 | |
|---|---|
| 1 | (Attorney-client conference). |
| 2 | BY MR. WAYNE: |
| 3 | Q.  What type of stress do you feel about the |
| 4 | lawsuit? |
| 5 | A.  Mental. |
| 6 | Q.  When you went to Whitney Place to apply for a |
| 7 | job, did you fill out an employment application? |
| 8 | A.  I don't remember.  No.  I was working for Sara |
| 9 | Goods, and then from Sara Goods I went to Whitney |
| 10 | Place.  That was a farm with horses.  She is a |
| 11 | lawyer.  Her husband is a doctor.  I work like |
| 12 | three years in there with her.  No problem. |
| 13 | Q.  I think you misunderstood the question.  When |
| 14 | you went to apply for a job at Whitney Place, did |
| 15 | they have an application form that you needed to |
| 16 | complete? |
| 17 | A.  Okay. |
| 18 | Q.  Do you recall that? |
| 19 | A.  Yes. |
| 20 | Q.  And do you recall completing that form on your |
| 21 | own? |
| 22 | A.  Yes. |
| 23 | Q.  I haven't asked you this question before but, |
| 24 | Mr. Famania, you can read English also, can't |

| 69 | |
|---|---|
| 1 | you? |
| 2 | A.  Yes. |
| 3 | Q.  You can write English? |
| 4 | A.  No. |
| 5 | Q.  Is it your testimony that you can't write |
| 6 | English? |
| 7 | A.  Yes.  I don't went to school in here. |
| 8 | Q.  A short time ago you testified that you |
| 9 | completed an application for employment at |
| 10 | Whitney Place.  Do you recall being asked that |
| 11 | question? |
| 12 | A.  Yes.  It's not hard to write for you if you |
| 13 | are going to write housekeeping or kitchen.  It's |
| 14 | not hard, but if you write whole thing it's going |
| 15 | to be hard for me, but just putting housekeeping, |
| 16 | what I work before, that is easy. |
| 17 | Q.  You can read the questions? |
| 18 | A.  Yes. |
| 19 | Q.  And you could write the answers to the |
| 20 | questions -- |
| 21 | A.  No. |
| 22 | Q.  -- on the employment application? |
| 23 | A.  No. |
| 24 | |

18 (Pages 66 to 69)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| | 70 |
|---|---|
| 1 | (Exhibit No. 4 marked |
| 2 | for identification). |
| 3 | BY MR. WAYNE: |
| 4 | Q. I would like to refer you to Exhibit 4, which |
| 5 | on the top reads the Willows at Westboro, |
| 6 | Beaumont Rehabilitation Nursing Centers. The |
| 7 | first blank line says name and it say Gilberto |
| 8 | Famania. Is that your handwriting? |
| 9 | A. Yes. |
| 10 | Q. Where it says position desired, housekeeping, |
| 11 | is that your handwriting? |
| 12 | A. Yes. |
| 13 | Q. Where it says work experience, 4/98 to 2/2000 |
| 14 | Sara Goods, is that your handwriting also? |
| 15 | A. Yes. |
| 16 | Q. Did you complete this employment application |
| 17 | on your own? |
| 18 | A. Yes. |
| 19 | Q. At some point in time -- Strike that. |
| 20 | MR. WAYNE: Can I have five minutes |
| 21 | please? |
| 22 | MS. ALTAMORE: Sure. |
| 23 | (Break taken). |
| 24 | MR. WAYNE: I have no further |

| | 72 |
|---|---|
| 1 | Strike that. |
| 2 | When you were hired by Whitney Place at |
| 3 | Natick, were you given an employee handbook? |
| 4 | A. No. |
| 5 | Q. At any point after your hiring at Whitney |
| 6 | Place at Natick, were you given an employee |
| 7 | handbook? |
| 8 | A. No. |
| 9 | Q. And when you were hired, what position did you |
| 10 | take? |
| 11 | A. Housekeeping. |
| 12 | Q. Were you ever officially hired in maintenance? |
| 13 | A. No. |
| 14 | Q. Why did you testify that you ended up in |
| 15 | maintenance? |
| 16 | A. I was doing both jobs. They hired me for |
| 17 | housekeeping, then Jack finds out that I know how |
| 18 | to do the maintenance jobs. So he was using me |
| 19 | some both positions. |
| 20 | Q. You testified that you had received a |
| 21 | 25-cent-an-hour raise, correct? |
| 22 | A. Yes. |
| 23 | Q. Was that increase due to your transfer to |
| 24 | maintenance? |

| | 71 |
|---|---|
| 1 | questions. |
| 2 | MS. ALTAMORE: I actually just have a |
| 3 | couple questions. |
| 4 | EXAMINATION BY MS. ALTAMORE: |
| 5 | Q. How did you feel when Mr. Curtain told you not |
| 6 | to speak Spanish but to speak English? |
| 7 | A. I feel bad. I feel like nobody, like trash. |
| 8 | Q. How did it feel when Mr. Mike Larouche told |
| 9 | you not to speak Spanish but to speak English? |
| 10 | A. I feel the same way. It's not easy to hear |
| 11 | somebody telling you, don't speak Spanish, speak |
| 12 | English when that is your language. So you feel |
| 13 | bad. You don't feel good. You hurt inside. |
| 14 | Q. Have you ever read the English language rule |
| 15 | belonging to Whitney Place in Natick? |
| 16 | A. No. |
| 17 | Q. Have you ever heard about an English language |
| 18 | rule? |
| 19 | A. No. Never. |
| 20 | Q. Have you ever seen an English language rule |
| 21 | posted at Whitney Place at Natick while you were |
| 22 | employed there? |
| 23 | A. No. Never. |
| 24 | Q. When you were employed, when you were hired -- |

| | 73 |
|---|---|
| 1 | A. No. That I know, no. |
| 2 | MS. ALTAMORE: I have nothing |
| 3 | further. |
| 4 | MR. WAYNE: Could I have that |
| 5 | document marked please? |
| 6 | (Exhibit No. 5 marked |
| 7 | for identification). |
| 8 | EXAMINATION BY MR. WAYNE: |
| 9 | Q. I refer your attention to the document marked |
| 10 | as Exhibit Number 5. It says acknowledge and |
| 11 | receipt of employee handbook. Is that your |
| 12 | signature? |
| 13 | A. Yes. |
| 14 | Q. In regard to being -- Strike that. |
| 15 | Is it fair to say that it's your preference to |
| 16 | speak Spanish rather than English? |
| 17 | A. Excuse me? |
| 18 | Q. Is it fair to say that your preference would |
| 19 | be to speak Spanish rather than English? |
| 20 | A. I don't mind. I speak both. All depends with |
| 21 | the person that is next to me. If he is speaking |
| 22 | English, I speak English. If he speaks Spanish, |
| 23 | Spanish. |
| 24 | |

19 (Pages 70 to 73)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 74 | |
|---|---|
| 1 | (Exhibit No. 6 marked |
| 2 | for identification). |
| 3 | BY MR. WAYNE: |
| 4 | Q. I refer you to an exhibit marked |
| 5 | Infection/Exposure Control Quiz. Is that your |
| 6 | handwriting on this document? |
| 7 | A. Yes. |
| 8 | Q. Did you write the answers to these questions? |
| 9 | A. Yes. |
| 10 | MR. WAYNE: I have no further |
| 11 | questions. |
| 12 | MS. ALTAMORE: I have nothing |
| 13 | further. |
| 14 | (Whereupon the deposition |
| 15 | concluded at 12:35 p.m.). |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| 76 | |
|---|---|
| 1 | ATTACH TO THE DEPOSITION OF: Gilberto Famania |
| 2 | CASE: Jose Famania, et al vs. Whitney Place |
| 3 | DATE TAKEN: 1/10/06 |
| 4 | ERRATA SHEET |
| 5 | Please refer to page 75 for Errata Sheet |
| 6 | instructions and distribution instructions. |
| 7 | PAGE    LINE            CORRECTION |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | I have read the foregoing transcript |
| 17 | of my deposition and except for any corrections |
| 18 | or changes noted above, I hereby subscribe to the |
| 19 | transcript as an accurate record of the |
| 20 | statements made by me. |
| 21 | Executed this_____ day of __ _____, 2005. |
| 22 | |
| 23 | _____ |
| 24 | Gilberto Famania |

| 75 | |
|---|---|
| 1 | ERRATA SHEET DISTRIBUTION INFORMATION |
| 2 | DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS |
| 3 | |
| 4 | ERRATA SHEET DISTRIBUTION INFORMATION |
| 5 | The original of the Errata Sheet has |
| 6 | been delivered to Joan M. Altamore, Esquire. |
| 7 | When the Errata Sheet has been completed |
| 8 | by the deponent and signed, a copy thereof should |
| 9 | be delivered to each party of record and the |
| 10 | ORIGINAL forwarded to Richard Wayne, Esquire, to |
| 11 | whom the original deposition was delivered. |
| 12 | INSTRUCTIONS TO DEPONENT |
| 13 | After reading this volume of your |
| 14 | deposition, please indicate any corrections or |
| 15 | changes to your testimony and the reasons |
| 16 | therefor on the Errata Sheet supplied to you and |
| 17 | sign it. Do NOT make marks or notations on the |
| 18 | transcript volume itself. Add additional sheets |
| 19 | if necessary. Please refer to the above |
| 20 | instructions for Errata Sheet distribution |
| 21 | information. |
| 22 | |
| 23 | |
| 24 | |

| 77 | |
|---|---|
| 1 | COMMONWEALTH OF MASSACHUSETTS |
| 2 | COUNTY OF PLYMOUTH |
| 3 | |
| 4 | I, Kim M. Romaine, a Professional |
| 5 | Shorthand Reporter and Notary Public and for the |
| 6 | Commonwealth of Massachusetts, do hereby certify |
| 7 | that the foregoing deposition was taken before me |
| 8 | on January 10, 2006. |
| 9 | |
| 10 | The said witness, who provided |
| 11 | satisfactory evidence of identification, as |
| 12 | prescribed by Executive Order 455 (03-13) issued |
| 13 | by the Governor of the Commonwealth of |
| 14 | Massachusetts, was duly sworn before the |
| 15 | commencement of his testimony; that the said |
| 16 | testimony was taken stenographically by myself |
| 17 | and then transcribed. To the best of my |
| 18 | knowledge, the within transcript is a true and |
| 19 | accurate record of said testimony. |
| 20 | |
| 21 | I am not connected by blood or marriage |
| 22 | with any of the said parties, nor interested |
| 23 | directly or indirectly in the matter on |
| 24 | controversy. |

20 (Pages 74 to 77)

Gilberto Famania 1-10-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

78

1    In witness whereof, I have hereunto set my
2    hand and Notarial Seal this 18th day of January
3    2006.
4
5
6
7
8    Kim M. Romaine, Notary Public
9    In and for the Commonwealth of
10   Massachusetts
11   My Commission Expires:
12   August 31, 2012
13
14   PLEASE NOTE:
15
16   THE FOREGOING CERTIFICATION OF THIS
17   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
18   THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
19   CONTROL AND/OR DIRECTION OF THE CERTIFYING
20   REPORTER.
21
22
23
24

21 (Page 78)

Case 1:05-cv-10996-WGY    Document 34-3    Filed 02/27/2006    Page 1 of 14

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

1                    UNITED STATES FEDERAL DISTRICT COURT

2                    EASTERN DISTRICT OF MASSACHUSETTS

3

4                              CIVIL ACTION NO.:    0510996WGY

5        * * * * * * * * * * * * * * * * * * * *

6        JOSE FAMANIA, GILBERTO FAMANIA,

7        MYRNA FAMANIA and IDALIA ALERS,

8                Plaintiffs,

9        vs.

10       WHITNEY PLACE AT NATICK, INC.,

11               Defendant.

12       * * * * * * * * * * * * * * * * * * *

13

14               DEPOSITION OF IDALIA D. ALERS, taken on

15       behalf of the defendant, pursuant to the

16       Massachusetts Rules of Civil Procedure, before

17       Elizabette M. Afonso, Professional Shorthand

18       Reporter and Notary Public within and for the

19       Commonwealth of Massachusetts, at the law offices

20       of Hinckley, Allen, Snyder, 28 State Street,

21       Boston, Massachusetts, commencing at 10:35 a.m. on

22       Thursday, January 12, 2006.

23

24

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 2 | | | 4 | | |
|---|---|---|---|---|---|
| 1 | APPEARANCES: | | 1 | | EXHIBITS |
| 2 | | | 2 | | |
| 3 | LAW OFFICES OF JOAN M. ALTAMORE | | 3 | NO. | DESCRIPTION                PAGE |
| 4 | by Joan M. Altamore, Esquire | | 4 | | |
| 5 | 258 Elm Street | | 5 | 6 | Answers to interrogatories          26 |
| 6 | Suite 200 | | 6 | | |
| 7 | Somerville, Massachusetts  02144 | | 7 | | |
| 8 | 617.686.1719 | | 8 | | |
| 9 | On behalf of the plaintiffs | | 9 | | |
| 10 | | | 10 | | |
| 11 | HINCKLEY, ALLEN, SNYDER, LLP | | 11 | | |
| 12 | by Richard D. Wayne, Esquire | | 12 | | |
| 13 | 28 State Street | | 13 | | |
| 14 | Boston, Massachusetts  02109 | | 14 | | |
| 15 | 617.345.9000 | | 15 | | |
| 16 | On behalf of the defendant | | 16 | | |
| 17 | | | 17 | | |
| 18 | BENOIT INTERPRETING SERVICES | | 18 | | |
| 19 | Giselle Lahey, Interpreter | | 19 | | |
| 20 | 33 South Street | | 20 | | |
| 21 | P.O. Box 147 | | 21 | | |
| 22 | Northboro, MA  01532 | | 22 | | |
| 23 | 1-800-261-5152 | | 23 | | |
| 24 | | | 24 | | (Exhibits retained by counsel.) |

| 3 | | | 5 | | |
|---|---|---|---|---|---|
| 1 | INDEX | | 1 | | PROCEEDINGS |
| 2 | | | 2 | | |
| 3 | DEPONENT              PAGE | | 3 | | (Giselle Lahey, Interpreter, |
| 4 | | | 4 | | having been first duly sworn.) |
| 5 | IDALIA D. ALERS | | 5 | | |
| 6 | | | 6 | | IDALIA D. ALERS, |
| 7 | EXAMINATION BY MR. WAYNE        5, 48 | | 7 | | having been first duly sworn through |
| 8 | | | 8 | | interpretation, was examined and testified as |
| 9 | EXAMINATION BY MS. ALTAMORE        47 | | 9 | | follows: |
| 10 | | | 10 | | |
| 11 | EXHIBITS | | 11 | | MS. ALTAMORE:  Read and sign within seven |
| 12 | | | 12 | | days. |
| 13 | NO.  DESCRIPTION          PAGE | | 13 | | MR. WAYNE:  Sure. |
| 14 | | | 14 | | MS. ALTAMORE:  And reserve objections |
| 15 | 1   Complaint            5 | | 15 | | except as to form. |
| 16 | | | 16 | | MR. WAYNE:  And motions to strike, yes. |
| 17 | 2   Employment Application        8 | | 17 | | Can I have this document marked as |
| 18 | | | 18 | | Exhibit 1, please. |
| 19 | 3   Attachment No. 2          13 | | 19 | | (Exhibit No. 1, complaint, marked for |
| 20 | | | 20 | | identification.) |
| 21 | 4   Notice of Charge of Discrimination    14 | | 21 | | EXAMINATION |
| 22 | | | 22 | | BY MR. WAYNE: |
| 23 | 5   Spanish chronology statement      26 | | 23 | Q. | Can you please state your name? |
| 24 | | | 24 | A. | Idalia Alers. |

2 (Pages 2 to 5)

Case 1:05-cv-10996-WGY   Document 34-3   Filed 02/27/2006   Page 3 of 14

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

6

| | | |
|---|---|---|
| 1 | Q. | Could I ask this question without translation? |
| 2 | A. | Yes. |
| 3 | Q. | Do you speak any English? |
| 4 | A. | Only a little. |
| 5 | Q. | I'm going to try to ask questions in English |
| 6 | | without translation, but if you don't understand |
| 7 | | what I'm saying, please let me know. Did you |
| 8 | | understand what I said? |
| 9 | A. | Yes. |
| 10 | Q. | When I made the last statement I spoke in English |
| 11 | | and I asked you if you understood what I said, but |
| 12 | | before you answered the question, you turned to the |
| 13 | | translator and asked her a question in Spanish. |
| 14 | | When I go back to the last question, I |
| 15 | | asked you if you understood that I was going, at |
| 16 | | first, ask you questions in English, and if you |
| 17 | | don't understand what I said in English, we would |
| 18 | | ask the translator. |
| 19 | | Did you understand what I said without |
| 20 | | speaking to the translator? |
| 21 | A. | I understand a little. I don't understand, you |
| 22 | | know, a lot English. That's why is better for me |
| 23 | | she told me in Spanish, because I understand -- you |
| 24 | | know, I don't understand a lot English. |

7

| | | |
|---|---|---|
| 1 | Q. | Okay. I appreciate that Spanish is your first |
| 2 | | language, but what I'd like to do to start the |
| 3 | | deposition, to start this process, is to test your |
| 4 | | ability to understand English. |
| 5 | | MS. ALTAMORE: My only objection to that, |
| 6 | | and I understand the process and I'm not going to |
| 7 | | say not to do it, but for the record, my fear is this |
| 8 | | a deposition that's occurring January 12th, 2006 |
| 9 | | for the events -- and while the events transpired |
| 10 | | approximately 2001/2002 and over the course of |
| 11 | | those years, there probably has been a greater |
| 12 | | accumulation of English with Ms. Alers, so that |
| 13 | | it's not necessarily a true reflection of her |
| 14 | | English capabilities at the time the events |
| 15 | | transpired, and that's just to put that on the |
| 16 | | record otherwise. |
| 17 | | THE INTERPRETER: I asked her, "did you |
| 18 | | understand what your attorney said?" She said |
| 19 | | "no". |
| 20 | | MR. WAYNE: Would it be easier for you, |
| 21 | | the translator, if that was read back off the |
| 22 | | record, so that you could translate it to |
| 23 | | Ms. Alers. Would that be the best way to do it? |
| 24 | | THE INTERPRETER: Absolutely. |

8

| | | |
|---|---|---|
| 1 | | MR. WAYNE: So why don't we take the time |
| 2 | | to just read back the statement of Attorney |
| 3 | | Altamore and have it translated for the deponent. |
| 4 | | (Stenographer read back previous |
| 5 | | statement.) |
| 6 | | BY MR. WAYNE: |
| 7 | Q. | At the time you were employed at Whitney Place, did |
| 8 | | you understand any English? |
| 9 | A. | Very little. |
| 10 | Q. | At the time you were employed at Whitney Place, did |
| 11 | | you understand enough English so that you could |
| 12 | | perform your job? |
| 13 | A. | No. |
| 14 | Q. | When you had a question about performing your job |
| 15 | | and you did not understand the instruction you |
| 16 | | received because it was in English, how did you |
| 17 | | find out what you were instructed to do? |
| 18 | A. | I need to talk to another person talk Spanish, and |
| 19 | | that person tell the other in English. |
| 20 | | MR. WAYNE: Could I have this marked as |
| 21 | | Exhibit 2, please. |
| 22 | | (Exhibit No. 2, application, marked for |
| 23 | | identification.) |
| 24 | Q. | Exhibit 2 has a caption, "The Willows at Westboro, |

9

| | | |
|---|---|---|
| 1 | | Beaumont Rehabilitation and Skilled Nursing |
| 2 | | Centers," and is an employment application. Do you |
| 3 | | understand what I just said? |
| 4 | A. | No. |
| 5 | | MR. WAYNE: Could you please translate. |
| 6 | A. | (With translation.) Yes. |
| 7 | Q. | Ms. Alers, have you seen this document before? |
| 8 | A. | Yes. |
| 9 | Q. | Is that your signature next to the word "name"? |
| 10 | A. | Yes. |
| 11 | Q. | Did you complete this application when you applied |
| 12 | | for a job at Whitney Place? |
| 13 | A. | No. My friend help me. |
| 14 | Q. | And who was your friend? |
| 15 | A. | Gilberto. |
| 16 | Q. | And that's Gilberto Famania? |
| 17 | A. | Mm-hmm. |
| 18 | | MS. ALTAMORE: You have to answer |
| 19 | | verbally. |
| 20 | | THE WITNESS: Yes. |
| 21 | Q. | It's okay. Everyone does it. |
| 22 | | And at the time that you completed this |
| 23 | | application, was Gilberto Famania an employee of |
| 24 | | Whitney Place? |

3 (Pages 6 to 9)

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 10 | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Did Gilberto Famania tell you that there were jobs |
| 3 | | at Whitney Place, and that's why you applied for a |
| 4 | | job? |
| 5 | A. | Yes. |
| 6 | Q. | And if you remember, did Gilberto tell you that |
| 7 | | Whitney Place was a good place to work? |
| 8 | A. | Yes, he told me. |
| 9 | Q. | Do you remember approximately when you completed |
| 10 | | the application for employment -- the date? Year? |
| 11 | A. | Was May 16, 2001. |
| 12 | Q. | And why do you remember it being May 16th, 2001? |
| 13 | A. | I remember I come to Puerto Rico, like, three |
| 14 | | months before, and there was a Wednesday I go |
| 15 | | there. |
| 16 | Q. | And were you hired shortly after you filled out the |
| 17 | | application? |
| 18 | A. | Yes. |
| 19 | Q. | How long was it between the time you completed the |
| 20 | | application and you remember that you were hired? |
| 21 | A. | Was, like, on the week after, because I filled the |
| 22 | | application, and I need to start next Wednesday. |
| 23 | Q. | You said that Gilberto helped you with the |
| 24 | | completion of the application. Do you recall what |

| 11 | | |
|---|---|---|
| 1 | | help Gilberto gave you? |
| 2 | A. | Translation. |
| 3 | Q. | Do you remember what parts of the application |
| 4 | | Gilberto translated for you? |
| 5 | A. | Everything. |
| 6 | Q. | I'd like to go back and address Exhibit 1. I'd |
| 7 | | like you to turn to the last page, and do you see |
| 8 | | your signature on that page? |
| 9 | A. | Yes. |
| 10 | Q. | Before you signed the complaint, did you read it? |
| 11 | A. | I read part, because I read, you know, a little bit |
| 12 | | English, and my friend translate me what I don't |
| 13 | | understand. |
| 14 | Q. | And who was that friend? |
| 15 | A. | Carlos. |
| 16 | Q. | And what's his last name? |
| 17 | A. | Famania. |
| 18 | Q. | And is he related to Gilberto? |
| 19 | A. | His brother. |
| 20 | Q. | At the time you filled out that application for |
| 21 | | employment, were you living near the Famania |
| 22 | | family? |
| 23 | A. | Yes. |
| 24 | Q. | And how close were you living to the Famania |

| 12 | | |
|---|---|---|
| 1 | | family? |
| 2 | A. | I was very close friend. |
| 3 | Q. | And was your apartment near the apartment where the |
| 4 | | Famanias lived? |
| 5 | A. | Yes. |
| 6 | Q. | Were you living in the apartment next door to |
| 7 | | Gilberto? |
| 8 | A. | No. I was -- when I start, I was with him and |
| 9 | | after I moved. |
| 10 | Q. | So at the time that you started at Whitney Place, |
| 11 | | you and Gilberto were sharing an apartment? |
| 12 | A. | I stay with him, yes. |
| 13 | Q. | Were you born in Puerto Rico? |
| 14 | A. | Yes. |
| 15 | Q. | And what town in Puerto Rico were you born? |
| 16 | A. | Aguada. |
| 17 | Q. | And could you spell that for the stenographer? |
| 18 | A. | A-G-U-A-D-A. |
| 19 | Q. | And all times you had been a citizen of the United |
| 20 | | States? |
| 21 | A. | (With translation.) Yes. |
| 22 | | MR. WAYNE:  Can I have this document |
| 23 | | marked as Exhibit 3, please. |
| 24 | | |

| 13 | | |
|---|---|---|
| 1 | | (Exhibit No. 3, Attachment No. 2, marked |
| 2 | | for identification.) |
| 3 | Q. | Have you ever seen that document before? |
| 4 | A. | Yes. |
| 5 | Q. | And is that your signature? |
| 6 | A. | Yes. |
| 7 | Q. | And before signing that document, did you read the |
| 8 | | paragraph above it? |
| 9 | A. | No. Gilberto told me. |
| 10 | Q. | Gilberto translated that paragraph for you? |
| 11 | A. | Yes. |
| 12 | Q. | And when Gilberto translated that document for you, |
| 13 | | were you in the offices at Whitney Place? |
| 14 | A. | Yes. |
| 15 | Q. | And at that time, did someone who was employed by |
| 16 | | Whitney Place permit Gilberto to translate that |
| 17 | | document for you? |
| 18 | A. | (With translation.) Yes. |
| 19 | Q. | At some point in time, did you make a complaint to |
| 20 | | the Equal Employment Opportunity Commission? |
| 21 | A. | (With translation.) No. |
| 22 | Q. | At some point in time, did you ever sign a document |
| 23 | | that was given to you that made a complaint on your |
| 24 | | behalf about Whitney Place? |

4 (Pages 10 to 13)

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

14

1  A.   (With translation.) No.
2       MR. WAYNE: I'd like this marked as
3  Exhibit 4, please.
4       (Exhibit No. 4, Notice of Charge of
5  Discrimination, marked for identification.)
6  Q.   This document is marked as Exhibit 4, and on page
7  one, left-hand corner it says, "Equal Employment
8  Opportunity Commission," and lower down in the
9  center of the page it says, "Notice of Charge of
10 Discrimination," and in the top, right-hand corner
11 it says, "Person filing charge, Alers, Idalia D,
12 and on page two at the bottom, left-hand corner it
13 states, "I declare under penalty of perjury that
14 the foregoing is true and correct," and above the
15 date is the number "7-9-02," and above the words,
16 "charging party (signature)" is a signature that
17 reads "Idalia D. Alers."
18      Do you remember ever seeing this
19 document?
20 A.   (With translation.) I think so. It's been such a
21 long time. I don't remember this. Yes.
22 Q.   At some time do you remember meeting with a person
23 employed by the Equal Employment Opportunity
24 Commission?

15

1  A.   (With translation.) Like someone like the
2  attorney?
3  Q.   Do you remember meeting with a person employed by
4  the government regarding the document I showed you
5  which is Exhibit 4?
6  A.   (With translation.) I had an interview with
7  Janette, that's the attorney.
8  Q.   And do you remember giving Janette a statement?
9  A.   (With translation.) Yes.
10 Q.   And when you met with Janette, was it for the
11 purpose of obtaining information from you regarding
12 a complaint of discrimination?
13 A.   (With translation.) Yes.
14 Q.   Did Janette speak Spanish?
15 A.   Yes.
16 Q.   And do you recall how long you met with Janette to
17 give her your interview?
18 A.   (With translation.) That was in 2002.
19 Q.   But do you remember how much time you were in the
20 presence of Janette giving the interview?
21 A.   (With translation.) Like two hours.
22 Q.   And during that interview, did Janette give you the
23 opportunity to state all the complaints you had
24 against Whitney Place?

16

1  A.   (With translation.) Yes.
2  Q.   And at the end of that interview, did Janette ask
3  you if you've told her all the information that you
4  had regarding complaints about Whitney Place?
5  A.   (With translation.) Yes.
6  Q.   In regard to the statements you gave Janette, did
7  you complain about Mike Larouche?
8  A.   Yes.
9  Q.   And during the statement that you gave to Janette,
10 did you make complaints about any other persons at
11 Whitney Place?
12 A.   Yes.
13 Q.   And who were those persons?
14 A.   Louise Pecora.
15 Q.   And in addition to Michael Larouche and Louise
16 Pecora, was there any other person at Whitney Place
17 that you made a complaint?
18 A.   No.
19 Q.   At the time you gave the statement to Janette, did
20 she give you the opportunity to make complaints
21 about any other person at Whitney Place?
22 A.   Yes.
23 Q.   And although you had the opportunity to make
24 complaints about other persons at Whitney Place,

17

1  the only persons that you identified were Michael
2  Larouche and Louise Pecora?
3  A.   Yes.
4  Q.   If you recall, what complaints did you make to
5  Janette about Michael Larouche?
6  A.   (With translation.) I was in the second floor
7  cleaning a room for a new patient, and Eduardo was
8  helping me. He came. I was telling Eduardo
9  something in Spanish, and he told me, "You cannot
10 speak Spanish."
11      But there was no resident around, and I
12 told him, "If Eduardo doesn't speak English, I have
13 to say it in Spanish." And he said, "You cannot
14 speak Spanish."
15 Q.   Do you remember anything else about that
16 conversation?
17 A.   No.
18 Q.   Did you ask Michael Larouche at that time why can I
19 not speak Spanish?
20 A.   No.
21 Q.   After Mr. Larouche told you not to speak Spanish,
22 did he stay with you, or did he leave?
23 A.   No. He say very little. He say that I said, you
24 know -- he just said don't speak Spanish and then

5 (Pages 14 to 17)

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

18

1      he left.
2   Q.  After Mr. Larouche told you not to speak Spanish to
3      Eduardo and he left, at some later time, did you go
4      to speak to Mr. Larouche and ask him why you could
5      not speak Spanish to Eduardo?
6   A.  (With translation.) No.
7   Q.  After Mr. Larouche said to you that you could not
8      speak Spanish, did he give you any other warning
9      because you spoke Spanish to Eduardo?
10  A.  No.
11  Q.  In regard to this incident when Mr. Larouche told
12     you not to speak Spanish to Eduardo, did he give
13     you any discipline for speaking Spanish to Eduardo?
14  A.  No.
15  Q.  Do you remember the date that this event happened?
16  A.  It was in January.
17  Q.  And do you recall what year that was?
18  A.  (With translation.) 2002.
19  Q.  And why do you remember it being in January 2002?
20  A.  (With translation.) I was pregnant and I had left
21     and it was when I came back.
22  Q.  In addition to what you've stated about the
23     incident involving Mr. Larouche and Eduardo and
24     yourself, do you recall anything else that happened

19

1      at that time?
2   A.  No.
3   Q.  Do you recall any other times where Mr. Larouche
4      told you that you could not speak Spanish?
5   A.  (With translation.) No.
6   Q.  Do you remember any other person who was employed
7      by Whitney Place who told you that you could not
8      speak Spanish?
9   A.  (With translation.) It was Pecora.
10  Q.  Do you recall a specific event where Ms. Pecora
11     told you not to speak Spanish?
12  A.  (With translation.) I was in the third floor with
13     Daisy. I was helping her to give the breakfast, so
14     she came. I told Daisy, "Can you give me a
15     coffee," because we were preparing the table for
16     breakfast, and she told me, "We cannot speak
17     Spanish in front of the residents."
18         And I told him, "Daisy doesn't speak
19     English. I have to speak to her in Spanish." "And
20     no matter what, you cannot speak Spanish." The
21     resident was not close to us.
22  Q.  This was the dining hall that residents used to
23     eat?
24  A.  (With translation.) Yes.

20

1   Q.  And is Daisy's last name Santiago?
2   A.  Yes.
3   Q.  And when Ms. Pecora told you and Daisy not to speak
4      Spanish, did you ask her at that time why can't we
5      speak Spanish?
6   A.  (With translation.) No.
7   Q.  At some later time, did you go to see Ms. Pecora
8      and ask her why you couldn't speak Spanish to Daisy
9      in the dining room?
10  A.  No.
11  Q.  Aside from or in addition to Ms. Pecora stating to
12     you that you should not speak Spanish to Daisy in
13     the dining room that day, did she ever speak to you
14     about that again?
15  A.  (With translation.) Not with Daisy. It was
16     another occasion when it was with Rosa.
17  Q.  Okay. But in regard to the incident, the event
18     with Daisy, did Ms. Pecora ever speak to you again
19     about your speaking to Daisy in Spanish in that
20     dining room?
21  A.  (With translation.) No.
22  Q.  Did you ever receive any additional warning from
23     anyone at Whitney Place because you spoke Spanish
24     to Daisy in the dining room the day that Ms. Pecora

21

1      said not to?
2   A.  (With translation.) No.
3   Q.  In regard to that event in the dining room where
4      you spoke Spanish to Daisy and Ms. Pecora told you
5      not to speak Spanish, did anyone at Whitney Place
6      give you discipline for doing that? Did they
7      discipline you for doing that?
8   A.  (With translation.) No.
9   Q.  Do you remember anything else about the time that
10     Ms. Pecora told you not to speak Spanish to Daisy
11     that you haven't stated today?
12  A.  (With translation.) No, no.
13  Q.  Now, you indicated that there was another time
14     where Ms. Pecora told you not to speak Spanish; is
15     that correct?
16  A.  Yeah.
17  Q.  And could you describe the other time that Ms.
18     Pecora told you not to speak Spanish? Where did
19     that occur?
20  A.  (With translation.) That was also on the third
21     floor. I was helping Rosa put the breakfast, but
22     that was before the residents had arrived. I also
23     asked Rosa for the coffee to put them on the table
24     for the residents. Then Louise Pecora came and

6 (Pages 18 to 21)

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

22

| | | |
|---|---|---|
| 1 | | told us, "You cannot speak Spanish." He told Rosa |
| 2 | | she couldn't speak Spanish. |
| 3 | Q. | And what's Rosa last name? |
| 4 | A. | (With translation.) I don't know her last name. |
| 5 | Q. | Do you know whether Rosa was Puerto Rican? |
| 6 | A. | No. |
| 7 | | MS. ALTAMORE: Actually, to clarify, |
| 8 | | because I'm not sure if you got it. She knows if |
| 9 | | Rosa is Puerto Rican. She knows Rosa is not Puerto |
| 10 | | Rican. |
| 11 | A. | (With translation.) She's an illegal alien. She |
| 12 | | doesn't have papers. |
| 13 | Q. | And just to clarify the point, because you were |
| 14 | | born in Puerto Rico, you are a United States |
| 15 | | Citizen? |
| 16 | A. | (With translation.) Yes. |
| 17 | Q. | And because you were born in Puerto Rico and you're |
| 18 | | a United States Citizen, you don't need papers? |
| 19 | A. | No. |
| 20 | | MS. ALTAMORE: Technically, everybody |
| 21 | | needs papers, but she has the papers. |
| 22 | Q. | To the best of your knowledge, Rosa was not born in |
| 23 | | Puerto Rico? |
| 24 | A. | Yes. She not born in Puerto Rico. |

24

| | | |
|---|---|---|
| 1 | Q. | Do you know whether Ms. Pecora speaks Spanish? |
| 2 | A. | No. |
| 3 | Q. | At sometime after Ms. Pecora told you and Rosa not |
| 4 | | to speak Spanish, did you receive a warning from |
| 5 | | Ms. Pecora? |
| 6 | A. | No. |
| 7 | Q. | Did you receive a warning from any other person at |
| 8 | | Whitney Place because you spoke Spanish to Rosa? |
| 9 | A. | No. |
| 10 | Q. | At any time after Ms. Pecora stated to you -- |
| 11 | | strike that. Reminded you not to speak Spanish, |
| 12 | | did you receive any discipline from anybody because |
| 13 | | you had spoken Spanish to Rosa? |
| 14 | A. | No. |
| 15 | Q. | Did you understand the question? |
| 16 | A. | (With translation.) Yes. They didn't give me any |
| 17 | | discipline. |
| 18 | Q. | Do you recall any other time that Ms. Pecora came |
| 19 | | to you and told you not to speak Spanish? |
| 20 | A. | No. |
| 21 | Q. | Do you recall any other person at Whitney Place |
| 22 | | aside from Michael Larouche and Ms. Pecora who told |
| 23 | | you not to speak Spanish? |
| 24 | A. | (With translation.) No. |

23

| | | |
|---|---|---|
| 1 | Q. | And to the best of your knowledge, Rosa was not |
| 2 | | born in the United States? |
| 3 | A. | No. |
| 4 | Q. | Do you know what nationality, nation, Rosa was |
| 5 | | born? |
| 6 | A. | (With translation.) I'm not sure. But I think |
| 7 | | she's from El Salvador. |
| 8 | Q. | And when Ms. Pecora stated to you not to speak |
| 9 | | Spanish, she was also stating to Rosa not to speak |
| 10 | | Spanish? |
| 11 | A. | (With translation.) Yes, she told Rosa -- he told |
| 12 | | Rosa. |
| 13 | Q. | After Ms. Pecora stated to you and Rosa not to |
| 14 | | speak Spanish, did you ask her at that time why you |
| 15 | | couldn't speak Spanish? |
| 16 | A. | No. |
| 17 | Q. | Later at any time did you speak to Ms. Pecora and |
| 18 | | ask her why you and Rosa could not speak Spanish in |
| 19 | | the dining room? |
| 20 | A. | No. |
| 21 | Q. | After Ms. Pecora said to you and Rosa not to speak |
| 22 | | Spanish, did you have any other conversation with |
| 23 | | Ms. Pecora at that time? |
| 24 | A. | No. |

25

| | | |
|---|---|---|
| 1 | Q. | Do you recall an individual by the name of Fred |
| 2 | | telling you not to speak Spanish on the fourth |
| 3 | | floor? |
| 4 | A. | (With translation.) No. |
| 5 | Q. | Is there anybody else who was employed by Whitney |
| 6 | | Place in addition to Michael Larouche and Norma |
| 7 | | (sic) Pecora who told you not to speak Spanish? |
| 8 | A. | No. |
| 9 | Q. | Do you recall the statement that you gave to |
| 10 | | Janette? |
| 11 | A. | Yes. |
| 12 | Q. | Do you recall in the statement that you gave to |
| 13 | | Janette that you did not mention anything about |
| 14 | | employees of Brazilian decent? |
| 15 | A. | (With translation.) That Brazilians spoke their |
| 16 | | language and nobody told them anything. |
| 17 | Q. | But in regard to the statement that you gave to |
| 18 | | Janette, do you recall that you made no comment |
| 19 | | about persons of Brazilian decent? |
| 20 | A. | (With translation.) That was three years ago. I |
| 21 | | don't remember if I spoke about the Brazilians or |
| 22 | | not. But I do know that they spoke between each |
| 23 | | other Brazilian. |
| 24 | | |

7 (Pages 22 to 25)

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 26 | | |
|----|---|---|
| 1 | | (Exhibit No. 5, Spanish chronology |
| 2 | | statement, marked for identification.) |
| 3 | Q. | Exhibit 5 at the top says on the left-hand side, |
| 4 | | "Idalia D. Alers," and has a date "4-14-2002," and |
| 5 | | it appears to be a chronology in Spanish? |
| 6 | A. | (With translation.) Yes. |
| 7 | Q. | Have you ever seen this statement before? |
| 8 | A. | (With translation.) Yes. |
| 9 | Q. | And is this the statement that you gave to Janette? |
| 10 | A. | Yes. |
| 11 | Q. | And did you give this statement to Janette on |
| 12 | | April 14th, 2002? |
| 13 | A. | Yes. |
| 14 | Q. | And after reviewing the document, you will agree |
| 15 | | that there's no statement that refers to persons of |
| 16 | | Brazilian nationality, correct? |
| 17 | | Take as much time as you need. |
| 18 | A. | (With translation.) No, I don't see anything about |
| 19 | | that. |
| 20 | | MR. WAYNE: Can I have this document |
| 21 | | marked, please. |
| 22 | | (Exhibit No. 6, answers to |
| 23 | | interrogatories, marked for identification.) |
| 24 | Q. | Exhibit 6 is captioned, "United States Federal |

| 28 | | |
|----|---|---|
| 1 | | about March 3, 2002, plaintiff was on the floor |
| 2 | | with Daisy who spoke no English discussing their |
| 3 | | jobs. Louise Pecora came to them and told them |
| 4 | | they could not speak Spanish in front of residents. |
| 5 | | There were residents in the area. |
| 6 | | Plaintiff told Louise that Daisy did not speak |
| 7 | | English." It says, "He replied that they still |
| 8 | | could not speak Spanish." |
| 9 | | Just for clarification, Louise is a |
| 10 | | female? |
| 11 | A. | Yes. |
| 12 | Q. | And are these events the same events that you've |
| 13 | | previously testified? |
| 14 | A. | Yes. |
| 15 | Q. | And when you testified previously, you indicated |
| 16 | | that there was one event involving Ms. Pecora, |
| 17 | | Daisy and you. Are you amending the answer here to |
| 18 | | say that there was one event with Ms. Pecora, you, |
| 19 | | and Daisy, and one event with Ms. Pecora, you, and |
| 20 | | Rosa? |
| 21 | A. | Yes. |
| 22 | Q. | And the testimony that you gave earlier today, was |
| 23 | | full and accurate, correct? |
| 24 | A. | (With translation.) Yes. |

| 27 | | |
|----|---|---|
| 1 | | District Court, Eastern District of Massachusetts," |
| 2 | | and it says "Plaintiff Idalia Alers Answers to |
| 3 | | Whitney Place at Natick, First Set of |
| 4 | | Interrogatories," and it's stamped with a mark that |
| 5 | | says "draft". |
| 6 | | And turning to Interrogatory Answer No. 3 |
| 7 | | on page two at Subpart 1 it states, "In |
| 8 | | January 2002, plaintiff was on the second floor |
| 9 | | with Eduardo cleaning a room for a new resident. |
| 10 | | Plaintiff and Eduardo were speaking in Spanish to |
| 11 | | each other. No residents were present. Michael |
| 12 | | Larouche appeared in the room to conduct an |
| 13 | | inspection and told them, 'Don't speak Spanish.' |
| 14 | | He later told them they were doing a good job." |
| 15 | | Did you understand what I just read? |
| 16 | A. | Yes. |
| 17 | Q. | Is this the same incident that you testified to |
| 18 | | earlier concerning Mr. Larouche speaking to you? |
| 19 | A. | Yes. |
| 20 | Q. | And to the best of your knowledge and belief, the |
| 21 | | answer in this document is true? |
| 22 | A. | Yes. |
| 23 | Q. | In regard to Interrogatory Answer No. 3, part two, |
| 24 | | it states, "On or about January 15, 2002, and on or |

| 29 | | |
|----|---|---|
| 1 | Q. | And that testimony was an amendment or change to |
| 2 | | Interrogatories 3, the answer that I just read to |
| 3 | | make it more accurate? |
| 4 | A. | (With translation.) Yes. They're the same thing. |
| 5 | Q. | Okay. Meaning the same thing meaning that there |
| 6 | | were two events with Ms. Pecora and one involved |
| 7 | | Daisy and one involved Rosa? |
| 8 | A. | Yes. |
| 9 | Q. | Now, you earlier testified that you observed |
| 10 | | persons of Brazilian decent speaking their native |
| 11 | | language and no one told them to speak English; is |
| 12 | | that correct? |
| 13 | A. | Yes. |
| 14 | Q. | Okay. And in regard to Brazilian employees, what |
| 15 | | is their native language? |
| 16 | A. | Portuguese. |
| 17 | Q. | Now, at some point in time, did you discuss the |
| 18 | | complaint with Gilberto? |
| 19 | A. | (With translation.) No. |
| 20 | Q. | At any time have you discussed the complaint with |
| 21 | | Gilberto? |
| 22 | A. | No. |
| 23 | Q. | And when you say that you have never discussed the |
| 24 | | complaint with Gilberto, I am talking about your |

8 (Pages 26 to 29)

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

30

1    complaints in Exhibit 1 and the complaint in
2    Exhibit 4. Have you ever discussed those
3    complaints with Gilberto?
4  A.  (With translation.) Yes. I spoke to him before.
5  Q.  And could you tell me on how many occasions have
6    you spoken to Gilberto about the complaints that
7    are raised in the documents, Exhibit 1 and
8    Exhibit 4?
9  A.  (With translation.) Only when we had the
10    interview.
11  Q.  And when you say "the interview," you mean the
12    interview with Janette?
13  A.  (With translation.) Yes.
14  Q.  Aside from the interview that you gave to Janette,
15    did you ever speak to Gilberto about the complaint
16    you made to the federal government?
17  A.  (With translation.) No.
18  Q.  Did you ever have any discussion with Gilberto
19    about the filing of the lawsuit?
20  A.  (With translation.) Yes.
21  Q.  And could you tell me about the discussion you had
22    had with Gilberto about filing the lawsuit?
23  A.  (With translation.) That's when we talk about
24    looking for an attorney. That's when we looked for

31

1    the attorney.
2  Q.  And in addition to speaking with Gilberto about
3    looking for an attorney, did you speak with
4    Gilberto about anything else about the lawsuit?
5  A.  (With translation.) No.
6  Q.  Did you ever speak with Myrna Famania about the
7    complaints you made to the federal government or
8    filed in court?
9  A.  (With translation.) No. Only the day of the
10    interview.
11  Q.  And have you ever spoken to Jose Famania concerning
12    the complaints that you made to the federal
13    government or in the complaint you filed in court?
14  A.  (With translation.) The same day of the interview.
15  Q.  And the interview that you mentioned in regard to
16    both Myrna and Jose, deals with the interview with
17    Janette?
18  A.  (With translation.) Yes.
19  Q.  And aside from having -- strike that.
20    In regard to the interview that you gave
21    Janette, was Jose present when you gave your
22    statement to Janette?
23  A.  Yes.
24  Q.  And was Myrna present when you gave your statement

32

1    to Janette?
2  A.  Yes.
3  Q.  And was Gilberto present when you gave your
4    statement to Janette?
5  A.  Yes.
6  Q.  And were you all in the same room at the same time?
7  A.  Yes.
8  Q.  And at any time after you gave the statement to
9    Janette, did you speak to Gilberto about the
10    Brazilians speaking Portuguese at Whitney Place?
11  A.  (With translation.) No.
12  Q.  And at any time after you gave the interview to
13    Janette, did you speak with Jose Famania about the
14    Brazilians speaking Portuguese at Whitney Place?
15  A.  (With translation.) No.
16  Q.  And at any time after you gave the statement to
17    Janette, did you speak to Myrna Famania about the
18    Brazilians speaking Portuguese at Whitney Place?
19  A.  No.
20  Q.  In addition to giving the statement to Janette, did
21    you speak to any other governmental official
22    concerning your complaint?
23  A.  (With translation.) Yes, with my attorney.
24  Q.  Aside from your attorney and aside from Janette?

33

1  A.  (With translation.) No. Aside them, no.
2  Q.  Now, you state in answer to Interrogatories 4,
3    "Plaintiff states that she has regularly observed
4    Brazilian employees speaking in their native
5    language in front of residents without incident."
6  A.  Yes.
7  Q.  Could you tell me the times and places you observed
8    Brazilian employees speaking in their native
9    language in front of residents without incident?
10  A.  (With translation.) In the second floor, they're
11    in one end of the kitchen, the other one in the
12    other end, and they scream to each other in their
13    language, and nobody tells them anything.
14  Q.  Is the kitchen different from the dining room?
15  A.  (With translation.) Yes.
16  Q.  And how is the kitchen different than the dining
17    room?
18  A.  (With translation.) It's not the same floor. It's
19    a different floor. Same area but a different made.
20    It's made differently.
21  Q.  In regard to Brazilians speaking to each other in
22    Brazilian on the second floor in the kitchen, aside
23    from the Brazilians speaking Brazilian to each
24    other in the kitchen on the second floor, were

9 (Pages 30 to 33)

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 34 | | |
|---|---|---|
| 1 | | there any other places where you observed |
| 2 | | Brazilians speaking to each other in Brazilian? |
| 3 | | And when I say "Brazilian," I mean Portuguese. |
| 4 | A. | (With translation.) They could be in the kitchen, |
| 5 | | they could be in the corridor in front of a |
| 6 | | resident, they would speak their language. |
| 7 | Q. | And is this on the second floor? |
| 8 | A. | (With translation.) Yes. |
| 9 | Q. | And you didn't see that happening on the third |
| 10 | | floor? |
| 11 | A. | (With translation.) No. |
| 12 | Q. | And you didn't see that happening on the fourth |
| 13 | | floor? |
| 14 | A. | No. |
| 15 | Q. | And you didn't see that happening on the fifth |
| 16 | | floor? |
| 17 | A. | No. |
| 18 | Q. | And you didn't see that happening on the first |
| 19 | | floor? |
| 20 | A. | No. |
| 21 | Q. | And do you recall how many times you saw the |
| 22 | | Brazilians speaking to each other in Portuguese in |
| 23 | | the kitchen on the second floor? |
| 24 | A. | (With translation.) They would do it all the time. |

| 35 | | |
|---|---|---|
| 1 | Q. | Do you remember the name of the Brazilian employees |
| 2 | | who would speak to each other in Portuguese on the |
| 3 | | second floor in the kitchen? |
| 4 | A. | (With translation.) No. |
| 5 | Q. | When the Brazilians spoke Portuguese on the second |
| 6 | | floor in the kitchen, aside from you and the |
| 7 | | Brazilian employees, who else was present? |
| 8 | A. | (With translation.) The nurses that were there, |
| 9 | | they would see it. |
| 10 | Q. | And which nurses do you remember being present? |
| 11 | A. | (With translation.) I don't remember the name. |
| 12 | Q. | Do you remember anything about who these nurses |
| 13 | | were? |
| 14 | A. | (With translation.) No. |
| 15 | Q. | Aside from nurses being present, do you remember |
| 16 | | any other employee of Whitney Place being present? |
| 17 | A. | (With translation.) Sometimes Pecora would go by |
| 18 | | and she wouldn't say anything. |
| 19 | Q. | When you say "Ms. Pecora would go by and not say |
| 20 | | anything," was Ms. Pecora in the hallway? |
| 21 | A. | (With translation.) Yes. |
| 22 | Q. | So she was in the hallway passing the kitchen when |
| 23 | | Brazilians were speaking Portuguese in the kitchen? |
| 24 | A. | (With translation.) Suppose I'm here and she's in |

| 36 | | |
|---|---|---|
| 1 | | front of me talking to me, you could hear the |
| 2 | | Brazilians talking in Portuguese, and she wouldn't |
| 3 | | say anything. |
| 4 | Q. | And do you recall the time that that happened? |
| 5 | A. | (With translation.) January or February. |
| 6 | Q. | And what year? |
| 7 | A. | 2002. |
| 8 | Q. | And why do you remember that event occurring in |
| 9 | | January or February of 2002? |
| 10 | A. | (With translation.) I was coming back from |
| 11 | | maternity time. |
| 12 | Q. | And why do you remember Ms. Pecora being there and |
| 13 | | persons in the kitchen speaking Brazilian while she |
| 14 | | was speaking to you? |
| 15 | A. | (With translation.) Because I was cleaning there, |
| 16 | | and she was coming by. |
| 17 | Q. | And why do you remember that when you were cleaning |
| 18 | | there it occurred in January or February of 2002? |
| 19 | A. | (With translation.) Because it was in January when |
| 20 | | I was cleaning. |
| 21 | Q. | Did Ms. Pecora stop to speak to you at that time? |
| 22 | A. | (With translation.) No. |
| 23 | Q. | You were cleaning and she passed you in the |
| 24 | | hallway? |

| 37 | | |
|---|---|---|
| 1 | A. | (With translation.) I was cleaning a room. I came |
| 2 | | out of the room to look for a piece of rag, and she |
| 3 | | was passing by. |
| 4 | Q. | And she was in the hallway? |
| 5 | A. | (With translation.) Yes. She passed by the |
| 6 | | hallway. |
| 7 | Q. | But at the time you were in the resident's room? |
| 8 | A. | (With translation.) I was coming out of the room |
| 9 | | to get something out. |
| 10 | Q. | You were coming out of the room that you were |
| 11 | | cleaning to get a rag? |
| 12 | A. | (With translation.) Yes. And a liquid that I had |
| 13 | | to have it out of the room. |
| 14 | Q. | And where was the kitchen in relationship to the |
| 15 | | room that you exited? |
| 16 | A. | (With translation.) It was not close to it. It |
| 17 | | was farer. |
| 18 | Q. | Did you say anything to Ms. Pecora -- when you |
| 19 | | walked out to take out the cleaning fluid and when |
| 20 | | you went to get a rag and you saw Ms. Pecora go by, |
| 21 | | did you say anything to Ms. Pecora? |
| 22 | A. | (With translation.) No. |
| 23 | Q. | And you don't recall Ms. Pecora saying anything to |
| 24 | | you? |

10 (Pages 34 to 37)

Case 1:05-cv-10996-WGY    Document 34-3    Filed 02/27/2006    Page 11 of 14

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

38

1   A.   (With translation.) No. Because I didn't say
2        anything.
3   Q.   And was Ms. Pecora with anyone?
4   A.   (With translation.) No.
5   Q.   Did she stop in the kitchen?
6   A.   (With translation.) I don't think so.
7   Q.   Was she with anyone?
8   A.   No.
9   Q.   Do you know where she was going?
10  A.   No. She passed. I don't know where she going.
11  Q.   Do you know where she came from?
12  A.   No.
13  Q.   At that time -- strike that.
14       At sometime after this event occurred,
15       did you speak to Ms. Pecora about the Brazilians
16       speaking Portuguese in the kitchen?
17  A.   No.
18  Q.   Did you speak to Mr. Larouche about the Brazilians
19       speaking Portuguese in the kitchen?
20  A.   No.
21  Q.   Did you speak to any other person about the
22       Brazilians speaking Portuguese in the kitchen?
23  A.   No.
24  Q.   Now, in addition -- strike that.

39

1        Is there anything else you would like to
2        state in regard to this event, anything you want to
3        add?
4   A.   No.
5   Q.   Okay. Is there any other event that you recall
6        where you heard Brazilians speaking Portuguese on
7        the second floor and Ms. Pecora was present?
8   A.   No.
9   Q.   Is there any other event that occurred on the
10       second floor where you heard Brazilians speaking
11       Portuguese and Mr. Larouche was present?
12  A.   (With translation.) No, no, I don't remember.
13  Q.   Was there any time where you were on the second
14       floor and the Brazilians were speaking Portuguese
15       and Mr. McGinley was present?
16       THE INTERPRETER: Who was present?
17       MR. WAYNE: McGinley.
18  A.   (With translation.) No.
19  Q.   Was there any time where the Brazilians were
20       speaking Portuguese on the second floor and
21       Ms. Salmon was present?
22  A.   (With translation.) No.
23  Q.   At any time did you go to a management person at
24       Whitney Place and make a complaint to them that

40

1        said that the Brazilians were speaking Portuguese
2        on the second floor?
3   A.   (With translation.) No.
4   Q.   In regard to the Brazilians speaking Portuguese on
5        the second floor, do you recall you testified that
6        there was a nurse present or nurses present? Do
7        you recall that?
8   A.   Yes.
9   Q.   Do you recall what their names are?
10       MS. ALTAMORE: Asked and answered.
11  A.   No.
12  Q.   Did you ask the nurses why they permitted the
13       Brazilians to speak Portuguese in the kitchen?
14  A.   (With translation.) No.
15  Q.   Do you recall any other time where you observed the
16       Brazilians speaking Portuguese on the second floor
17       aside from the event where Ms. Pecora passed you in
18       the hallway?
19  A.   (With translation.) No.
20       MS. ALTAMORE: Objection. She had
21       previously testified, I believe, that it was a
22       regular occurrence. So if you were to ask another
23       specific event.
24       MR. WAYNE: I was asking about if she

41

1        ever saw Ms. Pecora passing by in the hallway when
2        the Brazilians were speaking Portuguese?
3        MS. ALTAMORE: The initial line of
4        questioning had been had you ever observed, and
5        that's what my objection --
6        MR. WAYNE: No. I appreciate that.
7   A.   (With translation.) They spoke in Portuguese all
8        the time. I don't know how many times she went by
9        while they were speaking Portuguese, because she
10       only time that I observed them speaking
11       Portuguese -- talking in Portuguese, and she was
12       passing by, was the one I told you.
13  Q.   And you don't recall any time where Mr. Larouche
14       was present when they were speaking Portuguese?
15  A.   (With translation.) You know when I was in the
16       room with Eduardo cleaning, I don't know if he went
17       out and heard them speaking Portuguese, because I
18       couldn't tell you.
19  Q.   But you, yourself, never observed Mr. Larouche
20       present when the employees were speaking
21       Portuguese?
22  A.   (With translation.) When we were leaving, he was
23       present, and they were talking Portuguese.
24  Q.   Leaving where?

11 (Pages 38 to 41)

Case 1:05-cv-10996-WGY    Document 34-3    Filed 02/27/2006    Page 12 of 14

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

42

| | | |
|---|---|---|
| 1 | A. | (With translation.) At 6:00 p.m. when we were |
| 2 | | leaving to go home -- 3:00 p.m. we were leaving to |
| 3 | | go home. |
| 4 | Q. | And when did that occur? |
| 5 | A. | (With translation.) That was in October. |
| 6 | Q. | October 2001? |
| 7 | A. | (With translation.) Yes. |
| 8 | Q. | And why do you remember that there was an event |
| 9 | | where employees were leaving and Mr. Larouche was |
| 10 | | present in October of 2001 and you recall employees |
| 11 | | speaking Portuguese? |
| 12 | A. | (With translation.) Because that was prior to me |
| 13 | | leaving to have the baby and that was October. |
| 14 | Q. | And tell me what you remember about that event? |
| 15 | A. | (With translation.) Well, we were waiting to punch |
| 16 | | the card to leave, and he went by, and I -- and he |
| 17 | | wouldn't say a word when they spoke Portuguese, but |
| 18 | | if we spoke Spanish, he would come and tell us. |
| 19 | Q. | Did Mr. Larouche ever tell you that you could not |
| 20 | | speak Spanish when you were waiting by the time |
| 21 | | clock to punch out? |
| 22 | A. | (With translation.) Not to me. |
| 23 | Q. | Did you observe him telling Hispanic employees that |
| 24 | | they could not speak Spanish when they were |

43

| | | |
|---|---|---|
| 1 | | standing by the time clock waiting to punch out? |
| 2 | A. | (With translation.) No. |
| 3 | Q. | And in regard to the punch clock, the punch clock |
| 4 | | is on the first floor? |
| 5 | A. | Yes. |
| 6 | Q. | And the punch clock is inside a door in a corridor? |
| 7 | A. | Yes. |
| 8 | Q. | In addition to the examples you gave about |
| 9 | | Brazilians speaking Portuguese on the second floor, |
| 10 | | do you recall any other circumstances, any other |
| 11 | | times, where you heard Brazilian employees speaking |
| 12 | | Portuguese? |
| 13 | A. | (With translation.) Only in the second floor. |
| 14 | Q. | At any time did you make a complaint to Ms. Pecora |
| 15 | | that the Brazilians were speaking Portuguese on the |
| 16 | | second floor? |
| 17 | A. | (With translation.) No. |
| 18 | Q. | And at any time did you go to Mr. Larouche and say, |
| 19 | | the Brazilians are speaking Portuguese on the |
| 20 | | second floor? |
| 21 | A. | (With translation.) No. |
| 22 | Q. | And at any time did you go to Mr. McGinley and |
| 23 | | complain that the Brazilians were speaking |
| 24 | | Portuguese on the second floor? |

44

| | | |
|---|---|---|
| 1 | A. | (With translation.) No. |
| 2 | Q. | And at any time did you go to Ms. Salmon and |
| 3 | | complain to her that the Brazilians were speaking |
| 4 | | Spanish on the second floor -- speaking Portuguese |
| 5 | | on the second floor? |
| 6 | A. | (With translation.) No. |
| 7 | Q. | Do you remember complaining to any employee of |
| 8 | | Whitney Place that Brazilians were speaking |
| 9 | | Portuguese on the second floor? |
| 10 | A. | (With translation.) No. |
| 11 | Q. | Do you know of any employee who complained about |
| 12 | | the Brazilians speaking Portuguese on the second |
| 13 | | floor? |
| 14 | A. | (With translation.) No. |
| 15 | Q. | Is it your complaint that Whitney Place should |
| 16 | | prohibit the Brazilians from speaking Portuguese on |
| 17 | | the second floor? |
| 18 | A. | (With translation.) Well, if they don't allow us |
| 19 | | to speak Spanish, they shouldn't do it. |
| 20 | Q. | So you believe that to remedy the problem, Whitney |
| 21 | | Place should prohibit Brazilian, Portuguese |
| 22 | | speaking employees from speaking Portuguese on the |
| 23 | | second floor? |
| 24 | | MS. ALTAMORE: Objection. You can |

45

| | | |
|---|---|---|
| 1 | | answer. |
| 2 | A. | (With translation.) Do I have to answer? Is that |
| 3 | | what she said, not to answer? |
| 4 | | MR. WAYNE: No. She said she can answer. |
| 5 | A. | (With translation.) Can you repeat the question? |
| 6 | | (Interpreter translated question.) |
| 7 | A. | No, I don't think the problem will be solved, but |
| 8 | | if they can do -- if they can speak in Portuguese, |
| 9 | | we have the right as well to speak our language, |
| 10 | | too. |
| 11 | Q. | And the problem would be solved -- if your |
| 12 | | complaint is that the Portuguese are allowed to |
| 13 | | speak -- if the Brazilians are allowed to speak |
| 14 | | Portuguese on the second floor, they should be |
| 15 | | stopped from doing it? |
| 16 | | MS. ALTAMORE: Objection. But you can |
| 17 | | answer. |
| 18 | A. | (With translation.) I say we all have the same |
| 19 | | right, and we all have the rights and we're all |
| 20 | | equal. |
| 21 | | If you see somebody is Chinese and speaks |
| 22 | | Chinese, and we Hispanic and we speak Spanish, |
| 23 | | we're not allowed to, why not? |
| 24 | Q. | And one way to deal with that problem, would be to |

12 (Pages 42 to 45)

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

46

1    stop the Chinese from speaking Chinese on the
2    second floor?
3    A.    (With translation.) No. That everybody speak
4    their own language, that's the right that everybody
5    has.
6    Q.    So you don't believe that the employer has the
7    right to restrict the language that's spoken?
8    A.    (With translation.) Is a right that you all have
9    to speak your language, because if an American goes
10   to Puerto Rico, he doesn't have to speak Spanish,
11   he can speak English.
12   Q.    Now, in regard to people who spoke Spanish, you
13   said that Rosa was not Puerto Rican, correct?
14   A.    Yes.
15   Q.    Were there other Hispanic persons employed by
16   Whitney Place who came from places other than
17   Puerto Rico?
18   A.    (With translation.) There were other Hispanic and
19   also Africans.
20   Q.    And in regard to the Hispanics, there were
21   Hispanics who came from countries other than El
22   Salvador?
23   A.    (With translation.) Yes. Bolivia.
24   Q.    Do you recall any other countries where persons

47

1    came from who they spoke Spanish as a native
2    language?
3    A.    (With translation.) No.
4    Q.    So the only two countries that you can recall that
5    other Hispanic speaking persons came from, were El
6    Salvador and Bolivia?
7    A.    (With translation.) Yes.
8          MR. WAYNE: Okay. I'd like five minutes.
9    I'm just going to look at my notes.
10         MS. ALTAMORE: Okay. And I do have a
11   couple of questions, too.
12         (A short break was taken.)
13   Q.    Do you know an individual by the name of Marlene?
14   A.    No.
15   Q.    I have no further questions.
16         MS. ALTAMORE: I have just a couple here.
17              EXAMINATION
18   BY MS. ALTAMORE:
19   Q.    Who hired you at Whitney Place?
20   A.    Jack.
21   Q.    And would that be Jack Curtin?
22   A.    Yes.
23   Q.    And did Jack Curtin ever specifically tell you that
24   there was an English language rule enforce at

48

1    Whitney Place?
2    A.    (With translation.) No.
3    Q.    To the best of your knowledge, what is Daisy
4    Santiago's immigration status?
5    A.    (With translation.) Illegal.
6    Q.    Is Daisy Santiago still employed at Whitney Place
7    at Natick?
8    A.    No.
9    Q.    To the best of your knowledge, what is Eduardo's
10   immigration status?
11   A.    (With translation.) Illegal also.
12   Q.    Is Eduardo still employed at Whitney Place?
13   A.    (With translation.) That I have knowledge, no.
14   Q.    After the event that you described regarding
15   Eduardo and Michael Larouche in January of 2002,
16   did you speak to Eduardo regarding the event that
17   transpired?
18   A.    No.
19   Q.    To the best of your knowledge, do you ever recall
20   seeing the English language rule in writing?
21   A.    (With translation.) No.
22   Q.    The employee handbook that you received at the time
23   of your hiring, did you read it?
24   A.    (With translation.) They read it to me.

49

1    Q.    The entire handbook?
2    A.    (With translation.) Yes.
3    Q.    I have nothing further.
4              EXAMINATION
5    BY MR. WAYNE:
6    Q.    In regard to Daisy Santiago, do you know what her
7    country of origin?
8    A.    Bolivia.
9    Q.    And in regard to Eduardo, his country of origin?
10   A.    Bolivia.
11         MR. WAYNE: No further questions.
12
13         (Whereupon the Deposition of
14   Idalia D. Alers concluded at 12:35 p.m.)
15
16
17
18
19
20
21
22
23
24

13 (Pages 46 to 49)

Idalia D. Alers 1-12-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 50 | | 52 | |
|---|---|---|---|
| 1 | ERRATA SHEET DISTRIBUTION INFORMATION | 1 | C E R T I F I C A T E |
| 2 | DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS | 2 | |
| 3 | | 3 | COMMONWEALTH OF MASSACHUSETTS |
| 4 | ERRATA SHEET DISTRIBUTION INFORMATION | 4 | |
| 5 | DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS | 5 | |
| 6 | | 6 | I, Elizabette M. Afonso, a Professional |
| 7 | ERRATA SHEET DISTRIBUTION INFORMATION | 7 | Shorthand Reporter and Notary Public in and for the |
| 8 | The original of the Errata Sheet has been | 8 | Commonwealth of Massachusetts, do hereby certify |
| 9 | delivered to Joan M. Altamore, Esquire. | 9 | that the following transcript of the deposition of |
| 10 | When the Errata Sheet has been completed | 10 | Idalia D. Alers, having been duly sworn through |
| 11 | by the deponent and signed, a copy thereof should | 11 | interpretation, is true and accurate to the best of |
| 12 | be delivered to each party of record and the | 12 | my knowledge, skill, and ability. |
| 13 | ORIGINAL forwarded to Richard D. Wayne, Esquire, to | 13 | IN WITNESS WHEREOF, I have hereunto set |
| 14 | whom the original deposition transcript was | 14 | my hand and seal this 19th day of January, 2006. |
| 15 | delivered. | 15 | |
| 16 | INSTRUCTIONS TO DEPONENT | 16 | |
| 17 | After reading this volume of your | 17 | |
| 18 | deposition, please indicate any corrections or | | Elizabette M. Afonso |
| 19 | changes to your testimony and the reasons therefor | 18 | Notary Public |
| 20 | on the Errata Sheet supplied to you and sign it. | 19 | |
| 21 | DO NOT make marks or notations on the transcript | 20 | My commission expires: |
| 22 | volume itself. Add additional sheet if necessary. | | November 10, 2006 |
| 23 | Please refer to the above instructions for errata | 21 | |
| 24 | sheet distribution information. | 22 | |
| | | 23 | |
| | | 24 | |

| 51 | |
|---|---|
| 1 | PLEASE ATTACH TO THE DEPOSITION OF IDALIA D. ALERS |
| 2 | DATE TAKEN:  01/12/2006 |
| 3 | ERRATA SHEET |
| 4 | Please refer to page 50 for errata sheet |
| 5 | instructions and distribution instructions. |
| 6 | PAGE    LINE    CHANGE         REASON |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | I have read the foregoing transcript of |
| 16 | my deposition and except for any corrections or |
| 17 | changes noted above, I hereby subscribe to the |
| 18 | transcript as an accurate record of the statements |
| 19 | made by me. |
| 20 | Executed this    day of    , 2006. |
| 21 | |
| 22 | |
| 23 | Idalia D. Alers |
| 24 | |

14 (Pages 50 to 52)

Case 1:05-cv-10996-WGY   Document 34-4   Filed 02/27/2006   Page 1 of 14

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

```
 1              UNITED STATES FEDERAL DISTRICT COURT

 2              EASTERN DISTRICT OF MASSACHUSETTS

 3

 4                          CIVIL ACTION NO.:  0510996WGY

 5     * * * * * * * * * * * * * * * * * * * *

 6     JOSE FAMANIA, GILBERTO FAMANIA,

 7     MYRNA FAMANIA and IDALIA ALERS,

 8              Plaintiffs,

 9     vs.

10     WHITNEY PLACE AT NATICK, INC.,

11              Defendant.

12     * * * * * * * * * * * * * * * * * * *

13

14              DEPOSITION OF JOSE O. FAMANIA, taken on

15     behalf of the defendant, pursuant to the

16     Massachusetts Rules of Civil Procedure, before

17     Elizabette M. Afonso, Professional Shorthand

18     Reporter and Notary Public within and for the

19     Commonwealth of Massachusetts, at the law offices

20     of Hinckley, Allen, Snyder, 28 State Street,

21     Boston, Massachusetts, commencing at 10:35 a.m. on

22     Tuesday, January 17, 2006.

23

24
```

| 2 | | 4 | | |
|---|---|---|---|---|

**2**

1     APPEARANCES:
2
3     LAW OFFICES OF JOAN M. ALTAMORE
4     by Joan M. Altamore, Esquire
5     258 Elm Street
6     Suite 200
7     Somerville, Massachusetts 02144
8     617.686.1719
9        On behalf of the plaintiffs
10
11    HINCKLEY, ALLEN, SNYDER, LLP
12    by Richard D. Wayne, Esquire
13    28 State Street
14    Boston, Massachusetts 02109
15    617.345.9000
16       On behalf of the defendant
17
18    BENOIT INTERPRETING SERVICES
19    Giselle Lahey, Interpreter
20    33 South Street
21    P.O. Box 147
22    Northboro, MA 01532
23    1-800-261-5152
24

**4**

1         EXHIBITS
2
3   NO.     DESCRIPTION       PAGE
4
5   6    Answers to interrogatories     30
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24      (Exhibits retained by counsel.)

**3**

1        INDEX
2
3   DEPONENT        PAGE
4
5   JOSE O. FAMANIA
6
7   EXAMINATION BY MR. WAYNE     5
8
9        EXHIBITS
10
11   NO.     DESCRIPTION       PAGE
12
13   1    Employment Application     15
14
15   2    Acknowledgement of Employment Handbook    23
16
17   3    History        26
18
19   4    Complaint       27
20
21   5    Plaintiff's memorandum of law in     29
22      opposition of Defendant's motion to
23      dismiss
24

**5**

1        PROCEEDINGS
2
3      (Giselle Lahey, Interpreter, having been
4   first duly sworn.)
5
6        JOSE O. FAMANIA,
7   having been first duly sworn through
8   interpretation, was examined and testified as
9   follows:
10
11      MR. WAYNE: In regard to stipulations,
12   all objections except as to form, shall be reserved
13   until the time of trial.
14      MS. ALTAMORE: Yes.
15      MR. WAYNE: The reading and signing shall
16   be done within seven days after the receipt of the
17   transcript. The reading does not have to be done
18   before a notary, and that motions to strike are not
19   reserved until the time of trial.
20      MS. ALTAMORE: Yes.
21        EXAMINATION
22   BY MR. WAYNE:
23   Q.    Mr. Famania, do you speak English?
24   A.    No.

2 (Pages 2 to 5)

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

6

1    MS. ALTAMORE: Again, to note for the
2    record as previously, the events that transpired
3    were approximately three to four years ago, and
4    during that passage of time, Mr. Famania has gained
5    more familiarity with the English language, though
6    he would still not -- would still not consider him
7    to be fluent.
8  Q.  Mr. Famania, what is your date of birth?
9  A.  February 12th, 1957.
10 Q.  And where were you born?
11 A.  Puerto Rico.
12 Q.  And have you always been a citizen of the United
13     States?
14 A.  Yes.
15 Q.  And how many years did you go to school?
16 A.  First year.
17 Q.  And at what age did you stop going to school?
18 A.  17.
19 Q.  And at what age did you start going to school?
20 A.  Around 17.
21 Q.  The first year you went to school was when you were
22     17 years old?
23 A.  That I don't remember.
24 Q.  Do you recall whether you were older than five

7

1    years old?
2  A.  I was older than five, yes.
3  Q.  Were you older than ten?
4  A.  Around that age.
5  Q.  And when you first began going to school, were you
6     going to school in Puerto Rico?
7  A.  Yes. Catholic school.
8  Q.  And who sent you to catholic school?
9     MS. ALTAMORE: Objection. Relevance.
10 A.  My father.
11 Q.  And what courses did you take when you first went
12     to catholic school?
13 A.  They gave us religion to write and read, and of
14     course they spoke religion, they were catholic.
15 Q.  And did they teach you English?
16 A.  Yes.
17 Q.  And during the period of time that you were in
18     school, did you continue to receive religious
19     education in the catholic school?
20 A.  Yes.
21 Q.  And during the period of time that you attended
22     catholic school, did they teach you how to write?
23 A.  Yes, they taught me how to write.
24 Q.  And during the period of time that you were in

8

1    catholic school, did they teach you how to read?
2     MS. ALTAMORE: Asked and answered.
3  A.  Yes.
4  Q.  And during the period of time that you were in
5     catholic school, did they continue to teach you
6     English?
7  A.  Yes.
8  Q.  And during the period of time from when you first
9     started until you left school at 17, were you
10     always in the catholic school?
11 A.  Yes.
12 Q.  Why did you stop going to the catholic school?
13 A.  I don't know, because I didn't want to go anymore.
14 Q.  When you were in the catholic school, was that
15     school always in Puerto Rico?
16 A.  Yes.
17 Q.  At sometime did you leave Puerto Rico to go to the
18     United States?
19 A.  Yes.
20 Q.  And at what age did you leave Puerto Rico?
21 A.  I stayed here first for eight years. Then I went
22     back to Puerto Rico, and I returned five years ago.
23 Q.  And when you returned to Puerto Rico, how long did
24     you live in Puerto Rico?

9

1  A.  Around two years.
2  Q.  When you first left Puerto Rico, what state did you
3     move to?
4  A.  Massachusetts.
5  Q.  And do you remember the year that you first came to
6     Massachusetts?
7  A.  No.
8  Q.  At the time you left Puerto Rico to go to
9     Massachusetts, was your father already in
10     Massachusetts?
11 A.  No.
12 Q.  Why did you leave Puerto Rico to go to
13     Massachusetts?
14 A.  Because the house we had in Puerto Rico was a wood
15     house, and we had four children and only two
16     bedrooms, and it was deteriorating, so it was
17     falling apart. So that's why I came to
18     Massachusetts, and I didn't have a job there.
19 Q.  When you say "you didn't have a job there," you did
20     not have a job in Puerto Rico?
21 A.  I didn't have a job there. The government would
22     give me a check for the children.
23 Q.  At the time when the government was giving you a
24     check for the children, were you married?

3 (Pages 6 to 9)

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 10 | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And at that time you had two children? |
| 3 | A. | Four. |
| 4 | Q. | Why did you choose to go to Massachusetts? |
| 5 | A. | Because I have three brothers here. |
| 6 | Q. | And what were their names? |
| 7 | A. | Hector Famania, Carlos Famania, and Gilberto |
| 8 | | Famania. |
| 9 | Q. | Did you ever have a sister who was in |
| 10 | | Massachusetts? |
| 11 | A. | Yes. |
| 12 | Q. | And what was her name? |
| 13 | A. | Sonia Yvette Famania. |
| 14 | Q. | Do you have more than one sister? |
| 15 | A. | Yes. |
| 16 | Q. | How many sisters do you have? |
| 17 | A. | Three. |
| 18 | Q. | And what are their names? |
| 19 | A. | Martha Famania as well, and Myrna Famania. |
| 20 | Q. | And do you recall at sometime getting a job with a |
| 21 | | company called Whitney Place? |
| 22 | A. | Yes. |
| 23 | Q. | And do you recall approximately what year you |
| 24 | | obtained a job with Whitney Place? |

| 12 | | |
|---|---|---|
| 1 | Q. | When Mr. Larouche was leaving work, was that about |
| 2 | | the time that you were arriving to go to work? |
| 3 | A. | That's true. |
| 4 | Q. | When you began work at 5:00 p.m., did you speak to |
| 5 | | Mr. Larouche before you began work? |
| 6 | A. | No. Sometimes. |
| 7 | Q. | On the times that you spoke with Mr. Larouche when |
| 8 | | you came to work, do you recall what Mr. Larouche |
| 9 | | said to you? |
| 10 | | MS. ALTAMORE: Objection. You can |
| 11 | | answer. |
| 12 | A. | Sometimes, sometimes he would give me jobs that did |
| 13 | | not belong to me. |
| 14 | Q. | On a regular workweek, did you have what you |
| 15 | | considered to be your regular job duties and |
| 16 | | responsibilities? |
| 17 | A. | Yes. |
| 18 | Q. | And how did you learn what your normal job would |
| 19 | | be? |
| 20 | A. | Jack Curtin taught me. |
| 21 | Q. | Did Jack Curtin speak Spanish? |
| 22 | A. | No. |
| 23 | Q. | How did Mr. Curtin communicate with you to explain |
| 24 | | to you what your normal job duties would be if he |

| 11 | | |
|---|---|---|
| 1 | A. | April 26, 2000. |
| 2 | Q. | And what position did you have with Whitney Place? |
| 3 | A. | Housekeeping. |
| 4 | Q. | And did you work the first or second shift? |
| 5 | A. | From 5:00 to 10:00. |
| 6 | Q. | And is that 5:00 to 10:00 p.m.? |
| 7 | A. | 5:00 p.m. to 10:00 p.m. |
| 8 | Q. | And how many days did you work per week? |
| 9 | A. | Monday through Friday. |
| 10 | Q. | You worked 20 hours a week? |
| 11 | A. | Yes, that's true. |
| 12 | Q. | And when you were working 5:00 to 10:00 p.m., who |
| 13 | | was your supervisor between 5:00 and 10:00 p.m.? |
| 14 | A. | My first supervisor was Jack Curtin, and the second |
| 15 | | one was Mike Larouche. |
| 16 | Q. | And when you worked on the second shift and Mike |
| 17 | | Larouche was the supervisor, did he tell you what |
| 18 | | to do? |
| 19 | A. | I already knew my job. |
| 20 | Q. | Did Mr. Larouche give you any instructions in |
| 21 | | regard to what to do when you came to work? |
| 22 | A. | I repeat again, I already knew my job. |
| 23 | Q. | Do you recall what hours Mr. Larouche worked? |
| 24 | A. | It seems that it was from 9:00 a.m. to 5:00 p.m. |

| 13 | | |
|---|---|---|
| 1 | | did not speak Spanish? |
| 2 | A. | My brother Gilberto was the interpreter of all of |
| 3 | | the people there at the job, for the people that |
| 4 | | didn't know English. |
| 5 | Q. | And Mr. Curtin would use Gilberto to explain in |
| 6 | | Spanish Mr. Curtin's instructions? |
| 7 | A. | To everybody. |
| 8 | Q. | And were there persons who were employed by Whitney |
| 9 | | Place at that time who spoke languages other than |
| 10 | | English and other than Spanish? |
| 11 | A. | Portuguese and Brazilian, but I think it's the same |
| 12 | | thing, maybe Brazilian. |
| 13 | Q. | Were there any persons there from Haiti? |
| 14 | A. | Not that I have knowledge. |
| 15 | Q. | Were there any persons there of African decent? |
| 16 | A. | I have know knowledge of it. My shift was from |
| 17 | | 5:00 to 10:00, and the only people I found there |
| 18 | | were the Brazilians. |
| 19 | Q. | Were there any persons on the 5:00 to 10:00 shift |
| 20 | | who were Spanish speaking? |
| 21 | A. | In the first floor. Because in the second floor, I |
| 22 | | would go with Wilson, and the Brazilian people were |
| 23 | | there, and I would communicate with them. |
| 24 | Q. | Did some of the Brazilian workers at Whitney Place |

4 (Pages 10 to 13)

Case 1:05-cv-10996-WGY    Document 34-4    Filed 02/27/2006    Page 5 of 14

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

|    | 14 |    | 16 |
|----|----|----|----|
| 1 | speak Spanish and Portuguese? | 1 | "The Willows at Westboro"? |
| 2 A. | I would come there to dump the trash. I would find | 2 A. | No. Now that I'm seeing it. |
| 3 | them there, and they were watching TV or eating and | 3 Q. | Do you know whose handwriting is on this document? |
| 4 | they knew me, and I understood them, and they | 4 A. | I don't know. |
| 5 | already knew me. They would say, "How are you, | 5 Q. | Do you see under where it says on the top of the |
| 6 | Jose?" And say hello to me. | 6 | first page, "Name, Jose Famania; address 105B |
| 7 Q. | When the Brazilians stated to you or when they | 7 | Beaver Terrace Circle"? |
| 8 | asked you how are you, did they say that in Spanish | 8 A. | That's my name and my address. |
| 9 | or Portuguese? | 9 Q. | And social security number 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, is that |
| 10 A. | In Brazilian. | 10 | your social security number? |
| 11 Q. | Did any of the Brazilians speak English? | 11 A. | That's my social security. The problem is that it |
| 12 A. | I assumed that they spoke English, how would they | 12 | was a long time ago. |
| 13 | find a job like that. They were CNN (sic). They | 13 Q. | And do you see that where it says "position |
| 14 | would deal with the elderly people. | 14 | desired, housekeeping"? |
| 15 Q. | How did you learn that there was a job at Whitney | 15 A. | Yes. |
| 16 | Place? | 16 Q. | Is that the position that you obtained when you |
| 17 A. | Because my brother Gilberto was working in the day | 17 | gained work at Whitney Place? |
| 18 | care part time and he didn't want it, and they were | 18 A. | Yes. |
| 19 | looking for somebody else, so he spoke to Jack | 19 Q. | And under the section of the first page where it |
| 20 | Curtin, and Jack Curtin gave me the opportunity. | 20 | says, "work and experience," do you see the name of |
| 21 | Because every place I went, they treated | 21 | the employer, "Carlos Famania-own business"? |
| 22 | me very bad. I don't want to talk about that. | 22 A. | Sorry? |
| 23 Q. | The places that they treated you bad, those are | 23 Q. | On that part of the first page which says, "work |
| 24 | places before you came to Whitney Place? | 24 | experience," it lists as the first employer Carlos |

|    | 15 |    | 17 |
|----|----|----|----|
| 1 A. | In Whitney Place. | 1 | Famania-own business, do you see that on the work |
| 2 Q. | Did the places that you went for jobs before | 2 | experience? |
| 3 | Whitney Place treat you bad? | 3 | MS. ALTAMORE: Do you see it? |
| 4 A. | In Whitney Place. | 4 A. | Yes. |
| 5 Q. | Well, what about the jobs that you referenced | 5 Q. | At some point in time, did you work for your |
| 6 | before you went to Whitney Place? | 6 | brother Carlos Famania? |
| 7 A. | I say Whitney Place, because I have requested other | 7 A. | The problem is that he would take me to the place |
| 8 | jobs, but I haven't worked anywhere else at Whitney | 8 | he worked, but I didn't work for him. I didn't |
| 9 | Place. | 9 | work there. And I bring him things, so I had |
| 10 Q. | Before you worked at Whitney Place, did you have a | 10 | knowledge of the tools. |
| 11 | job? | 11 Q. | Did Carlos pay you for working? |
| 12 A. | I repeat again, the only job I had was Whitney | 12 A. | No. |
| 13 | Place. | 13 Q. | When you went with Carlos, did somebody pay you? |
| 14 | MR. WAYNE: Can I have this marked, | 14 A. | No. |
| 15 | please. | 15 Q. | Did you get any money when you went to work with |
| 16 | (Exhibit No. 1, employment application, | 16 | Carlos? |
| 17 | marked for identification.) | 17 A. | No. I went there for training to get knowledge. |
| 18 Q. | Do you recall ever seeing in Exhibit 1 that in the | 18 Q. | And what type of work did you do with Carlos? |
| 19 | left-hand corner says, "The Willow at Westboro"? | 19 A. | I didn't have any kind of job. I would give him |
| 20 A. | Where is my signature here? | 20 | the tools, and then I start learning. |
| 21 Q. | Do you want me to repeat the question? | 21 Q. | And what type of tools did Carlos show you? |
| 22 A. | Yes. | 22 A. | Vacuum cleaner and to shine the floors and to clean |
| 23 Q. | Do you ever remember seeing the document marked as | 23 | the windows and things like that. |
| 24 | Exhibit 1 which in the left-hand corner it says, | 24 Q. | During this time, do you know who Carlos was |

5 (Pages 14 to 17)

Case 1:05-cv-10996-WGY    Document 34-4    Filed 02/27/2006    Page 6 of 14

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

18

1    employed by?
2    A.   I don't know, because I never asked him.
3    Q.   And for how long did you work with Carlos?
4    A.   I didn't work with him. I just was going with him
5        to help him with the tools.
6    Q.   How long did you go with Carlos to help him with
7        the tools?
8    A.   I don't recall well, one or two years.
9    Q.   And for that entire one or two years, you received
10       no money?
11   A.   No. But I was receiving money from the government,
12       SSI.
13   Q.   And what were you receiving money from the
14       government for SSI?
15   A.   For me, my children, and my wife that at that time
16       she didn't work.
17   Q.   Did any of the SSI money that you received, was
18       that due to any type of disability?
19   A.   Yes.
20   Q.   And what money was that for?
21   A.   Because I have disability in my left arm and hand.
22       I had meningitis at one year old.
23   Q.   What type of jobs was Carlos performing when you
24       were working with him when he was showing you how

19

1        to use the tools?
2    A.   I didn't help him. I went with the tools.
3    Q.   And what type of work was Carlos doing?
4    A.   He was vacuuming the floor, shampooing the carpets,
5        buffing the floors, and cleaning windows.
6    Q.   Do you know who he was employed by?
7        MS. ALTAMORE: Asked and answered.
8    A.   I don't know.
9    Q.   Was this work done in office buildings?
10   A.   It was houses that he clean.
11   Q.   Now, on the employment application it has a name
12       and address of an employer called RJB. Do you know
13       who RJB is?
14   A.   I don't know.
15   Q.   Could that be PJB?
16   A.   I don't recall.
17   Q.   Do you see the telephone number 508-904-4004?
18   A.   I don't recall.
19   Q.   Is it your testimony that you do not know who is
20       the person who has that telephone number?
21   A.   I don't remember. Too many years. I don't
22       remember.
23   Q.   There's listed the name of the supervisor, Peter,
24       do you know a supervisor named Peter?

20

1    A.   I don't remember.
2    Q.   It indicates that you were employed by the employer
3        PJB or RJB between 1995 and 1997. Do you recall
4        what you did for a job between 1995 and 1997?
5    A.   I don't remember.
6    Q.   For the period of time before you went to Carlos
7        when he was doing housecleaning, do you recall if
8        you ever had a job?
9    A.   No. Only in Whitney Place.
10   Q.   After you left the employ of Whitney Place, have
11       you gotten another job?
12   A.   No.
13   Q.   Is Whitney Place the only employer that you've ever
14       worked?
15   A.   Yes.
16   Q.   Did you graduate from high school?
17       THE INTERPRETER: Sorry?
18   Q.   Did you graduate from high school?
19   A.   No.
20   Q.   On the second page of Exhibit 1, I believe it says
21       under education, "Stella Marquez Salinas, PR," is
22       that the high school that you attended?
23   A.   No. I went to the Perpetuo Socorro.
24   Q.   Could you spell that for the record, please.

21

1        THE INTERPRETER: Let me write it down.
2    P-E-R-P-E-T-U-O, S-O-C-O-R-R-O.
3    Q.   Do you know an individual by the name of Carmen?
4    A.   Carmen? I don't remember. Carmen what?
5    Q.   Carmen.
6    A.   No.
7    Q.   Do you know an individual by the name of Wanda
8        Vargas?
9    A.   That's my sister-in-law.
10   Q.   Did Wanda Vargas work at Boston Scientific?
11   A.   Yes.
12   Q.   At sometime after April 18th of 2000, did you
13       obtain employment with Whitney Place?
14   A.   Yes, 26 April of 2000.
15   Q.   And why do you remember that you began work on
16       April 26th, 2000?
17   A.   Because I always remember that date.
18   Q.   Is there any reason why you specifically remember
19       August 26th of 2000?
20       MS. ALTAMORE: Strike that. Not August.
21   Q.   Is there any reason why you remember April 26th of
22       2000?
23   A.   Because of the bad experience and the bad treatment
24       they gave me there.

6 (Pages 18 to 21)

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| | | 22 |
|---|---|---|
| 1 | Q. | Did you receive any bad treatment from Whitney |
| 2 | | Place on April 26th of 2000? |
| 3 | A. | No. That day they gave me the job. |
| 4 | Q. | And was that your first job? |
| 5 | A. | Yes. |
| 6 | Q. | And at the time you received your job, Jack Curtin |
| 7 | | was your supervisor? |
| 8 | | MS. ALTAMORE: Asked and answered. |
| 9 | A. | Yes. |
| 10 | Q. | And could you describe your relationship with Jack |
| 11 | | Curtin? |
| 12 | A. | Jack Curtin know how to treat people, and he would |
| 13 | | help them. |
| 14 | Q. | And did Mr. Curtin help you? |
| 15 | A. | Yes. He gave me the job and gave me that |
| 16 | | opportunity. |
| 17 | Q. | And aside from giving you the job, what else did |
| 18 | | Mr. Curtin do for you? |
| 19 | A. | He was very supportive all the time. |
| 20 | Q. | And what did Jack Curtin do to support you? |
| 21 | A. | He would advise me and help in the job. |
| 22 | Q. | And what type of advice would Jack Curtin give you? |
| 23 | A. | You know, he would tell me how to do the job, how |
| 24 | | to maintain my job, you know. |

| | | 23 |
|---|---|---|
| 1 | Q. | Would Mr. Curtin come on the job after five o'clock |
| 2 | | when you were working? |
| 3 | A. | He would stay, yes. I would see him. |
| 4 | Q. | And when Mr. Curtin stayed after five o'clock when |
| 5 | | you were working, did you and Mr. Curtin talk to |
| 6 | | each other? |
| 7 | A. | Yes. He would talk to me. |
| 8 | Q. | And how often would that happen? |
| 9 | A. | Sometimes whenever he had time. |
| 10 | Q. | Was it often? |
| 11 | A. | Sometimes. |
| 12 | | (Exhibit No. 2, Acknowledgement of |
| 13 | | Employment Handbook, marked for identification.) |
| 14 | Q. | I direct your attention to a document, Exhibit 2, |
| 15 | | which states, "Acknowledgement of Receipt of |
| 16 | | Employee Handbook," is that your signature? |
| 17 | A. | Yes. |
| 18 | Q. | In the upper right-hand corner it says, "Jose |
| 19 | | Famania," is that your handwriting? |
| 20 | A. | I don't recall. That's not my handwriting. |
| 21 | Q. | Prior to the time that you executed this document, |
| 22 | | did you read the lines above your signature? |
| 23 | A. | I don't remember that moment. |
| 24 | Q. | At some point in time when you were employed at |

| | | 24 |
|---|---|---|
| 1 | | Whitney Place, did you report that you were injured |
| 2 | | at work? |
| 3 | A. | Yes. I remember that moment. |
| 4 | Q. | And who did you report that you received a work |
| 5 | | injury? |
| 6 | A. | In my left hand. |
| 7 | Q. | And who did you report that you had an injury in |
| 8 | | your left hand? |
| 9 | A. | As I told you in the beginning, he put me to do |
| 10 | | jobs that are not my jobs, like, lifting heavy |
| 11 | | tables and chairs and those shining machines, |
| 12 | | buffing machines, and I hurt myself. |
| 13 | Q. | Now, the person you're saying that assigned you to |
| 14 | | do the lifting of the heavy tables and the buffing |
| 15 | | machines, was that Mr. Larouche? |
| 16 | A. | Yes. |
| 17 | Q. | When you were assigned to work with the tables, did |
| 18 | | you report to Mr. Larouche that you injured your |
| 19 | | hand? |
| 20 | A. | Yes, that's true. |
| 21 | Q. | Was Mr. Larouche present when you injured your |
| 22 | | hand? |
| 23 | A. | No. Not at that moment, no. |
| 24 | Q. | When you injured your hand, did you go to the |

| | | 25 |
|---|---|---|
| 1 | | doctor? |
| 2 | A. | Yes, I went to the doctor. I went first to the |
| 3 | | second floor where the nurses are, and they did the |
| 4 | | report there. Then I went to look for my wife to |
| 5 | | take me to the hospital. |
| 6 | Q. | Did your wife work at Whitney Place? |
| 7 | A. | No. My wife works at Kiddie Fenway. |
| 8 | Q. | Can you spell that? |
| 9 | A. | Oh, no. |
| 10 | Q. | And did she take you to Metrowest Hospital? |
| 11 | A. | Metrowest. |
| 12 | Q. | After your wife took you to Metrowest, were you |
| 13 | | seen by a doctor? |
| 14 | A. | Yes. |
| 15 | Q. | After you saw the doctor, did you report back to |
| 16 | | work? |
| 17 | A. | Yes. The doctor gave me a letter. |
| 18 | Q. | Do you recall what the letter said? |
| 19 | A. | I don't know whether the letter said -- I know that |
| 20 | | I stayed a few days without working. |
| 21 | Q. | After you stayed a few days without working, did |
| 22 | | you go back to work? |
| 23 | A. | With a letter, I went back to my job with the |
| 24 | | letter that I gave Mike that he had to give me easy |

7 (Pages 22 to 25)

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

26

1    jobs.
2              MS. ALTAMORE: I'm just going to note for
3    the record my objection to this entire line of
4    questioning, because we're not relitigating any
5    type of Workers' Comp injury, but continue on.
6    Q.   At some point in time after you gave Mr. Larouche a
7         letter that said that he had to give you easy jobs,
8         did you get hurt again?
9    A.   I injured on 5/16/02, and I never returned. I
10        never went back there.
11   Q.   And after that time, did you receive money for your
12        injuries?
13   A.   Yes, they gave me money.
14             MR. WAYNE: Can I have this marked as
15   Exhibit 3, please.
16             (Exhibit No. 3, history, marked for
17   identification.)
18             MS. ALTAMORE: I'm just going to note an
19   objection again, this is all -- it's not applicable
20   to our current situation, and I just think it's a
21   bit of a diversion. There's no question these
22   events happened, and I don't see its relevance to
23   the current proceeding, but continue.
24             Actually, lets go off the record for a

27

1    second.
2              (Discussion held off the record.)
3    Q.   In regard to Exhibit No. 3, which on the left-hand
4         corner says, "employee, Jose Famania; employer,
5         Beaumont Rehab at Natick; Insurer, Atlantic
6         Charter Insurance Company," on the bottom of the
7         page there's a signature line that says,
8         "employee," is that your signature above the line
9         that says "employee"?
10   A.   That's my signature.
11   Q.   And as a result of signing this document, you were
12        given money by the insurance company?
13   A.   Yes, they gave me money.
14   Q.   Prior to signing this document, did you read the
15        document?
16   A.   I don't remember, but I must have read it.
17             MR. WAYNE: Can I have this marked please
18   as Exhibit 4.
19             (Exhibit No. 4, complaint, marked for
20   identification.)
21   Q.   Exhibit 4 is a document which is captioned, "United
22        States Federal District Court, Eastern District of
23        Massachusetts, Civil Action No. 0501996WGY, Jose
24        Famania, Gilberto Famania, Myrna Famania, Idalia

28

1         Alers, plaintiffs v. Whitney Place at Natick, Inc.,
2         defendant."
3    A.   Yes.
4    Q.   I'd like you to turn to the last page?
5    A.   (Witness complies.)
6    Q.   In the middle of the last page it says,
7         "Respectfully submitted," and on the next line it
8         says, "Jose Famania-pro se," is that your
9         signature?
10   A.   Yes, that's my signature.
11   Q.   And prior to signing this document, did you read
12        it?
13   A.   I must have read it.
14   Q.   Mr. Famania, do you speak some English?
15   A.   Very little, because I haven't practiced it and you
16        forget it.
17   Q.   Did you speak sufficient English to perform your
18        job at Whitney Place?
19             MS. ALTAMORE: Objection. You can
20   answer.
21   A.   Not enough English. As I said before, Gilberto was
22        our interpreter.
23   Q.   If you remember, what things could you not do at
24        Whitney Place because you had difficulty speaking

29

1    English?
2    A.   No. I did my job.
3              (Exhibit No. 5, Plaintiff's memorandum of
4    law in opposition of Defendant's motion to dismiss,
5    marked for identification.)
6    Q.   This document is captioned, "United States Federal
7         District Court, Eastern District of Massachusetts,
8         Civil Action No. 0501996WGY." It is in the matter
9         of Jose Famania, Gilberto Famania, Myrna Famania,
10        Idalia Alers, plaintiffs v. Whitney Place at
11        Natick, Inc., defendant.
12             Caption on this document is, "Plaintiff's
13        memorandum of law in opposition of Defendant's
14        motion to dismiss." And I'd like to draw your
15        attention to the second to last page. In the
16        middle of page five it says, "respectfully
17        submitted," and directly underneath the term
18        "respectfully submitted," is a line, and underneath
19        the line it says, "Jose Famania-pro se," is that
20        your signature?
21   A.   Yes.
22   Q.   Now, turning your attention to the last page of
23        this document which is captioned, "Certificate of
24        Service," and there's a signature line, and the

8 (Pages 26 to 29)

Case 1:05-cv-10996-WGY    Document 34-4    Filed 02/27/2006    Page 9 of 14

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

30

1  signature line it's typed "Jose Famania," above
2  that is your signature?
3  A.  That's my signature.
4  Q.  And prior to executing the document that's
5  entitled, "Certificate of Service," did you read
6  that document?
7  A.  I must have read it.
8  Q.  And in regard to the document itself which is
9  entitled, "Plaintiff's memorandum of law in
10  opposition of Defendant's motion to dismiss," did
11  you read this document before you signed it?
12  A.  I must have read it.
13        MR. WAYNE:  Can I have this exhibit
14  marked, please.
15        (Exhibit No. 6, Answers to
16  interrogatories, marked for identification.)
17  Q.  The document that has been marked as Exhibit 6 has
18  a stamp "draft" on the right-hand corner it says,
19  "United States Federal District Court, Eastern
20  District of Massachusetts, Civil Action No.
21  0501996WGY," and it's entitled, "Plaintiff Jose
22  Famania's answers to Whitney Place at Natick first
23  set of interrogatories."
24        MS. ALTAMORE:  We'll stipulate as to the

31

1  caption.  We'll stipulate as to the caption, but if
2  you just want to read that.
3        THE INTERPRETER:  Okay.
4  Q.  Now, drawing your attention to the answer to
5  Interrogatory 3.
6        MS. ALTAMORE:  Do you have a copy for me?
7  Q.  In regard to Interrogatory No. 3, paragraph 1, it
8  states that "On a Wednesday in 2000, he was
9  cleaning on the first floor after 5:00 p.m.
10  Plaintiff's regular shift was 5:00 to 10:00 p.m.
11  Plaintiff also recalls that it was a Wednesday,
12  because there were chairs in the room for an open
13  house which occurred on a Wednesday.
14        There were no residents present and Kate
15  Salmon told him not to speak Spanish.  Plaintiff
16  states that he went to Mike Larouche to complain
17  and was told that he could do nothing as Ms. Salmon
18  was an owner.  No written warning was issued."
19        Are you certain that this occurred on a
20  Wednesday in the year 2000?
21  A.  Yes.
22  Q.  Do residents and guests use the room?
23  A.  Yes.
24        MS. ALTAMORE:  Actually, can I have

32

1  a minute?
2  A.  Mike did not work at that time for Whitney Place.
3  Q.  And you're making this notice of your thought after
4  you spoke to counsel?
5  A.  Yes.  Because the date is wrong.
6  Q.  So at the present time, you're not certain of what
7  the date was?
8  A.  2001 or -- 2001.
9  Q.  At the time that this answer was written, you
10  thought that the time was the year 2000, correct?
11  A.  Yes, but it was mistaken.
12  Q.  Now, you say that Kate Salmon told you not to speak
13  Spanish; is that correct?
14  A.  Yes, that's correct.
15  Q.  Did you say anything in response to Ms. Salmon?
16  A.  No, at that moment.  No, I didn't answer to her,
17  but I felt very bad, because that's my language.
18  There were no residents there at that moment.
19  Q.  Did you say that to Ms. Salmon?
20  A.  No.  I thought that inside of myself.
21  Q.  Did you say anything to Ms. Salmon at that time?
22  A.  No.  I told Mike.
23  Q.  Did Ms. Salmon say anything else to you at that
24  time?

33

1  A.  She told me you cannot speak Spanish in this area,
2  even though there was no residents there.
3  Q.  Did you question her about what she just said to
4  you?
5  A.  No.  How could I do that?  I could lose my job.
6  She was the owner.
7  Q.  Did you ask her why?
8        MS. ALTAMORE:  Asked and answered.
9  A.  No.
10  Q.  Did she say anything else to you at that time about
11  speaking Spanish?
12        MS. ALTAMORE:  Asked and answered.
13  A.  She told me, "You cannot be speaking Spanish in
14  this area," and there were no residents there.
15  Q.  And she said nothing else to you?
16  A.  No.
17  Q.  Did she later give you a warning?
18  A.  No.
19  Q.  Did she later discipline you?
20  A.  No.
21  Q.  Did she later take any other action against you
22  because you spoke Spanish in that area?
23  A.  Her?
24  Q.  Yes, her.

9 (Pages 30 to 33)

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

34

1　A.　No. She only told me, "You cannot speak Spanish in
2　　　this area, even though there are no residents."
3　Q.　Did you later discuss the matter with Michael
4　　　Larouche?
5　A.　He said, "Well, I cannot do anything. She's the
6　　　owner."
7　Q.　Did you ask him what was the reason for the rule?
8　A.　No.
9　　　　　MS. ALTAMORE: Objection. No rule. He
10　　　did not state that there was a rule. In question
11　　　and form.
12　Q.　Did you ask Mr. Larouche why you could not speak
13　　　Spanish in that area?
14　A.　No. He only told me that she was the owner.
15　Q.　When you made the statement to Mr. Larouche, was
16　　　anyone else present?
17　A.　Yes. My coworker Silas was there with me.
18　Q.　Silas was present with you when you spoke to
19　　　Mr. Larouche?
20　A.　No. When the lady, the owner, told me not to speak
21　　　Spanish, Silas was there with me.
22　Q.　Was Salis Puerto Rican?
23　A.　No. He is Brazilian.
24　Q.　Were you speaking to Silas in Spanish?

35

1　A.　Yes. Because he didn't speak English.
2　Q.　Did Silas understand Spanish?
3　A.　Yes.
4　Q.　Was the direction that Kate Salmon gave to you, did
5　　　she also give that direction to Silas?
6　A.　To both of us, because we were speaking Spanish.
7　Q.　At that time did Silas make any statement to
8　　　Ms. Salmon?
9　A.　He doesn't speak English.
10　Q.　Did you explain to Silas what Ms. Salmon said to
11　　　you?
12　A.　Yes.
13　Q.　When Ms. Silas stated to you not to speak Spanish,
14　　　was she speaking in English?
15　　　　　MS. ALTAMORE: Kate Salmon?
16　　　　　MR. WAYNE: Yes.
17　A.　Yes. She doesn't speak Spanish.
18　Q.　Did you understand what Ms. Salmon said to you?
19　A.　Yes.
20　Q.　Do you recall anything else that Ms. Salmon said to
21　　　you at that time?
22　A.　No.
23　Q.　Now, later you said that you went and you made a
24　　　complaint to Mr. Larouche; is that correct?

36

1　A.　Yes.
2　Q.　And you complained to Mr. Larouche about the
3　　　statement made by Ms. Salmon to you?
4　　　　　MS. ALTAMORE: Asked and answered.
5　A.　Yes.
6　Q.　And was anyone else present when you made the
7　　　complaint to Mr. Larouche?
8　A.　Silas.
9　Q.　And Silas is the Brazilian?
10　A.　Yes.
11　Q.　And when you made your complaint to Mr. Larouche,
12　　　did you make your complaint in English?
13　A.　Yes.
14　Q.　Do you recall what you said in English to
15　　　Mr. Larouche?
16　A.　Yes.
17　Q.　What did you say?
18　A.　Should I say it in English?
19　Q.　Yes, please.
20　A.　(In English.) "The owner, Kate, she told me no
21　　　speak Spanish in this area. This area is no
22　　　resident around." He said, "No worry about it,
23　　　Jose, she's the owner."
24　Q.　Do you recall saying anything else to Mr. Larouche

37

1　　　at that time when you made your complaint about
2　　　Kate Salmon?
3　A.　No, nothing else.
4　Q.　Do you recall anything else that Mr. Larouche said
5　　　to you?
6　A.　No.
7　Q.　Do you recall where that conversation took place?
8　A.　At his office, because we were down the corridor.
9　　　Because when she told me that, I went back, and
10　　　Mike was in his office, so I told him that.
11　Q.　Did Mike give you any discipline for speaking
12　　　Spanish in front of Ms. Salmon in the room?
13　A.　No. He only told me that she's the owner, and I
14　　　cannot do anything, and I felt bad because that's
15　　　my language, and there were no residents around.
16　Q.　Did you tell Mr. Larouche that you felt bad?
17　A.　Yes.
18　Q.　Did you tell him that in English?
19　A.　Yes.
20　Q.　Could you tell me what you said to Mr. Larouche in
21　　　English? Take your time.
22　A.　(In English.) I really nervous, you know.
23　Q.　Do you recall that you told Mr. Larouche in English
24　　　-- do you recall that you said to

10 (Pages 34 to 37)

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

38

1     Mr. Larouche in English that you felt bad about
2     what Ms. Salmon said to you?
3  A. I said in English, (In English.) I no feel good.
4     The owner say that.
5  Q. Did I understand you correctly that you said in
6     English to Mr. Larouche that you didn't feel good
7     because of what the owner said?
8  A. Yes, that's true.
9  Q. Did you feel bad because the owner scolded you?
10 A. Yes. She had a bad attitude, and she raised her
11    voice, like, angry.
12 Q. Did Mr. Larouche give you a written warning because
13    you spoke English in front of Ms. Salmon in the
14    resident hall?
15    MS. ALTAMORE: Asked and answered.
16 A. No. He only told me that she's the owner, I cannot
17    do anything.
18 Q. Now, in regard to Interrogatory 3 at number two it
19    states, "Plaintiff states that he was cleaning the
20    day care facility with Silas Leite and Amadu, who
21    are both Brazilian. Plaintiff does not recall the
22    exact date, but the time was during his regular
23    5:00 to 10:00 shift.
24    Three employees were speaking Spanish

39

1     because neither plaintiff nor the two employees
2     were fluent in English. The common language
3     between the three employees was Spanish. No
4     resident were present in the day care facility.
5     Although there were some minor children present.
6     The director of day care, who has since left, told
7     them not to speak Spanish. No written warning was
8     issued."
9     MS. ALTAMORE: Just as a note, this was
10    amended in the final interrogatory answer, in that
11    there were only two persons present. Silas Leite
12    Amadu, I believe is his full name, and so only two
13    employees were present, not three.
14 A. We were two. No.
15 Q. No what?
16 A. He didn't give me any warning.
17    THE INTERPRETER: He answered the last
18    sentence, "no written warning issued."
19 Q. And arising from this incident when you were
20    reminded to speak English not Spanish, did you ask
21    the director of day care why you could not speak
22    Spanish at that time?
23 A. No.
24 Q. In regard to this event, did Mr. Larouche take any

40

1     action against you?
2  A. I didn't communicate anything to him, because if he
3     didn't say anything, and he told me he couldn't do
4     anything because of the owner in the first
5     occasion, how could I tell him about the teacher?
6  Q. Do you recall the name of the person who told you
7     not to speak English -- strike that. Not to speak
8     Spanish?
9  A. It was a teacher, the director.
10 Q. How did you know whether it was the director or the
11    teacher?
12 A. Because she was always in that office that was the
13    director's office.
14 Q. Do you remember her first name?
15 A. No. I never asked the name to anybody. I was
16    going to my job and that was it.
17 Q. Did anyone else aside from the director or the
18    teacher in regard to this event, say anything to
19    you about this event?
20 A. What event?
21 Q. The event that you complain of where you were
22    speaking Spanish to a Brazilian employee in the day
23    care center?
24 A. No.

41

1  Q. Now, in regards to number three it says that "The
2     plaintiff states that during his 5:00 to 10:00 p.m.
3     shift, one of his duties was to clear away the
4     trash from the second floor. Plaintiff states that
5     he regularly conversed with Marcello and Erica, who
6     are Brazilian and Spanish. As plaintiff's not
7     fluent in English, the only common language is
8     Spanish. No residents were present.
9     On multiple occasions, Plaintiff was told
10    by the CNA supervisor, Marlene, not to speak
11    Spanish. Plaintiff does not recall an occasion in
12    which Marlene told either Marcello or Erica to stop
13    speaking their language other than English even
14    when they were speaking Spanish or Portuguese.
15    Plaintiff states that both Marcello and Erica told
16    plaintiff that Marlene was wrong."
17 A. Yes. Because I would arrive there, and they were
18    speaking in their language, and I would come there,
19    and she would take another attitude with me and see
20    me wrongly.
21 Q. Does Marlene speak Spanish?
22 A. No. She's American.
23 Q. Does Marlene speak Portuguese?
24 A. I don't know. I think not.

11 (Pages 38 to 41)

42

1  Q.  When you spoke to Marcello, did Marcello speak
2      English?
3  A.  He spoke to me in Spanish. He would speak some
4      Spanish.
5  Q.  Do you know whether Marcello speaks English?
6  A.  I suppose that he speaks English, because with a
7      job like CNA, he must speak English.
8  Q.  And in regard to Erica, does Erica speak Spanish?
9  A.  Yes, a little bit.
10 Q.  Does Erica speak English?
11 A.  I assume that as much as Marcello, but I couldn't
12     tell.
13 Q.  Did you ever speak with Marcello in English?
14 A.  No.
15 Q.  Did you ever speak with Erica in English?
16 A.  No.
17 Q.  Did you ever speak with Marcello in Spanish?
18 A.  Yes. All the time that I went there, I would say
19     hello in Spanish, how are you?
20 Q.  And would Marcello reply to you in Spanish?
21 A.  Yes.
22 Q.  And what else do you recall saying to Marcello in
23     Spanish?
24 A.  Job matters. They would ask me for trash bags,

43

1      napkins, things like that.
2  Q.  Anything else you recall speaking to Marcello in
3      Spanish?
4  A.  No. She said the CNA was acting wrong. She was
5      treating me badly and why me.
6  Q.  Aside from when Marcello spoke to you in Spanish,
7      was he asking you to provide him with supplies?
8  A.  No. We were talking hello, how are you, Jose, how
9      you feeling?
10 Q.  And Marcello was speaking in Spanish?
11 A.  A little bit of Spanish.
12 Q.  And on some occasions, Marlene would hear you
13     speaking Spanish?
14 A.  Yes.
15 Q.  And she would tell you not to speak in Spanish?
16 A.  Exactly.
17 Q.  And she would tell Marcello not to speak in
18     Spanish?
19 A.  No. She wouldn't say anything to him.
20 Q.  Did you ask her why she was allowing Marcello to
21     speak in Spanish and you not to speak in Spanish?
22 A.  No.
23 Q.  Why do you believe when you were speaking to
24     Marcello in Spanish, that Marcello was speaking to

44

1      you in Spanish, that when Marlene said "don't speak
2      Spanish," she was directing it only at you and not
3      Marcello?
4  A.  Because she looked at me and pointed at me.
5  Q.  Were you the person speaking Spanish right before
6      she pointed at you?
7  A.  Yes.
8  Q.  Did she give Marcello permission to speak in
9      Spanish?
10     MS. ALTAMORE: Objection. That's a very
11     broad question.
12 Q.  Did she give Marcello permission to speak in
13     Spanish?
14 A.  He didn't ask for permission. He was talking to
15     me.
16 Q.  After Marlene looked at you and told you not to
17     speak Spanish, did Marcello stop speaking Spanish?
18 A.  Yes.
19 Q.  Was Erica also part of this conversation?
20 A.  Yeah. She was also saying hello.
21 Q.  At that time did she stop speaking Spanish?
22 A.  She only say hello to me.
23 Q.  But at that time, did she stop speaking Spanish?
24 A.  Yes, she stopped.

45

1  Q.  And after Marlene asked you to stop speaking
2      Spanish, and you, Marcello, and Eric stopped
3      speaking Spanish, did she take any other action
4      against you?
5  A.  She looked at me with an attitude like if I was a
6      trash.
7  Q.  Exactly what did she say to you when you were
8      speaking Spanish?
9      MS. ALTAMORE: Who?
10 A.  "Don't speak Spanish."
11 Q.  Did she say anything else?
12 A.  No.
13 Q.  When you were speaking Spanish to Marcello and
14     Erica, where were you standing?
15 A.  I was in front of the garbage pulling the garbage
16     out.
17 Q.  And was that in a particular room?
18 A.  The kitchen.
19 Q.  Is the kitchen also the dining area?
20 A.  Yes.
21 Q.  And aside from Erica, Marcello, and you, was anyone
22     else present in the dining area?
23 A.  No. There were no residents there.
24 Q.  And at the time you started speaking Spanish to

12 (Pages 42 to 45)

Case 1:05-cv-10996-WGY   Document 34-4   Filed 02/27/2006   Page 13 of 14

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

46

1  Marcello and Erica, was Marlene also in the dining
2  area?
3  A.  She arrived at that moment.
4  Q.  Did you notice where she came from?
5  A.  No, I don't know.  I have no knowledge.
6  Q.  And how long was the conversation which she told
7  you not to speak Spanish?
8  A.  Well, after she told me that, she went to her desk,
9  and when she went to her desk, it was when Marcello
10  and Erica told me she was wrong for telling me
11  that.
12  Q.  Was her desk in the dining room?
13  A.  No.  Like in front after the corridor.
14  Q.  How many feet away, if you remember, was her desk
15  from where you were speaking with Marcello and
16  Erica?
17  A.  Like from here (indicating) to the wall.
18  Q.  That's about 20 feet?
19  A.  More or less.
20  Q.  Approximately, how long, seconds or minutes, was
21  she in front of you when she told you not to speak
22  Spanish and reminded you and Marcello and Erica not
23  to speak Spanish?
24  A.  No.  She only said that and went to her desk.

47

1      (Discussion held off the record.)
2
3      (Whereupon the Deposition of
4      Jose O. Famania suspended at 12:30 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

48

1      ERRATA SHEET DISTRIBUTION INFORMATION
2      DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4      ERRATA SHEET DISTRIBUTION INFORMATION
5      DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
6
7      ERRATA SHEET DISTRIBUTION INFORMATION
8      The original of the Errata Sheet has been
9  delivered to Joan M. Altamore, Esquire.
10      When the Errata Sheet has been completed
11  by the deponent and signed, a copy thereof should
12  be delivered to each party of record and the
13  ORIGINAL forwarded to Richard D. Wayne, Esquire, to
14  whom the original deposition transcript was
15  delivered.
16      INSTRUCTIONS TO DEPONENT
17      After reading this volume of your
18  deposition, please indicate any corrections or
19  changes to your testimony and the reasons therefor
20  on the Errata Sheet supplied to you and sign it.
21  DO NOT make marks or notations on the transcript
22  volume itself.  Add additional sheet if necessary.
23  Please refer to the above instructions for errata
24  sheet distribution information.

49

1  PLEASE ATTACH TO THE DEPOSITION OF JOSE O. FAMANIA
2      DATE TAKEN: 01/17/2006
3      ERRATA SHEET
4  Please refer to page 48 for errata sheet
5  instructions and distribution instructions.
6  PAGE    LINE    CHANGE        REASON
7
8
9
10
11
12
13
14
15      I have read the foregoing transcript of
16  my deposition and except for any corrections or
17  changes noted above, I hereby subscribe to the
18  transcript as an accurate record of the statements
19  made by me.
20      Executed this    day of    , 2006.
21
22
23          Jose O. Famania
24

13 (Pages 46 to 49)

Jose O. Famania 1-17-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

50

1     C E R T I F I C A T E

2

3     COMMONWEALTH OF MASSACHUSETTS

4

5

6           I, Elizabette M. Afonso, a Professional

7     Shorthand Reporter and Notary Public in and for the

8     Commonwealth of Massachusetts, do hereby certify

9     that the following transcript of the deposition of

10    Jose O. Famania, having been duly sworn through

11    interpretation, is true and accurate to the best of

12    my knowledge, skill, and ability.

13           IN WITNESS WHEREOF, I have hereunto set

14    my hand and seal this 19th day of January, 2006.

15

16

17    _____
      Elizabette M. Afonso

18          Notary Public

19

20    My commission expires:
      November 10, 2006

21

22

23

24

14 (Page 50)

1               UNITED STATES FEDERAL DISTRICT COURT

2               EASTERN DISTRICT OF MASSACHUSETTS

3

4                       CIVIL ACTION NO.:  0510996WGY

5

6       * * * * * * * * * * * * * * * * * *

7       JOSE FAMANIA, GILBERTO FAMANIA,

8       MYRNA FAMANIA and IDALIA ALERS,

9               Plaintiffs,

10      vs.

11      WHITNEY PLACE AT NATICK, INC.,

12              Defendant.

13      * * * * * * * * * * * * * * * * * *

14

15              DEPOSITION OF JOSE O. FAMANIA, taken on

16      behalf of the defendant, pursuant to the

17      Massachusetts Rules of Civil Procedure, before

18      Elizabette M. Afonso, Professional Shorthand

19      Reporter and Notary Public within and for the

20      Commonwealth of Massachusetts, at the law offices

21      of Hinckley, Allen, Snyder, 28 State Street,

22      Boston, Massachusetts, commencing at 10:35 a.m. on

23      Monday, January 23, 2006.

24

Jose O. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 2 | | 4 | |
|---|---|---|---|
| 1 | APPEARANCES: | 1 | P R O C E E D I N G S |
| 2 | | 2 | |
| 3 | LAW OFFICES OF JOAN M. ALTAMORE | 3 | (Giselle Lahey, Interpreter, having been |
| 4 | by Joan M. Altamore, Esquire | 4 | first duly sworn.) |
| 5 | 258 Elm Street | 5 | |
| 6 | Suite 200 | 6 | JOSE O. FAMANIA, |
| 7 | Somerville, Massachusetts  02144 | 7 | having been first duly sworn through |
| 8 | 617.686.1719 | 8 | interpretation, was examined and testified as |
| 9 | On behalf of the plaintiffs | 9 | follows: |
| 10 | | 10 | |
| 11 | HINCKLEY, ALLEN, SNYDER, LLP | 11 | EXAMINATION |
| 12 | by Richard D. Wayne, Esquire | 12 | BY MR. WAYNE: |
| 13 | 28 State Street | 13 | Q.  I'd like to show you Exhibit No. 1.  Do you |
| 14 | Boston, Massachusetts  02109 | 14 | recognize whose handwriting is on that document? |
| 15 | 617.345.9000 | 15 | A.  No, I don't know.  I think it was my brother |
| 16 | On behalf of the defendant | 16 | Gilberto. |
| 17 | | 17 | Q.  Do you understand any spoken English? |
| 18 | BENOIT INTERPRETING SERVICES | 18 | A.  Very little, very little. |
| 19 | Giselle Lahey, Interpreter | 19 | Q.  Now, the first question I believe I asked at the |
| 20 | 33 South Street | 20 | deposition as I said to you, "Mr. Famania, do you |
| 21 | P.O. Box 147 | 21 | speak English," and without any translation, you |
| 22 | Northboro, MA  01532 | 22 | said, "no." |
| 23 | 1-800-261-5152 | 23 | Do you recall answering that question |
| 24 | | 24 | without a translation? |

| 3 | | 5 | |
|---|---|---|---|
| 1 | I N D E X | 1 | A.  Yes.  Without help, I don't know. |
| 2 | | 2 | Q.  So there is some English that you understand? |
| 3 | DEPONENT                           PAGE | 3 | A.  You know, as I told you the other day, I'm not |
| 4 | | 4 | practicing it, and then it goes. |
| 5 | JOSE O. FAMANIA | 5 | Q.  If you recall the other day you stated that you |
| 6 | | 6 | attended a catholic high school in Puerto Rico.  Do |
| 7 | EXAMINATION BY MR. WAYNE              4 | 7 | you recall how many years that you attended the |
| 8 | | 8 | catholic high school in Puerto Rico? |
| 9 | EXAMINATION BY MS. ALTAMORE          32 | 9 | A.  I don't remember at this moment.  I don't remember. |
| 10 | | 10 | I told you last time. |
| 11 | E X H I B I T S | 11 | Q.  But do you recall how many years you spent at that |
| 12 | | 12 | school? |
| 13 | NO.      DESCRIPTION               PAGE | 13 | A.  Until first year. |
| 14 | | 14 | Q.  How many years did you go to school? |
| 15 | (No exhibits were marked.) | 15 | A.  Up to first year. |
| 16 | | 16 | Q.  When you say "up to first year," do you mean up to |
| 17 | | 17 | the first year of high school? |
| 18 | | 18 | A.  Yes. |
| 19 | | 19 | Q.  And do you recall how many years you went to school |
| 20 | | 20 | prior to the first year in high school? |
| 21 | | 21 | A.  From kindergarten to first year. |
| 22 | | 22 | Q.  Would that be ten years? |
| 23 | | 23 | A.  Could be. |
| 24 | | 24 | Q.  And in each of those ten years, you were in a |

2 (Pages 2 to 5)

Jose O. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 6 | | | 8 | | |
|---|---|---|---|---|---|
| 1 | | catholic school? | 1 | A. | Yes, he left. |
| 2 | A. | Yes. | 2 | Q. | And do you know why Jack Curtin left the employ of |
| 3 | Q. | And prior to the time that you left Puerto Rico, | 3 | | Whitney Place? |
| 4 | | did you have any jobs? | 4 | A. | No. |
| 5 | A. | I believe I told you last time that I was receiving | 5 | Q. | Was Jack Curtin the person who showed you how to |
| 6 | | help from the government. | 6 | | perform the jobs at Whitney Place? |
| 7 | Q. | Do you recall how old you were when you stopped | 7 | A. | Yes. He was the one who gave me the opportunity |
| 8 | | going to catholic school? | 8 | | and the job at Whitney Place. |
| 9 | A. | I remember I finished the first year, but I don't | 9 | Q. | And did he demonstrate for you the jobs that you |
| 10 | | remember what age I was. | 10 | | had to perform at Whitney Place? |
| 11 | Q. | After you left school, did you get a job? | 11 | A. | Yes, yes, he did. |
| 12 | A. | I was disabled because of the meningitis, and I was | 12 | Q. | And Jack did not speak English? |
| 13 | | receiving money from the government. | 13 | A. | He would speak English, but Gilberto was my |
| 14 | Q. | And the government program that you were receiving | 14 | | interpreter. |
| 15 | | disability, was the supplemental social security | 15 | Q. | So when Jack needed to communicate with you, he |
| 16 | | income? | 16 | | would get your brother Gilberto who would translate |
| 17 | A. | Social Services. | 17 | | for you? |
| 18 | Q. | Is that sometimes known as SSI? | 18 | A. | Well, as I said before, I learned a little bit to |
| 19 | A. | They give here SSI. They don't give SSI there. | 19 | | communicate with Jack, but as I left the job in |
| 20 | Q. | When you received the money in Puerto Rico under | 20 | | 2002, I haven't practiced, and I have forgotten my |
| 21 | | social services, do you have to establish that you | 21 | | English. |
| 22 | | can't perform any work? | 22 | Q. | To clarify, when you said "you learned a little bit |
| 23 | A. | Yes. | 23 | | to communicate with Jack," you mean that you |
| 24 | Q. | Just to be sure I understand, was Whitney Place the | 24 | | learned a little bit of English to communicate with |

| 7 | | | 9 | | |
|---|---|---|---|---|---|
| 1 | | only job that you ever held? | 1 | | Jack? |
| 2 | A. | Yes. It was the only one was Whitney Place, | 2 | A. | Yes. And I already knew my job. |
| 3 | | because the other one that I had was helping | 3 | Q. | At any time did you speak English with other |
| 4 | | Carlos. | 4 | | employees at Whitney Place? |
| 5 | Q. | And at the time prior to the time that you went to | 5 | A. | I don't think so. |
| 6 | | work for Whitney Place and you were in the main | 6 | Q. | Did you need to know English to perform the jobs |
| 7 | | land, did you receive SSI? | 7 | | you were assigned at Whitney Place? |
| 8 | A. | Yes. But then I went to work, and I stopped it. | 8 | A. | I don't know if I had to, because at least I know |
| 9 | Q. | So SSI stopped when you went to work at Whitney | 9 | | they gave me the opportunity to perform the job, |
| 10 | | Place? | 10 | | and they didn't tell me anything about to have to |
| 11 | A. | Yes, true. | 11 | | speak English. |
| 12 | Q. | And after you left Whitney Place, did you apply for | 12 | Q. | But did you need to know English to properly |
| 13 | | SSI again? | 13 | | perform your job? |
| 14 | A. | Yes, I applied, but I'm waiting for an answer. | 14 | | MS. ALTAMORE: Objection. |
| 15 | Q. | And since the time you left Whitney Place, you've | 15 | A. | It was cleaning. I don't need to talk. |
| 16 | | been unable to receive a job? | 16 | Q. | At some point in time, did an individual by the |
| 17 | A. | No. | 17 | | name of Michael Larouche assign you jobs? |
| 18 | Q. | At the time that you were employed by Whitney | 18 | A. | Yes. |
| 19 | | Place, Jack Curtin was the supervisor? | 19 | Q. | And do you know whether Mr. Larouche could speak |
| 20 | A. | I started with Jack Curtin. | 20 | | Spanish? |
| 21 | Q. | And Jack Curtin was the supervisor of housekeeping? | 21 | A. | No, he didn't speak Spanish. |
| 22 | A. | Yes. | 22 | Q. | Do you know whether Mr. Larouche could speak any |
| 23 | Q. | And at sometime Jack Curtin left the employ of | 23 | | other language besides English? |
| 24 | | Whitney Place? | 24 | A. | I never asked him. |

3 (Pages 6 to 9)

Jose O. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 10 | | |
|---|---|---|
| 1 | Q. | Do you know whether he could speak Portuguese? |
| 2 | A. | I couldn't tell you. |
| 3 | Q. | Did Mr. Larouche from time to time assign you jobs? |
| 4 | A. | Yes. He would give me sometimes jobs with heavy |
| 5 | | machines. |
| 6 | Q. | When he assigned you the job with heavy machines, |
| 7 | | did he speak to you in English? |
| 8 | A. | Yes. |
| 9 | Q. | Based upon what Mr. Larouche stated to you, did you |
| 10 | | understand what your job was? |
| 11 | A. | Yes. |
| 12 | Q. | Was some of the persons who you worked with of |
| 13 | | Brazilian decent? |
| 14 | A. | Silas would work with me, and he was Brazilian. |
| 15 | Q. | Were there any other persons who worked with you |
| 16 | | who were Brazilian? |
| 17 | A. | No. |
| 18 | Q. | Was Erica Brazilian? |
| 19 | A. | Yes, she was Brazilian, but she wouldn't work with |
| 20 | | me. She would work in the second floor. She was a |
| 21 | | CNN [sic], nothing to do with me. |
| 22 | Q. | And what were Silas's job duties and |
| 23 | | responsibilities? |
| 24 | | MS. ALTAMORE: Objection. |

| 11 | | |
|---|---|---|
| 1 | | THE INTERPRETER: I beg your pardon. |
| 2 | Q. | What were Silas's job duties and responsibilities? |
| 3 | A. | The same thing I had to do, cleaning. |
| 4 | Q. | And could you describe for me what type of cleaning |
| 5 | | you did? |
| 6 | | MS. ALTAMORE: Objection. Asked and |
| 7 | | answered. |
| 8 | A. | To clean the day care and the second floor, because |
| 9 | | Elio and Wilson will clean the trash kitchen. |
| 10 | Q. | And what did you have to do to clean the day care |
| 11 | | center? |
| 12 | A. | I had to pick up the trash, mop the floor, vacuum, |
| 13 | | and sweep, and also clean the glasses. |
| 14 | Q. | Are the glasses the windows or drinking glasses? |
| 15 | A. | Window glasses. |
| 16 | Q. | And in regard to the second floor, what job duties |
| 17 | | and responsibilities did you have? |
| 18 | A. | When the residents had lunch, all the trash and |
| 19 | | glasses and dishes that they put in the trash cans, |
| 20 | | I had to get them out. |
| 21 | Q. | And that was what was done on the second floor? |
| 22 | A. | Only that. |
| 23 | Q. | In regard to the second floor, did you have any |
| 24 | | responsibility for cleaning the floors? |

| 12 | | |
|---|---|---|
| 1 | A. | Only when Mike started, he put me to mop the floor. |
| 2 | | I had to sweep them and mop them. |
| 3 | Q. | And prior to the time that Mike was employed, you |
| 4 | | didn't have that responsibility on the second |
| 5 | | floor? |
| 6 | | THE INTERPRETER: What was that? |
| 7 | Q. | Prior to the time that Michael was employed, you |
| 8 | | did not have that responsibility on the second |
| 9 | | floor? |
| 10 | A. | Yes. I only had to pick up the trash, not to mop |
| 11 | | or sweep the floor. |
| 12 | Q. | Did you resent that Michael Larouche assigned you |
| 13 | | to do additional work on the second floor? |
| 14 | | MS. ALTAMORE: Objection. |
| 15 | A. | Yes. Because he put me to do other things that the |
| 16 | | maintenance people use to do, like, bringing the |
| 17 | | papers, cleaning the floor, yes. |
| 18 | | Excuse me, now I remember something. So |
| 19 | | even he put me to do that up to the fifth floor in |
| 20 | | five hours. |
| 21 | Q. | You've mentioned something about bringing in the |
| 22 | | paper, what paper are you talking about? |
| 23 | A. | Papers are toilet paper, napkins, the bags for the |
| 24 | | trash and also the paper towels in every floor. He |

| 13 | | |
|---|---|---|
| 1 | | put me to do that. |
| 2 | Q. | Do you recall any other job duties and |
| 3 | | responsibilities that Mike Larouche added to the |
| 4 | | duties that you had previously performed for Jack |
| 5 | | Curtin? |
| 6 | A. | Everything I mentioned you know. |
| 7 | Q. | So you have nothing to add except from what you've |
| 8 | | previously testified? |
| 9 | A. | Yes. He also put me to shovel snow outside. |
| 10 | Q. | And in addition to the shoveling snow and the |
| 11 | | increase duties in regard to mopping, cleaning and |
| 12 | | paper, did he do anything else? |
| 13 | A. | I don't remember anything else. Sorry. Shine the |
| 14 | | floor, shampoo to the carpets in five hours. |
| 15 | Q. | Did you ever inform Mr. Larouche that you could not |
| 16 | | do that work? |
| 17 | A. | I never told him anything, because I feared to lose |
| 18 | | my job. |
| 19 | Q. | How often did you speak to Mr. Larouche on a daily |
| 20 | | basis? |
| 21 | A. | Very few times. |
| 22 | Q. | Did you ever speak Spanish to another employee and |
| 23 | | no one told you to stop speaking Spanish? |
| 24 | A. | With Silas. |

4 (Pages 10 to 13)

Jose O. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

14

1    Q.    But when you spoke to Silas in Spanish, were there
2          times you spoke to Silas in Spanish and nobody told
3          you not to speak Spanish?
4                MS. ALTAMORE: Objection. Overbroad.
5    A.    The owner. What's her name?
6    Q.    Ms. Salmon, Kate Salmon?
7    A.    Yes, Kate Salmon.
8    Q.    But aside from the one time that Kate Salmon told
9          you not to speak Spanish to Silas, did she tell you
10         not to speak Spanish on any other occasion?
11               MS. ALTAMORE: Objection. We don't have
12         any knowledge that she ever saw him speak Spanish
13         before. So the question is overbroad.
14   A.    I already answered that question.
15   Q.    No. Were you ever told by Kate Salmon aside from
16         one time not to speak Spanish?
17               MS. ALTAMORE: Objection again.
18   A.    Only once.
19   Q.    And were there times that you spoke Spanish that no
20         one told you not to speak Spanish?
21               MS. ALTAMORE: Objection. Overbroad.
22   A.    In the second floor, the CNN [sic], Marlene.
23   Q.    But were there times you spoke Spanish when no one
24         told you to speak Spanish?

15

1                MS. ALTAMORE: Objection to form.
2    Q.    Were there times when you spoke Spanish when no one
3          told you not to speak Spanish?
4    A.    No. Because we were alone.
5    Q.    And when you state that you were alone, does that
6          mean that you were alone with Silas on the second
7          floor?
8                MS. ALTAMORE: Objection.
9    A.    In the day care we were cleaning there was nobody.
10   Q.    So the answer is, yes, you spoke Spanish to Silas
11         on occasion, and no one saw you speak Spanish?
12   A.    In the day care when nobody was there, and we were
13         cleaning.
14               MS. ALTAMORE: It's a yes or no answer.
15   Q.    I'll just state the question again. So there were
16         times when you worked with Silas in the day care
17         and you spoke Spanish and you received no warning?
18   A.    Yeah. Because we were alone.
19   Q.    In regard to your employment application which was
20         Exhibit 1, there were the initials that you had
21         worked for an employer by the name of RJB. Do you
22         recall today who RJB is?
23   A.    My brother was an employee there, and I would go
24         with my brother and check the cars there, but I was

16

1          not working.
2    Q.    Was your brother an employee of RJB?
3    A.    Yes, my brother.
4    Q.    And do you know who the supervisor Peter was?
5    A.    Yes. I met him, but he passed away.
6    Q.    Now, was he a supervisor for RJB?
7    A.    No.
8    Q.    Who was he a supervisor for?
9    A.    He was my brother Hector's supervisor.
10   Q.    And do you know what company that Peter worked as
11         the supervisor of your brother Hector?
12   A.    He was working for a cleaning company.
13   Q.    Do you remember the name of the cleaning company?
14   A.    PJB.
15   Q.    And do you know where PJB is located?
16   A.    Yes, I know where it is. It's in Framingham.
17   Q.    And do you know who owns PJB?
18   A.    Peter was, but he had a car accident and he passed
19         away. He died.
20   Q.    Do you know if the business is still in business?
21   A.    I never went there, because he was in charge of
22         that.
23   Q.    Did Peter treat you badly?
24               MS. ALTAMORE: Objection. Relevance.

17

1                MR. WAYNE: Just testimony.
2                MS. ALTAMORE: I understand. I'm putting
3          my objection in.
4    A.    No. He was very nice to me.
5    Q.    Now, who at Whitney Place treated you badly?
6    A.    In Whitney Place.
7                MS. ALTAMORE: Objection.
8    Q.    Who at Whitney Place treated you badly?
9    A.    Mike Larouche and Marlene. He would see you bad.
10               MS. ALTAMORE: I'm sorry, what was that?
11               THE INTERPRETER: They see you in a bad
12         way.
13   Q.    And how did Mike Larouche communicate to you that
14         he saw you in a bad way?
15               MS. ALTAMORE: Objection.
16   A.    First, the ways he saw me, and then giving me all
17         that work, being me a person I'm incapacitated.
18         I'm a handicap. That's the way he treated me
19         badly.
20   Q.    When you say "the way he saw me," what do you mean
21         by that?
22   A.    He saw me in a way, an unpleasant way like.
23   Q.    When you say "he saw you in an unpleasant way,"
24         what do you mean by that?

5 (Pages 14 to 17)

Jose O. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 18 | | |
|---|---|---|
| 1 | A. | Like, if I was not even there. |
| 2 | Q. | Do you know what job duties and responsibilities |
| 3 | | Mr. Larouche had? |
| 4 | | MS. ALTAMORE: Objection. |
| 5 | A. | No. I have no knowledge. He was a supervisor. |
| 6 | Q. | When you say "he treated you as if you were not |
| 7 | | there," could you describe for me what that means? |
| 8 | A. | Like, ignoring you. |
| 9 | Q. | Did you ever approach Mr. Larouche to ask him a |
| 10 | | question? |
| 11 | | MS. ALTAMORE: Objection. One would |
| 12 | | guess that during the course of his employment at |
| 13 | | some point in time a question was asked of the |
| 14 | | supervisor. |
| 15 | A. | No. |
| 16 | Q. | During your period of employment with Whitney |
| 17 | | Place, did Mr. Larouche ever come over to speak |
| 18 | | with you? |
| 19 | | MS. ALTAMORE: Objection. Broad. |
| 20 | A. | He would come to me and say, "I left you a note for |
| 21 | | what you have to do." |
| 22 | Q. | Were those occasions when he was giving you job |
| 23 | | duties and responsibilities that were beyond what |
| 24 | | you ordinarily did? |

| 19 | | |
|---|---|---|
| 1 | | MS. ALTAMORE: Objection. |
| 2 | | THE INTERPRETER: I'm going to clarify to |
| 3 | | him. |
| 4 | A. | Yes. |
| 5 | Q. | Were the notes in English? |
| 6 | A. | Yes, in English. |
| 7 | Q. | Did you sometimes have questions concerning the |
| 8 | | content of the notes? |
| 9 | A. | No, never. |
| 10 | Q. | When you were working, did Mr. Larouche ever come |
| 11 | | by? |
| 12 | A. | Sometimes he was in his office. |
| 13 | Q. | But when you were doing your work in either the day |
| 14 | | care center or on the second floor, did |
| 15 | | Mr. Larouche ever come by to review your work? |
| 16 | | MS. ALTAMORE: It's a yes or no |
| 17 | | question. |
| 18 | | MR. WAYNE: Well, I'll object to that. |
| 19 | A. | Once came with him one person that is deaf that |
| 20 | | works for him, only once. |
| 21 | Q. | If I understand correctly, on one occasion |
| 22 | | Mr. Larouche came with a person who worked with him |
| 23 | | who could not hear, is that what you said? |
| 24 | A. | No, I didn't say that. |

| 20 | | |
|---|---|---|
| 1 | | Okay. I don't remember the name of the |
| 2 | | guy. I don't know if he was deaf or not, but I |
| 3 | | know that everybody called him the deaf "el sordo", |
| 4 | | which means the deaf. And he send this guy to |
| 5 | | check me. |
| 6 | Q. | And how often did that happen? |
| 7 | A. | Only once. |
| 8 | Q. | And after he checked you, did you get any warning? |
| 9 | A. | No. |
| 10 | Q. | Did Mr. Larouche ever tell you that you weren't |
| 11 | | performing your job properly? |
| 12 | A. | He never said anything. |
| 13 | Q. | Do you recall Mr. Larouche ever saying anything |
| 14 | | negative about your work? |
| 15 | | MS. ALTAMORE: Objection. |
| 16 | A. | I don't recall. But I don't think so. |
| 17 | Q. | Did Mr. Larouche ever say anything positive about |
| 18 | | your work? |
| 19 | | MS. ALTAMORE: Objection. |
| 20 | A. | He never said anything. |
| 21 | Q. | Do you recall being given a handbook by Whitney |
| 22 | | Place at the time you became employed? |
| 23 | A. | Yes. |
| 24 | Q. | Do you recall reading the handbook? |

| 21 | | |
|---|---|---|
| 1 | A. | I don't recall. There are too many years ago. |
| 2 | Q. | When Kate Salmon told you not to speak Spanish, |
| 3 | | reminded you not to speak Spanish, were there any |
| 4 | | other persons present? |
| 5 | A. | Silas. |
| 6 | Q. | And Silas is Brazilian? |
| 7 | | MS. ALTAMORE: Asked and answered. |
| 8 | A. | Yes. |
| 9 | Q. | Do you know whether Kate Salmon speaks Spanish? |
| 10 | A. | No. I have no idea. |
| 11 | Q. | Do you know whether Kate Salmon speaks Portuguese? |
| 12 | A. | I have no idea. |
| 13 | Q. | Do you recall the place where you complained to |
| 14 | | Mr. Larouche about Kate Salmon telling you not to |
| 15 | | speak Spanish? |
| 16 | | MS. ALTAMORE: Objection. I'm not sure |
| 17 | | what you're asking him. |
| 18 | | MR. WAYNE: Read back the question, |
| 19 | | please. |
| 20 | | (Stenographer read back pending |
| 21 | | question.) |
| 22 | Q. | Where Mr. Larouche was? |
| 23 | A. | I went to his office. |
| 24 | Q. | Do you recall whether there was anyone present in |

6 (Pages 18 to 21)

Jose O. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

22

1    Mr. Larouche's office at the time you made the
2    complaint?
3  A.  Silas.
4  Q.  In regard to the complaint you received from the
5    day care teacher, do you recall what her name was?
6  A.  I don't remember her name, because I never asked
7    their names.
8  Q.  Do you remember the date that she made the
9    complaint to you?
10  A.  I would work from 10:00 to 5:00, and they leave at
11    five, that's the only thing I remember.
12  Q.  Do you remember the month and year?
13  A.  Could be 2001, could be 2002.
14  Q.  Could it be 2000?
15  A.  No.
16  Q.  And why not 2000?
17  A.  Because I remember that Silas start working there
18    in 2001, not 2002.
19  Q.  Do you recall if Silas began work in 2000?
20  A.  No.
21  Q.  Could Silas have begun work in 2000?
22  A.  He started in 2001.
23  Q.  When the teacher complained to you and reminded you
24    to speak English not Spanish, did you question her?

23

1  A.  No, I didn't say anything.
2  Q.  Did you report that incident to Mr. Larouche?
3  A.  No, not that one.
4  Q.  Why did you choose not to report that incident to
5    Mr. Larouche?
6  A.  When he told me that the owner -- what he told me
7    about the owner. Why would I go about the owner?
8  Q.  So you didn't report the incident with the teacher
9    to Mr. Larouche?
10      MS. ALTAMORE: Objection. Asked and
11    answered.
12  A.  The teacher, no.
13  Q.  And was that the only time that the teacher
14    reminded you not to speak Spanish in the day care
15    center?
16  A.  There was another occasion that we were outside and
17    they were coming out, and I was with a coworker
18    named Jeffrey, and she told me again.
19  Q.  And when you say that "they were coming out," were
20    they leaving the day care center and coming into
21    the lobby?
22  A.  Yeah, they were coming out from the day care.
23  Q.  And into the lobby?
24  A.  Going to pass by the lobby, because their cares

24

1    around there.
2  Q.  And do you recall what the teacher said to you at
3    that time?
4  A.  Not to speak Spanish.
5  Q.  And at that time were you speaking Spanish?
6  A.  At that moment, yes.
7  Q.  And was Silas speaking Spanish at the moment?
8  A.  It was not Silas. It was Jeffrey.
9  Q.  Was Jeffrey speaking Spanish?
10  A.  Yes, with me.
11  Q.  And is Jeffrey a citizen of the United States?
12      MS. ALTAMORE: Objection.
13  A.  Yes. He's Puerto Rican, yes.
14  Q.  And did you say anything in response to the teacher
15    at that time?
16  A.  Nothing.
17  Q.  Did Jeffrey say anything in response to the teacher
18    at that time?
19  A.  No, neither.
20  Q.  Did you report that incident to Mr. Larouche?
21  A.  No.
22  Q.  Did Mr. Larouche ever bring that incident to your
23    attention?
24  A.  Wait a minute. I'm remembering something.

25

1    Something's coming to my mind. I remember now that
2    when this happened with Jeffrey, it was not Michael
3    Larouche at that time. It was the year 2000 when
4    Jack Curtin was there.
5  Q.  Did you report the incident to Mr. Curtin at that
6    time?
7  A.  No. We didn't say anything.
8  Q.  At that time did you have a good relationship with
9    Mr. Curtin?
10  A.  Yes.
11  Q.  Did you get any discipline because of the incident
12    in the lobby?
13  A.  No.
14  Q.  Do you recall any other incidents involving your
15    speaking Spanish in the day care center?
16  A.  Only those two.
17  Q.  In regard to Marlene, is she a CNA?
18  A.  CNA, yes.
19  Q.  Does she speak Spanish?
20  A.  I don't think so.
21  Q.  Does she speak Portuguese?
22  A.  I only saw her speaking English.
23  Q.  In regard to Erica, does Erica speak Spanish?
24  A.  She understood me. She just spoke a little.

7 (Pages 22 to 25)

Jose O. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 26 | | 28 | |
|---|---|---|---|
| 1  Q. | Did Erica speak English? | 1  A. | To Marcello and Erica. |
| 2  A. | She had to speak English, because she was a CNA, | 2  Q. | And were Erica and Marcello speaking Spanish to |
| 3 | and she had to communicate with them. | 3 | you? |
| 4  Q. | And when you say "she had to communicate," you mean | 4 | MS. ALTAMORE: Objection. Asked and |
| 5 | she had to communicate with the residents? | 5 | answered. |
| 6  A. | With her boss she had to speak English. | 6  A. | Yes. Because I don't understand much English. |
| 7  Q. | Did you ever see her communicating with the | 7  Q. | Do you understand any Portuguese? |
| 8 | patients? | 8  A. | No. |
| 9  A. | No, no. | 9  Q. | Now, in regard to your lawsuit, did you speak to |
| 10  Q. | When you were speaking with Marcello, did you | 10 | Gilberto about your lawsuit? |
| 11 | usually speak in Spanish? | 11 | THE INTERPRETER: Sorry? |
| 12  A. | Always in Spanish. | 12  Q. | Did you speak to Gilberto about your lawsuit? |
| 13  Q. | And how many times did you get warned for speaking | 13  A. | No. He keeps himself working. I don't have time |
| 14 | Spanish to Marcello? | 14 | to talk to him. |
| 15  A. | Every time her boss or the boss, Marlene, would see | 15  Q. | When was the last time you spoke to Gilberto about |
| 16 | us speaking Spanish would come and say, "Don't | 16 | the lawsuit? |
| 17 | speak Spanish." | 17  A. | When we had the meeting with the attorney. |
| 18  Q. | And how often was that? | 18  Q. | Aside from your meeting with the attorney, does |
| 19  A. | Every time she would pass by and she would hear us | 19 | Gilberto speak to you about the lawsuit? |
| 20 | speaking Spanish. She would say it even though | 20  A. | No. I don't see him anymore. |
| 21 | there were no residents around. | 21  Q. | Where do you presently live? |
| 22  Q. | And how many times was that? | 22  A. | 72B Second Street, Framingham. |
| 23  A. | I don't know. Two, three, four. Every time she | 23  Q. | And where does Gilberto live? |
| 24 | saw us. | 24  A. | I don't remember, Beaver Park Road. |

| 27 | | 29 | |
|---|---|---|---|
| 1  Q. | Is that two, three, four a month; two, three, four | 1  Q. | And how far is that from 72B Second Street? |
| 2 | a year? | 2 | MS. ALTAMORE: Objection. Relevance. |
| 3  A. | A week. I had to go upstairs every day. | 3  A. | Quite far. |
| 4  Q. | And when Marlene reminded you to speak English, did | 4  Q. | Now, was it your idea to bring the lawsuit? |
| 5 | she give you any warning? | 5 | MS. ALTAMORE: Objection. |
| 6  A. | No. | 6  A. | No. |
| 7  Q. | Do you know whether she ever reported the matter to | 7  Q. | Whose idea was it to bring the lawsuit? |
| 8 | Mr. Larouche? | 8 | MS. ALTAMORE: Objection. |
| 9  A. | I have no knowledge. | 9  A. | We got together in a group, and we were more, but |
| 10  Q. | Did Mr. Larouche ever come up to you and question | 10 | as they didn't have papers, they had to give up and |
| 11 | you why you were speaking Spanish on the second | 11 | go to their country. |
| 12 | floor? | 12  Q. | So some of the persons who were originally in the |
| 13  A. | No. | 13 | group were not in the United States legally? |
| 14  Q. | Aside from reminding you to speak Spanish on the | 14  A. | Yes. There were three more that they were working |
| 15 | second -- strike that. | 15 | there. |
| 16 | Aside from reminding you to speak English | 16  Q. | And do you recall what countries they came from? |
| 17 | on the second floor, did you receive any other | 17  A. | In Bolivia. |
| 18 | warning in regard to speaking Spanish on the second | 18  Q. | Did anyone come from El Salvador? |
| 19 | floor? | 19  A. | No. I don't know. |
| 20  A. | They told me not to speak Spanish. | 20  Q. | Did anyone come from Nicaragua? |
| 21  Q. | And at the time they told you not to speak Spanish, | 21 | MS. ALTAMORE: Shall we list all |
| 22 | were you speaking Spanish to Marcello? | 22 | countries in the world? |
| 23 | MS. ALTAMORE: Objection. Are we going | 23  A. | I remember only the people from Bolivia. |
| 24 | to go around in circles? | 24  Q. | Is it your position that you cannot be prohibited |

8 (Pages 26 to 29)

Jose O. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| | | 30 |
|---|---|---|
| 1 | | from speaking Spanish in the workplace? |
| 2 | | MS. ALTAMORE: Objection. |
| 3 | Q. | Is it your position that you cannot be prohibited |
| 4 | | from speaking Spanish in the workplace? |
| 5 | A. | It's our language, and there were no residents in |
| 6 | | front of us. Why couldn't we speak it? |
| 7 | Q. | Do you know why Gilberto lost his job at Whitney |
| 8 | | Place? |
| 9 | A. | I have no knowledge. |
| 10 | Q. | Do you know why Idalia Alers no longer works at |
| 11 | | Whitney Place? |
| 12 | A. | I have no knowledge. |
| 13 | Q. | Do you know if Myrna still works at Whitney Place? |
| 14 | A. | I don't ask her personal things. |
| 15 | Q. | Did you ever have discussions with Myrna concerning |
| 16 | | the lawsuit? |
| 17 | A. | No. |
| 18 | Q. | Can Myrna speak English? |
| 19 | A. | I don't know, but she must because she has a PCA |
| 20 | | job. |
| 21 | Q. | Have you ever heard Myrna speak English? |
| 22 | A. | Yes, with the attorney. |
| 23 | Q. | When you were working at Whitney Place, did you |
| 24 | | ever hear Myrna speak English? |

| | | 32 |
|---|---|---|
| 1 | Q. | And do you know whether Marlene knows the country |
| 2 | | of origin of Silas? |
| 3 | A. | I have no idea. |
| 4 | Q. | And do you know whether Marlene knew the country of |
| 5 | | origin of Erica? |
| 6 | A. | I have no knowledge. |
| 7 | Q. | And do you know whether Marlene knew the country of |
| 8 | | origin of Marcello? |
| 9 | A. | I have no knowledge. |
| 10 | | MR. WAYNE: I have no further questions |
| 11 | | with this witness at this time. |
| 12 | | MS. ALTAMORE: I just have one question, |
| 13 | | I believe. |
| 14 | | EXAMINATION |
| 15 | | BY MS. ALTAMORE: |
| 16 | Q. | To the best of your recollection, what is the |
| 17 | | Whitney Place English language rule? |
| 18 | A. | I don't remember that. |
| 19 | | MS. ALTAMORE: Okay. I have nothing |
| 20 | | further. Thank you. |
| 21 | | MR. WAYNE: I have nothing further. |
| 22 | | |
| 23 | | (Whereupon the Deposition of |
| 24 | | Jose O. Famania concluded at 11:50 a.m.) |

| | | 31 |
|---|---|---|
| 1 | A. | No. Because my area was a different one, and she |
| 2 | | was working in the third floor. |
| 3 | Q. | In regard to Idalia Alers, how do you know her? |
| 4 | | MS. ALTAMORE: Objection. But you can |
| 5 | | answer. |
| 6 | A. | Sometimes I would see her when I was getting my |
| 7 | | check because her work was different to mine. Her |
| 8 | | shift was 7:00 to 3:00, so that people I didn't see |
| 9 | | them much. |
| 10 | Q. | Did you know that she lived with Gilberto? |
| 11 | A. | No. I had no knowledge. Who was living with |
| 12 | | Gilberto? |
| 13 | Q. | Idalia. |
| 14 | A. | No. I have no knowledge. |
| 15 | | MR. WAYNE: Let's take a five-minute |
| 16 | | break. |
| 17 | | (A short break was taken.) |
| 18 | Q. | In regard to Marlene, do you know whether Marlene |
| 19 | | could distinguish between Spanish and Portuguese? |
| 20 | A. | I think she's American, because she always speaks |
| 21 | | English. |
| 22 | Q. | But can she distinguish between Spanish and |
| 23 | | Portuguese? |
| 24 | A. | I don't know. |

| | 33 |
|---|---|
| 1 | ERRATA SHEET DISTRIBUTION INFORMATION |
| 2 | DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS |
| 3 | |
| 4 | ERRATA SHEET DISTRIBUTION INFORMATION |
| 5 | DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS |
| 6 | |
| 7 | ERRATA SHEET DISTRIBUTION INFORMATION |
| 8 | The original of the Errata Sheet has been |
| 9 | delivered to Joan M. Altamore, Esquire. |
| 10 | When the Errata Sheet has been completed |
| 11 | by the deponent and signed, a copy thereof should |
| 12 | be delivered to each party of record and the |
| 13 | ORIGINAL forwarded to Richard D. Wayne, Esquire, to |
| 14 | whom the original deposition transcript was |
| 15 | delivered. |
| 16 | INSTRUCTIONS TO DEPONENT |
| 17 | After reading this volume of your |
| 18 | deposition, please indicate any corrections or |
| 19 | changes to your testimony and the reasons therefor |
| 20 | on the Errata Sheet supplied to you and sign it. |
| 21 | DO NOT make marks or notations on the transcript |
| 22 | volume itself. Add additional sheet if necessary. |
| 23 | Please refer to the above instructions for errata |
| 24 | sheet distribution information. |

9 (Pages 30 to 33)

Jose O. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

34

1    PLEASE ATTACH TO THE DEPOSITION OF JOSE O. FAMANIA
2              DATE TAKEN: 01/23/2006
3                 ERRATA SHEET
4    Please refer to page 33 for errata sheet
5    instructions and distribution instructions.
6    PAGE    LINE    CHANGE         REASON
7
8
9
10
11
12
13
14
15        I have read the foregoing transcript of
16   my deposition and except for any corrections or
17   changes noted above, I hereby subscribe to the
18   transcript as an accurate record of the statements
19   made by me.
20        Executed this    day of    , 2006.
21
22
23              Jose O. Famania
24

35

1    C E R T I F I C A T E
2
3    COMMONWEALTH OF MASSACHUSETTS
4
5
6         I, Elizabette M. Afonso, a Professional
7    Shorthand Reporter and Notary Public in and for the
8    Commonwealth of Massachusetts, do hereby certify
9    that the following transcript of the deposition of
10   Jose O. Famania, having been duly sworn through
11   interpretation, is true and accurate to the best of
12   my knowledge, skill, and ability.
13        IN WITNESS WHEREOF, I have hereunto set
14   my hand and seal this 26th day of January, 2006.
15
16
17        _____
              Elizabette M. Afonso
18            Notary Public
19
20   My commission expires:
     November 10, 2006
21
22
23
24

10 (Pages 34 to 35)

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

1                    UNITED STATES FEDERAL DISTRICT COURT

2                    EASTERN DISTRICT OF MASSACHUSETTS

3

4                             CIVIL ACTION NO.:  0510996WGY

5

6        * * * * * * * * * * * * * * * * * * *

7        JOSE FAMANIA, GILBERTO FAMANIA,

8        MYRNA FAMANIA and IDALIA ALERS,

9                    Plaintiffs,

10       vs.

11       WHITNEY PLACE AT NATICK, INC.,

12                   Defendant.

13       * * * * * * * * * * * * * * * * * * *

14

15                   DEPOSITION OF MICHAEL LAROUCHE, taken on

16       behalf of the plaintiff, pursuant to the

17       Massachusetts Rules of Civil Procedure, before

18       Elizabette M. Afonso, Professional Shorthand

19       Reporter and Notary Public within and for the

20       Commonwealth of Massachusetts, at the law offices

21       of Hinckley, Allen, Snyder, 28 State Street,

22       Boston, Massachusetts, commencing at 2:25 p.m. on

23       Monday, January 23, 2006.

24

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

2

1   APPEARANCES:
2
3   LAW OFFICES OF JOAN M. ALTAMORE
4   by Joan M. Altamore, Esquire
5   258 Elm Street
6   Suite 200
7   Somerville, Massachusetts 02144
8   617.686.1719
9       On behalf of the plaintiffs
10
11  HINCKLEY, ALLEN, SNYDER, LLP
12  by Richard D. Wayne, Esquire
13  28 State Street
14  Boston, Massachusetts 02109
15  617.345.9000
16      On behalf of the defendant
17
18
19
20
21
22
23
24

4

1       MS. ALTAMORE: Is he going to read and
2   sign?
3       MR. WAYNE: Yes.
4       MS. ALTAMORE: Same standard as to
5   objections?
6       MR. WAYNE: Certainly, why not.
7       MS. ALTAMORE: Sir, my name is Joan
8   Altamore. I'm the plaintiffs' attorney in this
9   case, and I'm going to be asking you some questions
10  regarding this matter, and if you have any
11  questions, you may at any time consult with your
12  attorney or go off the record, and if you do not
13  understand a question that I'm asking, I would just
14  ask that you ask me to clarify it.
15      THE WITNESS: Okay.
16      MS. ALTAMORE: Thank you.
17
18
19
20
21
22
23
24

3

1           I N D E X
2
3   DEPONENT                  PAGE
4
5   MICHAEL LAROUCHE
6
7   EXAMINATION BY MS. ALTAMORE        5
8
9
10          E X H I B I T S
11
12  NO.    DESCRIPTION         PAGE
13
14  (No exhibits were marked.)
15
16
17
18
19
20
21
22
23
24

5

1           P R O C E E D I N G S
2
3       MICHAEL LAROUCHE, having been first duly
4   sworn, was examined and testified as follows:
5
6           EXAMINATION
7   BY MS. ALTAMORE:
8   Q.   Can you please state your name for the record.
9   A.   Michael R. Larouche.
10  Q.   And can you spell your last name for the record,
11       please?
12  A.   L-A-R-O-U-C-H-E.
13  Q.   Okay. And what is your current address?
14  A.   111 Turkey Hill Road, Lunenburg, Massachusetts.
15       L-U-N --
16  Q.   No, no. I understand that. Something just hit me
17       for a moment.
18       And where are you currently employed?
19  A.   Whitney Place at Natick.
20  Q.   And when did you start there?
21  A.   October 22nd, 2001.
22  Q.   And prior to that employment at Whitney Place,
23       where were you employed?
24  A.   I was employed at Community Health Link a/k/a

2 (Pages 2 to 5)

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| | | 6 |
|---|---|---|
| 1 | | Herbert Lipton Community Mental Health Center. |
| 2 | Q. | And where was that located? |
| 3 | A. | They were based out of Fitchburg, Leominster, |
| 4 | | Mass., and they were bought out in 2001 by |
| 5 | | Community Health like in Worcester. |
| 6 | Q. | And what was your position there? |
| 7 | A. | I was the director of maintenance. |
| 8 | Q. | And how long had you worked there? |
| 9 | A. | Twenty-three years. |
| 10 | Q. | And who was your supervisor at that employment? |
| 11 | A. | Bill -- gosh. |
| 12 | Q. | His name was Bill? |
| 13 | A. | His name was Bill. |
| 14 | Q. | What is your educational experience? |
| 15 | A. | I have some college and some course work in my |
| 16 | | field. |
| 17 | Q. | And what type of course work would that be? |
| 18 | A. | From construction supervisor courses to, you know, |
| 19 | | OSHA courses. |
| 20 | Q. | And in general -- |
| 21 | A. | Building related. |
| 22 | Q. | Where would you have taken those courses? |
| 23 | A. | Fitchburg State College mostly. |
| 24 | Q. | At any other location? |

| | | 7 |
|---|---|---|
| 1 | A. | That's primarily where I did most of my college |
| 2 | | work. UMASS through the University with Atwells. |
| 3 | Q. | And when was the last time that you did any type of |
| 4 | | course work? |
| 5 | A. | Probably 2000. |
| 6 | Q. | Okay. And have you ever had occasion to receive |
| 7 | | any type of diversity or sensitivity training at |
| 8 | | either place of employment? |
| 9 | A. | I'm sure I have. |
| 10 | Q. | To the best of your recollection, do you recall |
| 11 | | which place of employment would have offered it? |
| 12 | A. | I think both. |
| 13 | Q. | And so Whitney Place did it require it, or did it |
| 14 | | offer it? |
| 15 | A. | I think it was required as a management -- some |
| 16 | | part of a management there. |
| 17 | Q. | And what type of training did you receive? |
| 18 | A. | It was just probably a one-day seminar or two-day |
| 19 | | seminar. |
| 20 | Q. | And when was that? |
| 21 | A. | It may have been 2002 or 2003. |
| 22 | Q. | And do you recall who provided the training? |
| 23 | A. | I think it was Orium. |
| 24 | Q. | And where was it handled, conducted? |

| | | 8 |
|---|---|---|
| 1 | A. | It was probably conducted in our Westboro campus. |
| 2 | Q. | So it was on site at Whitney Place? |
| 3 | A. | Right. |
| 4 | Q. | And approximately how many people attended that |
| 5 | | course? |
| 6 | A. | My group probably had 20, 25. |
| 7 | Q. | And who did that group entail? |
| 8 | A. | I remember Catherine. I don't know her last name. |
| 9 | Q. | Do you know what position Catherine is? |
| 10 | A. | She was either a human services or some sort of |
| 11 | | consultant in the field. |
| 12 | Q. | And do you recall any of the other persons who were |
| 13 | | present at that time? |
| 14 | A. | Actually, I think my boss was at this particular |
| 15 | | group, which would be Bill McGinley; Brian Ash, my |
| 16 | | counter part; John Jepson from the other campuses. |
| 17 | Q. | Okay. And what did that training entail? |
| 18 | A. | I think it was just your general 101 training on |
| 19 | | just being aware that, you know, people have |
| 20 | | sensitivity to certain issues. |
| 21 | Q. | Did they do any type of role playing? |
| 22 | A. | They may have. |
| 23 | Q. | And were you required to take any tests or |
| 24 | | questionnaires? |

| | | 9 |
|---|---|---|
| 1 | A. | I think we did some narrative, you know, we were |
| 2 | | probably -- I'm kind of remembering one that was |
| 3 | | taken at our facility, and we were asked to |
| 4 | | essentially change roles with someone else in our |
| 5 | | facility and figure out what their jobs were and |
| 6 | | being sensitive to the fact that everyone has |
| 7 | | certain demands in their jobs and put yourself in |
| 8 | | someone else's place. |
| 9 | Q. | Did they provide you with curriculum material? |
| 10 | A. | There were certainly curriculum materials on the |
| 11 | | management piece, that was done in Westboro, that |
| 12 | | was a more formalized presentation, yes. |
| 13 | Q. | So when you say "this was a more formalized |
| 14 | | presentation" -- |
| 15 | A. | There was actually a book given at the end of the |
| 16 | | course, and you could follow along with the |
| 17 | | visuals, and there was the moderator would actually |
| 18 | | go through the visual aids and perhaps bring up |
| 19 | | instances in the health care field or something |
| 20 | | could come up and -- |
| 21 | Q. | Was there a more informal component to that |
| 22 | | training? |
| 23 | A. | I think there were just, like, questions that were, |
| 24 | | you know -- |

3 (Pages 6 to 9)

Michael Larouche 1-23-2006

Jose Famania, et al. v. Whitney Place at Natick, Inc.

10

1   Q.   I guess what I'm asking more, was there more than
2        one occasion that you did this type of training?
3   A.   I remember two with Whitney Place. One that was at
4        our facility and one that was in Westboro.
5   Q.   Okay. So one at Natick?
6   A.   Yes. One may have been leadership versus
7        sensitivity training. I sort of feel it's kind of
8        all the same.
9   Q.   When did the one at Westboro occur, to the best of
10       your recollection?
11  A.   I don't remember exactly. I want to say probably
12       -- I'm just guessing, you know, it was probably
13       2002, 2003.
14  Q.   And then the one at Natick?
15  A.   Probably more recent, maybe 2004.
16  Q.   And the one at Natick, would that have been --
17  A.   That was probably the leadership one.
18  Q.   Okay. And how did you come to be employed at
19       Whitney Place?
20  A.   I was in between jobs from -- you know, we had just
21       gotten -- I answered an ad actually in Westboro,
22       and I interviewed there, and I was told that there
23       was an opening in Natick, and it looked like I was
24       qualified for that position, and I waited for a

11

1        call from Bill McGinley, and he called me, set up
2        an interview.
3   Q.   Do you recall who you were interviewed by in
4        Westboro?
5   A.   Brian Ash.
6   Q.   And then you were interviewed again?
7   A.   By Bill McGinley.
8   Q.   Okay. And did you know any persons who were
9        working at Whitney Place?
10  A.   No, I did not.
11  Q.   And whom did you take over from?
12  A.   I took over for a permanent position who was once
13       held by Jack Curtin. It was the interim Dave Shoe
14       -- I have a hard time with his name here. There
15       was an interim person when I came in.
16            So I actually replaced Jack Curtin, but
17       the interim person became my maintenance
18       coordinator. He wasn't really capable of doing the
19       top job, but he was certainly capable of doing the
20       maintenance coordinator's position.
21  Q.   Do you have reason to know why Jack Curtin left
22       Whitney Place?
23  A.   I mean, I've heard stories, in just that it wasn't
24       working out. He wasn't there a lot.

12

1   Q.   When you came to Whitney Place, what was your
2        title?
3   A.   Director of environmental services.
4   Q.   And let me just step back for a moment. Was Jack
5        Curtin fired?
6   A.   I'm not exactly sure what -- there was some
7        arrangement -- there was some incident that he was
8        either out for medical reasons, but that he was no
9        longer there, and that I was to assume that
10       position.
11  Q.   Okay. And at Whitney Place, who was your
12       supervisor -- who currently?
13  A.   Bill McGinley.
14  Q.   And Bill McGinley is still your supervisor,
15       correct?
16  A.   That is correct.
17  Q.   All right. And what hours do you work?
18  A.   Generally 8:00 to 4:00, Monday through Friday.
19  Q.   And is there cause for overtime?
20  A.   I don't get it. I'm a management person.
21  Q.   I guess my question is more: Do you work greater
22       than those hours?
23  A.   Yes, I do.
24  Q.   What is the average workweek?

13

1   A.   I'd say I'm often in the facility by 7:30 in the
2        morning, sometimes earlier, and oftentimes will not
3        leave, you know, till closer to five o'clock, and
4        I'm also on call 24/7.
5   Q.   And what are your duties at Whitney Place?
6   A.   My duties are to the day-to-day operations for a
7        53-bed nursing home, making sure that we are
8        licensed and maintain that licensure with the
9        Department of Public Health as well as maintain the
10       88 apartments which is part of our assisted living
11       part of our building.
12            There's a child day care center as well
13       as now an adult day care center that I also am
14       responsible for.
15  Q.   Approximately how many people do you supervise?
16  A.   Runs between 16 to 18 individuals.
17  Q.   And are those individuals broken down in any
18       particular grouping?
19  A.   Housekeeping, maintenance and laundry workers.
20  Q.   And do those individuals work throughout those
21       three departments, or are they specific to the
22       departments?
23  A.   There's approximately 12 housekeepers, three to
24       four maintenance, and two to three laundry, and

4 (Pages 10 to 13)

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

14

1  there were some sharing given when someone calls in
2  sick. Everyone's kind of cross trained to do most
3  anything.
4  Q.  Are there paid discrepancies or pay differences --
5  strike that.
6       Does a person particular to a department
7  -- is there a different rate of pay for each
8  department?
9  A.  Everyone gets paid on an individual basis.
10 Q.  And are you responsible for the hiring and firing
11 of your workers?
12 A.  Yes, I am.
13 Q.  And are you responsible for the verification of
14 their alien status?
15 A.  I usually have -- the HR department takes care of
16 that. They make those calls and tell me whether or
17 not a Social Security number is valid or not valid.
18 Q.  Okay. When you started at Whitney Place, did you
19 meet with all of your department employees?
20 A.  Yes.
21 Q.  How was that conducted?
22 A.  I think I just went to their -- I think there may
23 have been an informal meeting introducing me as a
24 department head, and then from there I just went

15

1  through their job descriptions.
2  Q.  Did you meet with each of the employees
3  individually?
4  A.  I may have. But once again, I don't recollect if
5  it was that formalized. I think it was pretty
6  informal.
7  Q.  And when you started at Whitney Place, were you
8  given an employee handbook?
9  A.  Yes, I was.
10 Q.  And did you review the employee handbook?
11 A.  Yes, I did.
12 Q.  And were you advised that Whitney Place had
13 something known as an English language rule?
14 A.  Yes.
15 Q.  And what was said about that?
16      MR. WAYNE: Objection. You can answer
17 the question.
18 A.  I think it's whatever the book says. The book is
19 very clear on what the policy is, and that's the
20 policy.
21 Q.  Did you have cause to raise any questions regarding
22 the contents of the employee handbook?
23 A.  Not for me personally.
24 Q.  In regards to your employees, your department

16

1  employees, is English a requirement to work at
2  Whitney Place?
3  A.  It's the only way we can communicate.
4  Q.  If a candidate for employment doesn't speak
5  English, what do you do?
6  A.  They're generally not hired.
7  Q.  And were employees who were -- strike that.
8       When you came to Whitney Place, were
9  there employees who did not speak English?
10 A.  Everyone seemed to have some English, some more
11 than others.
12 Q.  And for those who were less, what did you do?
13 A.  I did my best to try to communicate what needed to
14 get done and what their needs were.
15 Q.  Did you use an interpreter?
16 A.  Sometimes I would, yes.
17 Q.  Who would interpret for you?
18 A.  Anyone who was available who could actually speak
19 two languages.
20 Q.  Who would that person or persons be?
21 A.  When I first started or now?
22 Q.  Then.
23 A.  I probably enlisted the help of a number of people.
24 Julio Davila is someone who helped a great deal

17

1  when I first started.
2  Q.  Any other person?
3  A.  Possibly Gilberto Famania. I'm trying to think of
4  some others who -- they were probably the primary
5  ones.
6  Q.  And now who do you use?
7  A.  Well, Julio is still there, so I would have to say
8  Julio.
9  Q.  And anyone else?
10 A.  Let's see. Rosa Tonics, she's a personal care
11 attendant who -- started actually she was a
12 housekeeper at the time, and so she would also be
13 someone who would help translate, and she's still
14 there now, and she helps me.
15 Q.  And if there were an applicant whose English --
16 strike that.
17      Is the ability to read English a
18 requirement to work at Whitney Place?
19      MR. WAYNE: Objection. You can answer
20 the question.
21 A.  I'm sorry?
22 Q.  You can answer.
23 A.  Okay. We have -- as the maintenance -- it depends
24 what position.

5 (Pages 14 to 17)

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 18 | | 20 | |
|---|---|---|---|
| 1 | However, every position requires English | 1 | housekeeper to a neighborhood, but sometimes we |
| 2 | either understanding how to write it or read it, to | 2 | have people to have days off, so we have what we |
| 3 | a lesser extent speaking it. But in the | 3 | call floaters who have to understand all the |
| 4 | maintenance department there are work orders, and | 4 | routines. |
| 5 | I, as well as my coordinator, will write | 5 Q. | Okay. And do you administer any type of test for |
| 6 | assignments in English. | 6 | once the employee is hired? |
| 7 | So if you're in the maintenance | 7 A. | There are observable tests that I can give to make |
| 8 | department, you're required to be able read the | 8 | sure -- you know, essentially is checking to see |
| 9 | assignments on the work orders. | 9 | whether or not the person -- the housekeeper has |
| 10 | If you're a housekeeper and there is a | 10 | done all parts of the routine. |
| 11 | routine, the routines are in English, and I think | 11 Q. | If a complaint is lodged about a particular |
| 12 | we may have some translations in Spanish as an aid. | 12 | employee or the non completion of a task, how is |
| 13 Q. | And what type of translations are you talking | 13 | that handled? |
| 14 | about? | 14 | MR. WAYNE: Objection. You can answer |
| 15 A. | Well, bathroom, you know, would be bano. So I'll | 15 | the question. |
| 16 | say, Clean the bano. | 16 | MS. ALTAMORE: Did you say answer or |
| 17 Q. | That would be on the work order? | 17 | don't answer? |
| 18 A. | Well, it's on the routine -- the housekeeping | 18 | MR. WAYNE: I said answer. |
| 19 | routine. | 19 | MS. ALTAMORE: I thought you said don't |
| 20 Q. | And is that routine though reduced to writing, to a | 20 | for a minute. |
| 21 | writing? | 21 A. | It could either be done verbally or in writing |
| 22 A. | I don't understand. | 22 | depending on what the time constraints are. You |
| 23 Q. | How does a new employee get trained to the routine? | 23 | know, like if someone had an accident which is not |
| 24 A. | The new employee gets trained by hopefully a | 24 | so much a complaint, but something that needs to |

| 19 | | 21 | |
|---|---|---|---|
| 1 | current employee who understands the routine, and | 1 | get done in a particular apartment or a room, I |
| 2 | would spend a day or two days or whatever it takes, | 2 | will probably get a call on my voice mail, and I'll |
| 3 | to understand the routine. | 3 | just assign it to that housekeeper or house tech or |
| 4 | It's not that complicated, but it seems | 4 | depending on the seriousness or the emergency part. |
| 5 | like it's easier to -- you know, a picture is worth | 5 | You know, it gets handled appropriately |
| 6 | a thousand words. One day in a routine, you | 6 | and within due course of that day. |
| 7 | basically know it. | 7 Q. | Would all complaints or emergency requests come |
| 8 Q. | Is there a checklist for the employees? | 8 | directly to you? |
| 9 A. | There is a checklist for each of the routines, that | 9 A. | Not all of them, but many of them do. |
| 10 | is correct. | 10 Q. | If they weren't directed to you, who would they be |
| 11 Q. | And is that checklist in multiple languages or not? | 11 | directed to? |
| 12 A. | The checklist is in English, but each cart is -- | 12 A. | If a housekeeper was nearby, it's not unlike |
| 13 | has the routine essentially or some sort of mirror | 13 | someone to ask, Could you help me here, and have |
| 14 | of what the job assignments are in Spanish just as | 14 | that taken care of in an informal fashion. |
| 15 | an aid. | 15 Q. | Should it then be reported to either yourself or |
| 16 Q. | And is a cart individual to an employee? | 16 | your assistant that something extra was necessary |
| 17 A. | It's usually individual to the neighborhood or to | 17 | or completed? |
| 18 | the unit. | 18 | MR. WAYNE: Objection. You can answer |
| 19 | So, for example, if you're working with | 19 | the question. |
| 20 | Thayer neighborhood, there is a cart for the Thayer | 20 A. | It may or may not have gotten back to me. |
| 21 | neighborhood, and that has a routine. | 21 | It's usually out of kindness that someone |
| 22 Q. | Is there usually one employee who will do the | 22 | says, Gee, your housekeep did such a great job. I |
| 23 | Thayer neighborhood? | 23 | asked her to do something, just so you know, that |
| 24 A. | That always fluctuates. Yes, we try to assign a | 24 | they went over and above the call of duty or there |

6 (Pages 18 to 21)

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

22

1    was some incident that -- so it usually was more,
2    like, Your housekeeper did a great job. I just
3    wanted to let you know about it.
4    Q.   Okay. Whitney Place has an employee handbook,
5         correct?
6    A.   Yes.
7    Q.   And is it your responsibility to disperse it to
8         your employees?
9              MR. WAYNE: Objection. You can answer
10        the question.
11   A.   I don't. I think it's given at the time of
12        employment.
13   Q.   So if you made the hiring decision, what would then
14        be the next step in the process?
15             MR. WAYNE: Objection. You can answer
16        the question.
17   A.   Someone got hired. I would put in the paperwork to
18        say that, yes, this person is hired. I'm usually
19        given the green light that -- on the HR side that
20        they're okay to hire.
21             Then I would in turn hire after I've done
22        my process, and then they would do their required
23        orientation. They would do their required doctors'
24        physicals, and after those items were cared for, I

23

1    would in turn train them.
2    Q.   Who would conduct the orientation?
3              MR. WAYNE: Objection. You can answer
4         the question.
5    A.   The orientation is done in our Westboro campus on a
6         regular basis.
7    Q.   All employees are required to complete -- to the
8         best of your knowledge, are your department
9         employees required to complete that orientation?
10             MR. WAYNE: Objection.
11   A.   Yes.
12   Q.   To the best of your knowledge, what language is the
13        Whitney Place employee handbook produced in?
14             MR. WAYNE: Objection. You can answer.
15   A.   It's in English.
16   Q.   Do you know if it's produced in any other
17        languages?
18             MR. WAYNE: Objection. You can answer.
19   A.   I'm not aware of any other language.
20   Q.   Do you speak any language other than English?
21   A.   Yes, I do.
22   Q.   What languages do you speak?
23   A.   French.
24   Q.   And would you consider yourself to be fluent?

24

1    A.   My grammars a little off, but I can speak. I'm
2         better if I'm in a French speaking environment for
3         a week or two.
4    Q.   And do you read any other language other than
5         English?
6    A.   I can read French.
7    Q.   Okay. Have you ever had cause to communicate to
8         any of your employees in French?
9              MR. WAYNE: Objection. You can answer.
10   A.   I was told that Portuguese was close to French, but
11        in my experience, my Portuguese speaking employees
12        could not understand my French, so I don't know how
13        close it was. It wasn't close enough.
14   Q.   To the best of your knowledge, Whitney Place has an
15        English language rule, correct?
16   A.   Yes.
17   Q.   And what is your responsibility towards that rule?
18             MR. WAYNE: Objection. You can answer.
19   A.   It's to make sure that employees uphold the rule.
20   Q.   Could you please paraphrase or state the rule to
21        me?
22             MR. WAYNE: Objection. You can answer.
23   A.   The rule states that because of our residents and
24        members, there's a certain sensitivity to the

25

1    English language because many of our residents, we
2    have a delicated alzheimer's component that
3    speaking any other language could confuse them, so
4    that's, I guess, the reason why it's there.
5              And just to be polite. It's just a
6    curtesy to speak the language that people around
7    you understand.
8    Q.   And have you ever had cause to post that English
9         language rule in your department?
10             MR. WAYNE: Objection. You can answer.
11   A.   I've never posted it, because it's never really
12        been an issue.
13   Q.   To your knowledge, is it posted anywhere in Whitney
14        Place?
15   A.   I think occasionally it's put into our newsletter
16        just as a friendly reminder that we are an English
17        speaking facility, and that rules are oftentimes
18        put in there as a reminder when employees pick up
19        their paycheck.
20   Q.   If there's a violation of that rule, what is the
21        action that is to be taken?
22             MR. WAYNE: Objection.
23   A.   I've never written up anybody on the rule.
24   Q.   Is it required that you write somebody up?

7 (Pages 22 to 25)

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

26

1  A.  I think I'm required to write up what I feel is
2      necessary to write up, but I have never written up
3      anyone for that rule, because it's rare that anyone
4      breaks that rule.
5  Q.  Have you ever had cause to give a verbal warning?
6          MR. WAYNE:  Objection.
7  A.  I may have reminded employees from time to time.
8      You know, sometimes people just don't realize that
9      we're in a residential area, and they should
10     probably be speaking English, and I may have
11     reminded people from time to time.
12 Q.  What's the difference between a reminder and a
13     warning?
14         MR. WAYNE:  Objection.
15 A.  I don't know.
16 Q.  And when you say that "if you're in a residential
17     area," what do you mean by that?
18 A.  That's an area of our facility that a resident may
19     be present or may arrive at any time.  That's a
20     residential area.
21 Q.  And a non residential area would be how described?
22 A.  A place where residents are not allowed.
23 Q.  And where would that be?
24 A.  That's probably the staff lunchroom, break room.

27

1  Q.  Any other place?
2  A.  Possibly, but not necessarily exclusive, the
3      service corridor that gets you to the employee
4      lounge or the time clock.  But residents often walk
5      around.  They could be escorted in those areas even
6      though they're not "residential areas".
7          So, essentially, the whole building is a
8      potential residential area.  Although it's rare
9      that you see them in the service area.
10 Q.  The second floor is known by a particular name,
11     correct?
12 A.  It's got a lot of names.
13 Q.  Where there's a dining room and a kitchen on the
14     second floor?
15 A.  Yes.
16 Q.  What area are the dining room and kitchen located?
17 A.  They're on the second level.
18 Q.  And is that kitchen open to residents?
19 A.  The kitchen is generally not open to residents.
20 Q.  Are employees who work in the kitchen required to
21     speak English?
22 A.  All employees are required to speak English in the
23     residential areas.  The dining room being a
24     residential area which adjoins the kitchen.

28

1  Q.  What hours are the meals served in the dining room?
2  A.  Meals are served at lunchtime at approximately
3      noontime until 2:00, and then supper is at
4      five o'clock till 7:00.
5  Q.  And outside of those times, are residents permitted
6      to be in the dining room?
7  A.  I've seen them beyond that time period, yes.  You
8      know, it adjoins the hallways that have -- there's
9      a hair salon.  There is an exercise room that
10     adjoins the dining room.
11         They could be waiting in the hallway to
12     get to either of those venues any time of the day.
13     There's a residential sun room that's for just
14     relaxation by the fifth floor elevator.
15 Q.  Can the dining room be closed off from those other
16     rooms?
17 A.  There are double doors that make a separation from
18     the hallway to the dining room.
19 Q.  And can those doors be locked?
20 A.  No.  By law they're required to be unlocked at all
21     times.
22 Q.  If the dining room is not in use, are the doors
23     generally opened or closed?
24 A.  They're generally closed.

29

1  Q.  Have you ever had cause to remind an employee of
2      the English language rule?
3  A.  It doesn't happen much, but I'm sure I have in the
4      past.
5  Q.  And to whom would that have been?
6  A.  Anyone who wasn't speaking English, and they were
7      in an area where we could have residents in.
8  Q.  And have you ever had cause to -- strike that.
9          Do you know a person by the name of
10     Gilberto Famania?
11 A.  Yes.
12 Q.  Was he a former employee of Whitney Place?
13 A.  Yes.
14 Q.  Did you ever have cause to speak to him regarding
15     the English language rule?
16 A.  I'm sure I may have suggested to him that he needed
17     to speak English in a residential area.
18 Q.  And on what occasion was that?
19 A.  He was an employee back in 2001, that's many years
20     ago.  I don't have dates or times, but I'm sure
21     within his employment it had probably come up from
22     time to time.
23 Q.  Why would you say that?
24 A.  Because I remember he was one of the violators of

8 (Pages 26 to 29)

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

30

| 1 | | that rule. |
|---|---|---|
| 2 | Q. | How did he violate the rule? |
| 3 | A. | He would be speaking -- he would not be speaking |
| 4 | | English in and around residents. |
| 5 | Q. | But you used him to translate for you, correct? |
| 6 | | MR. WAYNE: Objection. |
| 7 | A. | That's true. |
| 8 | Q. | So, technically, wasn't he violating the rule by |
| 9 | | translating for you? |
| 10 | | MR. WAYNE: Objection. |
| 11 | A. | He would usually translate for me in my office |
| 12 | | which was on the first level. |
| 13 | Q. | According to you, the entire building is available |
| 14 | | to the residents? |
| 15 | | MR. WAYNE: Objection. Move to strike. |
| 16 | A. | Technically that's true, but my office, I don't |
| 17 | | really see many residents. |
| 18 | Q. | Did you have occasion to speak to Gilberto Famania |
| 19 | | while working on the third floor? |
| 20 | | MR. WAYNE: Objection. |
| 21 | A. | I don't remember exactly. He certainly would have |
| 22 | | had access to the third level. |
| 23 | Q. | Did you ever have cause to speak with Jose -- |
| 24 | | strike that. |

31

| 1 | | Do you recall an employee by the name of |
|---|---|---|
| 2 | | Jose Famania? |
| 3 | A. | Yes, I do remember Jose. |
| 4 | Q. | And do you recall speaking to Jose Famania |
| 5 | | regarding the English language rule? |
| 6 | | MR. WAYNE: Objection. |
| 7 | A. | I don't remember exactly. He was only in my |
| 8 | | employment for a very short time. |
| 9 | Q. | What period of time was that? |
| 10 | A. | It was either the end of 2001 or the beginning of |
| 11 | | 2002. |
| 12 | Q. | Do you recall whether or not Jose Famania was |
| 13 | | fluent in English? |
| 14 | | MR. WAYNE: Objection. |
| 15 | A. | He did speak some English. |
| 16 | Q. | Did you ever have cause to require the use of an |
| 17 | | interpreter in communicating with Jose Famania? |
| 18 | | MR. WAYNE: Objection. |
| 19 | A. | I don't remember that I did. |
| 20 | Q. | Do you have cause to remember a conversation with |
| 21 | | Jose Famania regarding Kate Salmon? |
| 22 | | MR. WAYNE: Objection. |
| 23 | A. | I don't remember exactly the conversation, but -- |
| 24 | Q. | Are you denying that a conversation took place? |

32

| 1 | | MR. WAYNE: Objection. Move to strike. |
|---|---|---|
| 2 | A. | I'm not. I don't remember it. Tell me more. |
| 3 | Q. | Do you recall that Jose Famania came to you and |
| 4 | | told you that Kate Salmon told him to stop speaking |
| 5 | | Spanish? |
| 6 | | MR. WAYNE: Objection. |
| 7 | A. | I don't remember that conversation. |
| 8 | Q. | Do you recall telling Jose Famania that you could |
| 9 | | not do anything about Kate Salmon telling him to |
| 10 | | stop speaking Spanish? |
| 11 | | MR. WAYNE: Objection. You can answer. |
| 12 | A. | I didn't hear him. |
| 13 | Q. | You can answer. |
| 14 | A. | Okay. I don't remember the conversation, but it |
| 15 | | may have occurred. |
| 16 | | She is the daughter of the owner of the |
| 17 | | company, and generally I would tell any -- advise |
| 18 | | any employee if the owner of the company's daughter |
| 19 | | is telling you to do something, you should probably |
| 20 | | do it. |
| 21 | Q. | Do you document meetings with employees in their |
| 22 | | file? |
| 23 | A. | Sometimes. |
| 24 | Q. | What would be the parameter? |

33

| 1 | | MR. WAYNE: Objection. You can answer. |
|---|---|---|
| 2 | A. | If they're being disciplined, those meetings are |
| 3 | | usually recorded and they're written. If it's just |
| 4 | | a touch base kind of thing, those are not. |
| 5 | Q. | And so was this conversation with Jose Famania |
| 6 | | recorded in any way? |
| 7 | | MR. WAYNE: Objection. |
| 8 | A. | I don't believe it was, because I don't remember |
| 9 | | it. |
| 10 | Q. | Do you recall an employee by the name of Myrna |
| 11 | | Famania? |
| 12 | A. | Yes, I do. |
| 13 | Q. | Were you ever her supervisor? |
| 14 | A. | I was never her supervisor. |
| 15 | Q. | Did you ever have cause to tell Myrna Famania not |
| 16 | | to speak Spanish? |
| 17 | A. | I may have. Myrna work exclusively in a |
| 18 | | residential area. |
| 19 | | So anywhere where she may work if she was |
| 20 | | speaking Spanish and I saw her speaking Spanish, I |
| 21 | | probably could have, but I don't remember anything |
| 22 | | specific. |
| 23 | Q. | Do you recall if you did speak to her, were there |
| 24 | | residents around? |

9 (Pages 30 to 33)

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

34

1           MR. WAYNE: Objection.
2    A.   Residential area is a residential area. I would
3         probably be more sensitive to the fact that there
4         were residents around; however, I don't remember
5         the incident, so, therefore, I can't really fully
6         answer your question.
7    Q.   Do you recall Myrna Famania saying to you that I'm
8         sorry to you?
9           MR. WAYNE: Objection.
10   A.   I don't remember her ever making comments about --
11   Q.   Do you recall an employee by the name of Idalia
12        Alers?
13   A.   I do remember Idalia.
14   Q.   And were you her supervisor?
15   A.   For a short time, yes, I was.
16   Q.   What period of time?
17   A.   I'm guessing -- she wasn't really there when I
18        started. She was on maternity leave but came back
19        possibly in 2002.
20   Q.   And then did she have cause to leave your
21        employment?
22   A.   Yes, she did.
23   Q.   And do you recall whether Ms. Alers spoke fluent
24        English?

35

1           MR. WAYNE: Objection.
2    A.   I believe she did speak English.
3    Q.   Fluently?
4    A.   I don't know what your definition of fluent. Would
5         she understand me? Yes.
6    Q.   Okay. Do you have cause to remember ever
7         approaching Mr. Alers about the English language --
8         strike that.
9           Do you have cause to recall speaking to
10        Ms. Alers about an English language rule violation?
11          MR. WAYNE: Objection. You can answer.
12   A.   I don't remember really much about Idalia's stay
13        or --
14   Q.   Did you ever speak to Ms. Alers about not speaking
15        Spanish?
16   A.   I may have, but once again, she had --
17   Q.   Why do you believe that you did -- strike that.
18          Why do you believe that you may have
19        spoken to her?
20          MR. WAYNE: Objection. You can answer.
21   A.   I don't remember any incident per se. I mean, I
22        didn't -- all I remember was Idalia had a lot of
23        performance issues.
24   Q.   Would speaking Spanish influence -- strike that.

36

1           Would speaking Spanish in a residential
2         area be a performance issue?
3           MR. WAYNE: Objection. You can answer.
4    A.   Not really. I have a lot of Spanish speaking
5         housekeepers, launders who are just great workers,
6         and I would probably have focused more on job
7         performance than English speaking violations.
8    Q.   Have you ever had cause to come upon employees who
9         were speaking Spanish and not advise them to stop?
10          MR. WAYNE: Objection.
11   A.   I probably would not have not made a comment, but
12        if I was busy, and I had water running down floors,
13        I probably would have want to -- what was more
14        important.
15   Q.   Would you address that at a later point in time?
16   A.   I could have, however, it's not -- I have so many
17        pressing priorities, and I don't mean to diminish
18        this whole proceeding, but my job is to maintain a
19        facility, and --
20   Q.   But is it your job to maintain a facility using
21        your employees?
22          MR. WAYNE: Objection.
23   Q.   Utilizing your employees?
24   A.   Yes.

37

1           MR. WAYNE: Objection.
2    Q.   Have you ever had cause -- strike that.
3           Has any other manager or supervisory
4         person at Whitney Place have cause to report to you
5         a violation of the English language rule by one of
6         your employees?
7           MR. WAYNE: Objection.
8    A.   They may have.
9    Q.   Would there not be records kept of that?
10          MR. WAYNE: Objection.
11   A.   Only if it was written up, but I've been there four
12        years, I've never heard of anyone being written up
13        for not speaking English.
14   Q.   But if another manager or supervisor contacted you
15        with potentially with -- strike that.
16          If another manager or a supervisor
17        contacted you regarding an incident which could
18        potentially require discipline, would you not keep
19        a written record?
20          MR. WAYNE: Objection.
21   A.   I would probably in that situation probably speak
22        to the individual and question, find out more about
23        what occurred.
24   Q.   Well, not just about an English language rule

10 (Pages 34 to 37)

Case 1:05-cv-10996-WGY    Document 34-6    Filed 02/27/2006    Page 11 of 14

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

38

1   violation, but any type of incident that's reported
2   to you, is it not documented?
3               MR. WAYNE: Objection.
4   A.   I only document the -- I probably wouldn't have
5        documented that unless it was serious.
6   Q.   Isn't any violation that could result in
7        termination serious?
8               MR. WAYNE: Objection.
9   A.   I guess if it was a repeated offense, I probably
10       would agree with you that --
11  Q.   But how do you know it's not egregious until it's
12       investigated?
13              MR. WAYNE: Objection.
14  A.   No. I investigate all incidences.
15              And you're asking me two questions: Do I
16       write them all down, or do I investigate? I
17       investigate all incidences that supervisors bring
18       to my attention that involve my employees.
19  Q.   Do you keep a daily log during the course of your
20       employment?
21              MR. WAYNE: Objection.
22  A.   I do not.
23  Q.   A calendar?
24              MR. WAYNE: Objection.

39

1   A.   I have a calendar on my desk. If someone's out
2        sick, I note on my calendar that they were sick, so
3        when payroll comes, I can verify that entry that,
4        Oh, yeah, someone's missing eight hours. So I will
5        sometimes use my calendar as a --
6   Q.   Have you ever had cause to speak to Bill McGinley
7        regarding the English language rule?
8               MR. WAYNE: Objection.
9   A.   We talk about all the rules.
10  Q.   Have you ever spoken to Bill McGinley about this
11       proceeding -- strike that. These proceedings?
12              MR. WAYNE: You mean in the absence of
13       counsel?
14              MS. ALTAMORE: In the absence of counsel,
15       yes.
16  A.   I'm sure we've -- you know, he knew that I was
17       coming to this deposition.
18              He is my supervisor, so he knows that I
19       would not be here at work so --
20  Q.   Prior to today, have you ever had cause to discuss
21       the English language rule with Bill McGinley?
22              MR. WAYNE: In the absence of counsel?
23              MS. ALTAMORE: All questions should be
24       assumed to be in the absence of counsel. I would

40

1        not ask the witness to violate any attorney-client
2        privilege.
3   A.   Bill McGinley and I -- as he's my supervisor, is
4        free to ask me about any question of any rule in
5        the employee handbook. One of which is the English
6        speaking notation, and certainly we've talked about
7        how in that rule fits into our day-to-day
8        environment.
9   Q.   Who notified you that a complaint had been filed in
10       district court?
11              MR. WAYNE: Objection. You can answer.
12  A.   I guess he may have notified me.
13  Q.   Were you ever interviewed by anybody from the Equal
14       Employment Opportunity Commission?
15  A.   Yes, I was.
16  Q.   And were you represented by counsel during that
17       meeting?
18  A.   I don't remember if we were or not, to be honest.
19  Q.   If counsel was present?
20  A.   Right. I don't remember.
21  Q.   Have you ever had cause to speak to human resources
22       regarding the complaint that has been filed at the
23       district court?
24  A.   I don't believe there was any meetings with human

41

1        resources, no.
2   Q.   Have you ever had cause to speak to Kate Salmon
3        about the complaint filed at the district court?
4   A.   I would have no reason to speak to Kate.
5   Q.   Have you ever spoken to Ms. Salmon?
6   A.   I speak to her from time to time. She use to be in
7        our building, but she's not anymore.
8   Q.   Are you familiar with an employee by the name of
9        Louise Pecora?
10  A.   Louise Pecora?
11  Q.   Is it Louise Pecora? Are you familiar with her?
12  A.   Yes. She's one of my colleagues.
13  Q.   And have you ever had occasion to speak to
14       Ms. Pecora regarding your employees speaking
15       Spanish?
16  A.   I'm sure Louise has talked to me about that and
17       other things when it comes to -- she hears a lot in
18       her neighborhoods, and she, you know, will inform
19       me on what my employees are doing or not doing.
20  Q.   Have you had occasion to speak to her regarding any
21       violations of the English language rule?
22  A.   I'm sure she's mentioned, you know, so and so is
23       speaking Spanish or some other language on the
24       Alzheimer's unit.

11 (Pages 38 to 41)

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

42

1   Q.   Why are you sure?
2   A.   Why am I sure? Because Louise pays attention to
3        her very sensitive population, and Louise does her
4        own courses on having us understand the
5        ramifications of changing routines in an
6        Alzheimer's world.
7             It doesn't take much to set residents
8        off. So she's very sensitive to that, more so than
9        we are. That's her field of expertise so --
10  Q.   Do you ever have occasion to interact with the
11       residents?
12  A.   Yes, I do.
13  Q.   To the best of your knowledge, do any of the
14       residents speak a language other than English?
15  A.   I'm not aware of any residents -- other languages.
16       I'm sure there are some who speak other languages.
17  Q.   What would you estimate to be the resident turnover
18       at any given year?
19            MR. WAYNE: Objection.
20  A.   I would have no way of knowing that.
21  Q.   Do your employees clean the rooms -- strike that.
22            The employees under your responsibility,
23       do they refurbish a room once a resident has
24       departed?

43

1   A.   Yes, we do.
2   Q.   For whatever cause?
3   A.   Right.
4   Q.   How frequent is that in any given year?
5   A.   Maybe you'd have a ten percent turnover is a guess.
6   Q.   So if we're looking at approximately 53 beds, it's
7        not that it's necessarily every -- would you
8        estimate once every two months or so --
9             MR. WAYNE: Objection.
10  Q.   -- there's a turnover?
11  A.   Once again, it's not something that is clockwork.
12       People come and go whether by natural causes or by
13       financial reasons. There is turnovers.
14  Q.   Does the employees' handbook provide a resource for
15       employees to whom they might complain if there's a
16       question regarding something in the handbook?
17            MR. WAYNE: Objection.
18  A.   I don't recall.
19  Q.   Have you ever had an employee approach you and
20       request information regarding clarification of
21       something in the employee handbook?
22  A.   I usually refer them to human resources for
23       something -- you know, because it's either 401Ks or
24       benefits, usually that kind of question.

44

1   Q.   What about a personal decision?
2   A.   "Personal," can you expand?
3   Q.   They question a termination process or a
4        disciplinary process?
5             MR. WAYNE: Objection.
6   A.   That's usually a human resource's question, and if
7        they -- you know, that's --
8   Q.   Have you ever had occasion to tell a Whitney Place
9        employee that it's impolite to speak another
10       language?
11            MR. WAYNE: Objection.
12  A.   I'm sure I may have said that.
13  Q.   You stated you have approximately 16 to 18 persons
14       under your supervision. Could you please identify
15       for me what their cultural backgrounds are?
16            MR. WAYNE: Objection. During what
17       period of time?
18  Q.   At the time you were hired?
19  A.   I'd only be guessing, but -- in how many
20       individuals?
21  Q.   Let's give it that there was 16 individuals. You
22       gave me a number of 16 to 18, so out of those 16,
23       how many, if any, were Brazilian?
24            MR. WAYNE: Objection.

45

1   A.   I don't remember having any Brazilian employees.
2   Q.   What about Asian?
3             MR. WAYNE: Objection.
4   A.   There were some -- I mean, in my department?
5   Q.   Yes. Just specific to yours.
6   A.   I don't think I had any Asian employees.
7   Q.   Haitian?
8             MR. WAYNE: Objection.
9   A.   I don't remember if I had -- I may have had one
10       Haitian.
11  Q.   Hispanic?
12  A.   Probably the bulk of my employees were probably
13       Hispanic.
14  Q.   What would be that number?
15            MR. WAYNE: Objection.
16  A.   Maybe 12 at least, 10 or 12.
17  Q.   And European?
18            MR. WAYNE: Objection.
19  A.   What would be European, like, French?
20  Q.   French, German, English, Scottish, Italian. I
21       would say eastern European.
22  A.   I mean, everyone has roots. I have a Scottish
23       rooted director or coordinator of maintenance, but
24       I don't look at people that way.

12 (Pages 42 to 45)

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

46

1    I mean, it's hard to even do this without
2    being -- scratching my head and saying, Gee, I
3    don't even look at people that way. But you're
4    asking the questions.
5 Q. Yes. Currently, as of today, how many of your
6    employees under your supervision only are Asian?
7         MR. WAYNE: Objection.
8 A. I have no Asian.
9 Q. Haitian?
10 A. No Haitians.
11 Q. Hispanic?
12 A. Probably the same number, 10 to 12.
13 Q. Brazilian?
14 A. I don't think I have any Brazilians.
15 Q. And the balance would be?
16 A. El Salvadorians.
17 Q. Central American, would you consider?
18 A. Yes. Not exclusively -- I may have, like, two who
19    are from Central America and Guatemalan. I have a
20    Guatemalan of origin, Irish, Scot. I may have one
21    Brazilian, now that you've mentioned it.
22         MS. ALTAMORE: I have nothing further.
23         MR. WAYNE: I have no questions.
24

47

1         (Whereupon the Deposition of
2    Michael Larouche concluded at 3:30 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

48

1         ERRATA SHEET DISTRIBUTION INFORMATION
2         DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4         ERRATA SHEET DISTRIBUTION INFORMATION
5         DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
6
7         ERRATA SHEET DISTRIBUTION INFORMATION
8         The original of the Errata Sheet has been
9    delivered to Richard D. Wayne, Esquire.
10         When the Errata Sheet has been completed
11    by the deponent and signed, a copy thereof should
12    be delivered to each party of record and the
13    ORIGINAL forwarded to Joan M. Altamore, Esquire, to
14    whom the original deposition transcript was
15    delivered.
16         INSTRUCTIONS TO DEPONENT
17         After reading this volume of your
18    deposition, please indicate any corrections or
19    changes to your testimony and the reasons therefor
20    on the Errata Sheet supplied to you and sign it.
21    DO NOT make marks or notations on the transcript
22    volume itself. Add additional sheet if necessary.
23    Please refer to the above instructions for errata
24    sheet distribution information.

49

1    PLEASE ATTACH TO THE DEPOSITION OF
2    MICHAEL LAROUCHE      DATE TAKEN: 01/23/2006
3              ERRATA SHEET
4    Please refer to page 48 for errata sheet
5    instructions and distribution instructions.
6    PAGE    LINE    CHANGE      REASON
7
8
9
10
11
12
13
14
15         I have read the foregoing transcript of
16    my deposition and except for any corrections or
17    changes noted above, I hereby subscribe to the
18    transcript as an accurate record of the statements
19    made by me.
20         Executed this    day of    , 2006.
21
22
23              Michael Larouche
24

13 (Pages 46 to 49)

Michael Larouche 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

50

1    CERTIFICATE
2
3    COMMONWEALTH OF MASSACHUSETTS
4
5
6        I, Elizabette M. Afonso, a Professional
7    Shorthand Reporter and Notary Public in and for the
8    Commonwealth of Massachusetts, do hereby certify
9    that the following transcript of the deposition of
10   Michael Larouche, having been duly sworn, is true
11   and accurate to the best of my knowledge, skill,
12   and ability.
13       IN WITNESS WHEREOF, I have hereunto set
14   my hand and seal this 26th day of January, 2006.
15
16
17   _____
         Elizabette M. Afonso
18           Notary Public
19
20   My commission expires:
     November 10, 2006
21
22
23
24

14 (Page 50)

```
 1              UNITED STATES FEDERAL DISTRICT COURT

 2              EASTERN DISTRICT OF MASSACHUSETTS

 3

 4                        CIVIL ACTION NO.:  0510996WGY

 5

 6     * * * * * * * * * * * * * * * * * * *

 7     JOSE FAMANIA, GILBERTO FAMANIA,

 8     MYRNA FAMANIA and IDALIA ALERS,

 9              Plaintiffs,

10     vs.

11     WHITNEY PLACE AT NATICK, INC.,

12              Defendant.

13     * * * * * * * * * * * * * * * * * * *

14

15              DEPOSITION OF MYRNA J. FAMANIA, taken on

16     behalf of the defendant, pursuant to the

17     Massachusetts Rules of Civil Procedure, before

18     Elizabette M. Afonso, Professional Shorthand

19     Reporter and Notary Public within and for the

20     Commonwealth of Massachusetts, at the law offices

21     of Hinckley, Allen, Snyder, 28 State Street,

22     Boston, Massachusetts, commencing at 12:10 p.m. on

23     Monday, January 23, 2006.

24
```

Case 1:05-cv-10996-WGY    Document 34-7    Filed 02/27/2006    Page 2 of 12

Myrna J. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

2

1  APPEARANCES:
2
3  LAW OFFICES OF JOAN M. ALTAMORE
4  by Joan M. Altamore, Esquire
5  258 Elm Street
6  Suite 200
7  Somerville, Massachusetts 02144
8  617.686.1719
9      On behalf of the plaintiffs
10
11 HINCKLEY, ALLEN, SNYDER, LLP
12 by Richard D. Wayne, Esquire
13 28 State Street
14 Boston, Massachusetts 02109
15 617.345.9000
16      On behalf of the defendant
17
18 BENOIT INTERPRETING SERVICES
19 Giselle Lahey, Interpreter
20 33 South Street
21 P.O. Box 147
22 Northboro, MA 01532
23 1.800.261.5152
24

3

1           INDEX
2
3  DEPONENT                        PAGE
4
5  MYRNA J. FAMANIA
6
7  EXAMINATION BY MR. WAYNE           4, 32
8
9  EXAMINATION BY MS. ALTAMORE        26, 36
10
11          EXHIBITS
12
13 NO.    DESCRIPTION               PAGE
14
15 1    Complaint                    6
16
17 2    Acknowledgement of Employment Handbook    32
18
19
20
21
22
23
24      (Exhibits retained by counsel.)

4

1           P R O C E E D I N G S
2
3       (Giselle Lahey, Interpreter, having been
4  first duly sworn.)
5
6           MYRNA J. FAMANIA,
7  having been first duly sworn through
8  interpretation, was examined and testified as
9  follows:
10
11          EXAMINATION
12 BY MR. WAYNE:
13 Q.  Could you please state your name for the record.
14 A.  My name is Myrna Gloria Famania.
15 Q.  And could you spell your first name?
16 A.  M-Y-R-N-A.
17 Q.  And where do you presently live?
18 A.  In Framingham.
19 Q.  And what is the street address?
20 A.  32 Pine Street.
21 Q.  And do you presently have a job?
22 A.  Whitney Place.
23 Q.  And how long have you worked at Whitney Place?
24 A.  I think for nine years. I started in

5

1  September '96.
2  Q.  And what position did you have when you first
3  started at --
4  A.  Housekeeping.
5  Q.  -- Whitney Place?
6       MS. ALTAMORE: You have to let him finish
7  the question.
8       THE WITNESS: I'm sorry is because I --
9       MS. ALTAMORE: Understood.
10 Q.  Now, what position do you presently hold at Whitney
11 Place?
12 A.  PCA.
13 Q.  And that's PCA, that's personal care assistant?
14 A.  Yes.
15 Q.  And how long have you held the position as personal
16 care assistant?
17 A.  I think for five years.
18 Q.  Do you remember the year you first became a
19 personal care assistant?
20 A.  I'm not sure, but I think in October -- the end of
21 September or October.
22 Q.  Of what year?
23 A.  Let me see.
24 Q.  Take your time.

2 (Pages 2 to 5)

Myrna J. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

6

1   A.   2000.
2   Q.   Okay. I want to show a document that I'm going to
3        have marked as Document No. 1.
4            (Exhibit No. 1, complaint, marked for
5        identification.)
6   Q.   Myrna, I'd like you to look at the document caption
7        on the first page reads, "United States Federal
8        Court District Court, Civil Action No. 0510996,"
9        and it says, "Jose Famania, Gilberto Famania, Myrna
10       Famania and Idalia Alers, plaintiffs vs. Whitney
11       Place at Natick, Inc., defendant."
12           And I'd like you to look at the last
13       page, and do you see a line on the last page that
14       says "Myrna Famania, pro se"?
15  A.   (Witness indicates.)
16           MS. ALTAMORE: You have to answer
17       verbally, because the only way she can record an
18       answer is if you say --
19  A.   Yes.
20  Q.   And is that your signature above the typed name?
21  A.   Yeah, mine.
22  Q.   That's your signature?
23  A.   Mm-hmm, my signature.
24  Q.   Prior to signing this document, did you read this

7

1        document?
2   A.   Mm-hmm.
3            MS. ALTAMORE: You have to say yes or no
4        verbally.
5   A.   Yes. I'm very nervous.
6   Q.   Now, at some point in time was Michael Larouche
7        your supervisor?
8   A.   He is not my supervisor, never. My last supervisor
9        is Jack Curtin.
10  Q.   Okay. When you were a housekeeper, Jack Curtin was
11       your supervisor?
12  A.   When I first started is Paul, and then is another
13       one the name Bob, and then is Jack Curtin.
14  Q.   You've had a lot of supervisors. That was a joke.
15  A.   Three supervisors in housekeeping.
16  Q.   Okay. So at no time was Mr. Larouche your
17       supervisor?
18  A.   This is Mike.
19  Q.   Was Michael Larouche ever your supervisor when you
20       were a housekeeper?
21  A.   Never, no.
22  Q.   Has Michael Larouche ever told you to stop speaking
23       Spanish?
24  A.   Yes.

8

1   Q.   And do you remember where he told you not to speak
2        Spanish?
3   A.   Well, it was time for lunch. I'm with my partner
4        eating lunch and talking, no resident, and he said,
5        "You can't speak Spanish here."
6   Q.   And where at Whitney Place were you about to have
7        your lunch?
8   A.   In the kitchen.
9   Q.   And on what floor is the kitchen?
10  A.   Third floor. I work in third floor.
11  Q.   And was Mr. Larouche in the kitchen at the time?
12  A.   He just came.
13  Q.   So right before you were about to eat lunch,
14       Mr. Larouche came by?
15  A.   When I ate lunch with my partner is when he came.
16  Q.   And who were you eating lunch with?
17  A.   With Luz Mareiro.
18  Q.   Now, do you recall what Mr. Larouche said to you?
19  A.   What he said to me?
20  Q.   Yes.
21  A.   "You can't speak Spanish here."
22  Q.   And did you say anything in response?
23  A.   I said, "I'm sorry."
24  Q.   And when you said, "I'm sorry," did Mr. Larouche

9

1        say anything in response?
2   A.   Nothing. He just left.
3   Q.   Do you remember what year that was that
4        Mr. Larouche told you in the kitchen not to speak
5        Spanish?
6   A.   Is like 203 or 204 -- 2004.
7   Q.   Okay. And did he say anything to Luz at that time?
8   A.   Well, he said both, to both.
9   Q.   Were you born in Puerto Rico?
10  A.   Yes.
11  Q.   And you are a United States Citizen?
12  A.   Yes.
13  Q.   And to the best of your knowledge, have you always
14       been a United States Citizen?
15  A.   Yeah. From Puerto Rico, yes.
16  Q.   And do you know were Luz came from?
17  A.   Puerto Rico.
18  Q.   And did Luz say anything to Mr. Larouche when he
19       said, "Don't speak Spanish"?
20  A.   No. She don't say anything.
21  Q.   At the time that Mr. Larouche told you not to speak
22       Spanish, did he ever have any other conversation
23       with you about that event?
24  A.   About the speak Spanish?

3 (Pages 6 to 9)

Myrna J. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

10

| 1 | Q. | Yes. About that speaking Spanish in the kitchen |
|---|---|---|
| 2 | | that time? |
| 3 | A. | I think that is the first time that he told me. |
| 4 | Q. | After he left, did you receive a warning for |
| 5 | | speaking Spanish? |
| 6 | A. | No warning, no. |
| 7 | Q. | Was he your supervisor at that time? |
| 8 | A. | He never be my supervisor. |
| 9 | Q. | Okay. At that time do you remember who your |
| 10 | | supervisor was? |
| 11 | A. | Heather. |
| 12 | Q. | Okay. Would that be Heather Sperling? |
| 13 | A. | Mm-hmm. |
| 14 | Q. | Aside from that time in the kitchen where |
| 15 | | Mr. Larouche told you and Luz, reminded you not to |
| 16 | | speak Spanish, did Mr. Larouche ever speak to you |
| 17 | | about speaking Spanish again? |
| 18 | A. | If he hear me again speak Spanish? |
| 19 | Q. | Yes. Did he ever tell you about not speaking |
| 20 | | Spanish again? |
| 21 | A. | (With translation.) No. |
| 22 | Q. | So that was the only time that Mr. Larouche |
| 23 | | reminded you not to speak Spanish? |
| 24 | A. | Yes. |

11

| 1 | Q. | At any time after he told you not to speak Spanish, |
|---|---|---|
| 2 | | did you ever have a conversation with Mr. Larouche |
| 3 | | to ask him why you could not speak Spanish? |
| 4 | A. | No. I no ask anything. I just said sorry, he |
| 5 | | left, and that's it. |
| 6 | Q. | Could the time with Mr. Larouche, the time that he |
| 7 | | spoke to you about not speaking Spanish, could that |
| 8 | | have occurred in the year 2002? |
| 9 | A. | (With translation.) I told you, like, 2003 or |
| 10 | | 2004. |
| 11 | Q. | Now, at any time did Heather tell you not to speak |
| 12 | | Spanish? |
| 13 | A. | No. |
| 14 | Q. | And if you remember, for how many years has Heather |
| 15 | | been your supervisor? |
| 16 | A. | For five years when I be a PCA she's the boss. |
| 17 | Q. | Has she been the only one who's been your boss when |
| 18 | | you were a PCA? |
| 19 | A. | Excuse me? |
| 20 | Q. | Was Heather your only boss since you became a PCA? |
| 21 | A. | Do I think she's the only one? No. Is Lisa. |
| 22 | | Heather is the big boss, and then there came a |
| 23 | | couple more boss, but she's the big one. |
| 24 | Q. | Okay. And Heather has never told you not to speak |

12

| 1 | | Spanish? |
|---|---|---|
| 2 | A. | Heather, no. |
| 3 | Q. | Do you know an individual by the name of Mr. |
| 4 | | McGinley? |
| 5 | A. | Bill? |
| 6 | Q. | Yes. Do you know him? |
| 7 | A. | Yes. He's the manager. |
| 8 | Q. | He's the manager at Whitney Place? |
| 9 | A. | Mm-hmm. |
| 10 | Q. | Has he ever told you not to speak Spanish? |
| 11 | A. | No. Just one time in the kitchen doing dishes with |
| 12 | | Jackie, and he came with people, no residents. |
| 13 | | When I saw him with people, I'm so |
| 14 | | scared, because you know, the big boss with |
| 15 | | visitors, and I'm talking Spanish, but he said, |
| 16 | | "It's okay." |
| 17 | Q. | So he saw that you were nervous? |
| 18 | A. | Excuse me? |
| 19 | Q. | Did he see that you were nervous that you were |
| 20 | | speaking Spanish? |
| 21 | A. | I said, "I'm sorry." |
| 22 | Q. | He said, don't worry about it? |
| 23 | A. | Mm-hmm. |
| 24 | Q. | Now, at some point in time -- do you know an |

13

| 1 | | individual of the name of Louise Pecora? |
|---|---|---|
| 2 | A. | Mm-hmm. |
| 3 | Q. | And at sometime did Louise Pecora state to you that |
| 4 | | you were speaking Spanish too loudly? |
| 5 | A. | Yeah, a couple of times. I can't remember day, |
| 6 | | year, but to everybody anyway. |
| 7 | Q. | Her complaint was that you were too loud? |
| 8 | A. | Well, because is too loud, no. |
| 9 | Q. | What exactly, if you remember, did Louise Pecora |
| 10 | | say to you? |
| 11 | A. | One day is like, let me -- a couple of -- let me |
| 12 | | think here. Couple months ago I'm talking Spanish, |
| 13 | | because no resident in the kitchen, and I'm talking |
| 14 | | with -- I'm working with Jackie. I think it was |
| 15 | | Jackie. |
| 16 | | And then somebody complained about the |
| 17 | | trash can. I'm the only one that did trash can, so |
| 18 | | I'm talking Spanish, and she came and she said to |
| 19 | | me she hear me in the hall. She said to me, "Speak |
| 20 | | not too loud," and I said, "Okay. I'm sorry. I'm |
| 21 | | mad." She said to me why I don't tell the other |
| 22 | | person about I'm the only one that wash the trash |
| 23 | | can? |
| 24 | Q. | Were you upset because the trash can was full? |

4 (Pages 10 to 13)

Myrna J. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

14

1  A.  No. All the PCAs is mad because is dirty, but
2     nobody else clean the trash can. I'm the only one.
3        So she knows. She said, "You're the only
4     one. Why she complaining about it? Why doesn't
5     she clean the trash can?"
6  Q.  Okay. So at the time, were you in the kitchen with
7     other people?
8  A.  Just with Jackie doing dishes. The resident
9     already have lunch.
10 Q.  Does Jackie speak Spanish as a first language?
11 A.  Yeah.
12 Q.  And while you were doing the work, the trash can
13    was full?
14 A.  Is not full, is dirty.
15 Q.  Okay. And was it your job to keep the trash can
16    clean?
17 A.  Who?
18 Q.  Was it your job to keep the trash can clean?
19 A.  No. The maintenance are the one that clean the
20    kitchen, but I like to clean, so I cleaned the
21    trash can.
22 Q.  Were you complaining that the maintenance person
23    should have cleaned the trash can rather than you?
24 A.  No. I don't complain. The other one complain

15

1     about it, but I no complain, because I no mind to
2     wash the trash can.
3  Q.  And at some point in time while you were talking to
4     Louise in the kitchen during the cleaning, you were
5     speaking in Spanish at this time?
6  A.  She hear me when she came, because I'm mad.
7  Q.  Okay. And she overheard you?
8  A.  And she say, "Not too loud," you know. And I said,
9     "Okay. I'm sorry, but I'm mad." She say, "Okay.
10    But tell the other PCAs that you the only one that
11    clean the trash can."
12       Because she know I'm the only one.
13    Louise Pecora knows.
14 Q.  Okay. So Louise overheard you in the corridor,
15    correct?
16 A.  In the car?
17 Q.  Louise was walking down the corridor?
18 A.  She probably walking for the hall, and I'm in the
19    kitchen with Jackie doing the dishes. I'm mad
20    because the other one complaining about the trash
21    can.
22 Q.  Okay. And Louise when she was in the hall heard
23    your voice?
24       MS. ALTAMORE: Objection. Speculation.

16

1  Q.  Did Louise come in and speak with you?
2        MR. WAYNE: Joan, Myrna's waiting for
3     your instructions.
4        MS. ALTAMORE: Oh, no. You can answer.
5     I'm sorry.
6  A.  She talked to me, she said I'm too loud. But I
7     speak to her in English, because she don't know
8     Spanish.
9  Q.  Okay. And did you explain to her that you were
10    angry?
11 A.  Yeah.
12 Q.  And did you explain to her in English that you were
13    angry because you were the only one who was
14    cleaning up the trash can?
15 A.  I'm the only one. And the other one is complaining
16    about nobody clean the trash can. Why she don't do
17    it like me?
18 Q.  Okay. And did Louise say to you it's okay, but you
19    just have to speak softer?
20 A.  She don't say, don't speak Spanish. She said to me
21    I'm too loud.
22 Q.  Okay. Did you tell her what the problem was?
23 A.  Yes.
24 Q.  And do you remember what you said to Louise at that

17

1     time?
2  A.  I said to Louise that the PCAs are complaining
3     about the trash is dirty, and I said to Louise,
4     "I'm the only one that clean the trash can," and
5     she said, "I know. Tell the other PCAs that you're
6     the only one."
7        Because why she complain, and no do it
8     like me? I don't complain. I just clean.
9  Q.  Okay. Did Louise acknowledge that you were the one
10    who did the cleaning?
11 A.  She knows I'm the one.
12 Q.  Okay. Was Louise sympathetic that you're the only
13    one who does that cleaning?
14       MS. ALTAMORE: Objection. Speculation.
15    You can answer.
16 A.  Yeah. Because I told you, I'm the only one that
17    cleans the kitchen, the cabinets, the trash can,
18    fridge, everything.
19 Q.  And Louise is --
20 A.  She knows.
21 Q.  She knows?
22 A.  Yeah.
23 Q.  If you know, does Louise speak Spanish?
24 A.  She speaks English.

5 (Pages 14 to 17)

Myrna J. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

18

1  Q.  Okay. Does Louise speak Portuguese?
2  A.  I think she only speak English and maybe Italian.
3      I'm not sure.
4  Q.  I'm going to say the question another way: Have
5      you ever heard Louise speak Spanish?
6  A.  Never.
7  Q.  Have you ever heard Louise speak Portuguese?
8  A.  No. Only English.
9  Q.  If you know, can Louise tell the difference between
10     employees when they're speaking Spanish or when
11     they're speaking Portuguese?
12 A.  I don't think she know the difference, because
13     Brazil -- Portuguese language is almost Spanish. A
14     lot of words in Spanish.
15 Q.  And if you know the answer, if you come from South
16     America, you come from Brazil and you speak
17     Portuguese, Portuguese spoken by Brazilians is more
18     like the Spanish spoken by Latin Americans and
19     maybe European Portuguese, if you know?
20 A.  (With translation.) Brazilian is like Spanish.
21     They almost the same.
22 Q.  And just to ask you again, do you know if Louise
23     can distinguish between Portuguese and Spanish?
24 A.  Can she speak?

19

1  Q.  No. When she hears workers speaking --
2  A.  Well, one day she hear two Brazilians. I'm in the
3      kitchen doing the dishes again, because I like to
4      do dishes, and then two Brazilians they speak
5      Brazilian, and she came and she said, "If you want
6      to speak Spanish, go out the building."
7         So I'm mad because that happened before,
8      and I said to one of the Brazilian guys, "I want to
9      speak to Louise, because somebody is talking about
10     that." So he said, "No, no."
11        So she sit in the desk. I went to the
12     desk and said, "Louise, I'm talking about with
13     respect, you know, I'm going tell you say don't
14     speak Spanish, don't speak Spanish. Do you know
15     what people doing? You no see what I'm doing
16     here?" She said, "Oh, that's how you feel about
17     me?" I said, "Yes."
18        She said, "But I'm the one that send you
19     to PCA." Because she signed the paper to be the
20     PCA. I said, "Yes. Thank you, and I appreciate."
21     But that don't mean that she have to tell me every
22     time when the resident is not there, "Don't speak
23     Spanish," you know. She said, "You're a good
24     worker," and I said, "Well, thank you. And I

20

1      appreciate everything."
2         Then one of the Brazilians go to talk to
3      her too, because everybody getting tired about it.
4  Q.  So it was your feeling that if the residents
5      weren't present, you should be able to speak
6      Spanish?
7  A.  But another thing, when somebody need translation
8      to somebody that no speak English, they don't look
9      to see if there a resident. They just want you to
10     tell the person what you have to tell them. They
11     don't looking around to see if there's resident.
12     They just want you to translate for them, that's
13     it.
14 Q.  Could you say that slower?
15        MR. WAYNE: You know what, maybe we
16     should translate this.
17        MS. ALTAMORE: Right.
18        THE INTERPRETER: She's saying that when
19     they want you to translate something from English
20     to Spanish, they ask you to do it, and they don't
21     care if there are residents. They don't look
22     around to see if there's residents or no resident
23     around.
24 Q.  Did you ever speak Spanish in front of Louise on

21

1      the second floor and not get warned?
2  A.  I no work in second floor.
3  Q.  Okay. Sorry. On the third floor. When you work
4      on the third floor, did you ever speak Spanish and
5      Louise not warn you?
6  A.  She warn me? Yeah, a lot of times. Not one or
7      two, is more.
8  Q.  And on some occasions when you spoke Spanish to
9      someone, did she not warn you?
10 A.  Warn me, like, give me a warning?
11        (With translation.) Now she's nice. She
12     don't say anything to me when she hear me speak
13     Spanish. She's nice with almost everybody now.
14 Q.  And when did that start?
15 A.  That started, like, one year or maybe nine, ten
16     months. She give me gift. I give her gift for her
17     birthday. She's nice. But before, I getting very
18     tired about that woman.
19 Q.  Now, before, what you describe as before she became
20     nice, would she remind people not to speak their
21     native language on the third floor?
22 A.  Spanish?
23 Q.  Yes.
24 A.  Other people, yes.

6 (Pages 18 to 21)

Myrna J. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

22

1  Q.  Do you know whether she ever gave anyone, not you,
2      but another person, a warning for not speaking
3      English?
4  A.  For not speaking English in the building?
5  Q.  Yes.
6  A.  Well, they hire people they don't speak English,
7      and they don't want them to speak Spanish. What
8      that people going to do if they need to say
9      something? They have to tell in Spanish the
10     question if they want answer.
11 Q.  But did Louise ever give anyone a warning, a
12     written warning?
13 A.  I don't know about warning. She don't give me any
14     warning.
15 Q.  What about other people, did you ever hear --
16 A.  No. I never heard that she gave a warning.
17 Q.  So aside from reminding people to stop speaking
18     Spanish, did she do anything more serious to the
19     worker who spoke Spanish, take any more serious
20     action against a Spanish speaking worker?
21 A.  (With translation.) Yes.
22 Q.  What did she do?
23 A.  Well, she gets mad.
24 Q.  And who did she get mad at?

23

1  A.  Louise Pecora.
2  Q.  But who was she mad at?
3  A.  (With translation.) Housekeeping.
4  Q.  And who in housekeeping?
5  A.  You want the name?
6  Q.  Yes.
7  A.  Well, in Beaumont is Rosa.
8  Q.  And what did she do to Rosa?
9  A.  "Don't speak Spanish." And Rosa don't know
10     English, and they hire her.
11 Q.  And was that done on the third floor?
12 A.  She work in third floor of Beaumont.
13 Q.  Okay. That's the Beaumont side of the third floor?
14 A.  No. The Beaumont is in second floor.
15 Q.  Okay. And aside from her reminding Rosa not to
16     speak Spanish, did she take any other action
17     against Rosa?
18 A.  No. Like give a warning? I don't think. She just
19     like to walk around and look for people doing and
20     when they talk. She give a hard time.
21 Q.  Was one of the things that Louise Pecora did was
22     walk around the third floor?
23 A.  She walk a lot in third floor.
24 Q.  Now, when she would walk around the third floor,

24

1      did she see residents?
2  A.  Well, sometimes she --
3          MS. ALTAMORE: Objection. Speculation.
4  A.  She can go see the residents, or she can check what
5      the people doing or what they talk or what
6      happened.
7  Q.  Are there residents on the third floor?
8  A.  Is resident on the third floor? Yes. I work in
9      there.
10 Q.  And the residents on the third floor, they live on
11     the third floor?
12 A.  They live in third floor.
13 Q.  And the residents on the third floor, is that where
14     their rooms are?
15 A.  Yes.
16 Q.  And do these residents also eat on the third floor?
17 A.  Yes.
18 Q.  And do these residents on the third floor, are
19     there also rooms where they exercise and meet?
20 A.  Their room for exercise is in the second floor.
21     You said, I'm sorry, exercise or activity?
22 Q.  Yes. Activity.
23 A.  Activity is in the third floor in the lounge. I
24     thought you had said exercise therapy.

25

1  Q.  And when you say "the activity room," is that where
2      residents get together with an instructor and do an
3      activity?
4  A.  Yes. The activities room and do exercise.
5  Q.  And do the doors on the third floor have locks?
6  A.  Yes.
7  Q.  And are the locks on third floor on the residents'
8      rooms?
9  A.  Well, everybody have their own key to open.
10 Q.  And are there also locks on the third floor so that
11     persons can't leave?
12 A.  Yes, is locked.
13 Q.  And the residents are not allowed to leave the
14     third floor, are they?
15 A.  Well, with the PCA or with the activity, they can
16     walk outside or family, but not alone, with
17     somebody.
18 Q.  So if they're escorted, they're allowed to -- if
19     they have an escort, they're allowed to leave the
20     third floor?
21 A.  Yes.
22 Q.  And Whitney Place does not want the residents on
23     the third floor to be wandering by themselves?
24         MS. ALTAMORE: Objection. Speculation.

7 (Pages 22 to 25)

Myrna J. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

| 26 | | 28 | |
|----|----|----|----|
| 1 | You can answer. | 1 Q. | I'm sorry, what was it? |
| 2 A. | Well, what do you mean "wandering"? Go outside? | 2 A. | He work now in Westboro in another nursing home |
| 3 Q. | Leaving the third floor. | 3 | from Whitney Place for the same company. |
| 4 A. | They can leave with somebody responsible for them. | 4 Q. | Okay. But what was Bob's last name, again, do you |
| 5 | MR. WAYNE: Okay. I have no further | 5 | know? |
| 6 | questions. | 6 A. | I don't remember his last name. I know his name |
| 7 | EXAMINATION | 7 | Bob. |
| 8 | BY MS. ALTAMORE: | 8 Q. | Did Bob ever tell you that there was an English |
| 9 Q. | Other than Louise Pecora or Michael Larouche, did | 9 | language rule at Whitney Place? |
| 10 | anybody else at Whitney Place ever tell you not to | 10 A. | Before that happened, no. |
| 11 | speak Spanish? | 11 Q. | Who was the supervisor, your supervisor after Bob? |
| 12 A. | Yeah. Kate Salmon. | 12 A. | Is Jack. |
| 13 Q. | And on what occasion did that happen? | 13 Q. | And do you recall what year Jack started? |
| 14 A. | Well, that happened when I already going to go out, | 14 A. | Let me see. Like, I think 2001. |
| 15 | is three o'clock already. I'm punched, and I'm | 15 Q. | 2001? |
| 16 | talking with somebody walking with me of the | 16 A. | 2001 or 2000. I don't know the year. |
| 17 | housekeeping. At that time I'm in housekeeping, | 17 Q. | Okay. Are you aware that there is an English |
| 18 | and then she said, "You know that you can't speak | 18 | language rule at Whitney Place? |
| 19 | Spanish here." | 19 A. | If he told us? |
| 20 | But we look to the woman like she's the | 20 Q. | Do you recall anybody at Whitney Place ever telling |
| 21 | owner. Never before told me no speak Spanish. | 21 | you that there was an English language rule? |
| 22 | She's the first one in the building, and I said, | 22 A. | Bob never said to me, don't speak Spanish. |
| 23 | "What happened to that woman? Is my language," and | 23 | (With translation.) No. |
| 24 | I'm thinking, like, I'm nothing, you know, I feel | 24 Q. | When you were hired, did you receive an employee |

| 27 | | 29 | |
|----|----|----|----|
| 1 | bad about myself. I said, "Why the woman talking | 1 | handbook? |
| 2 | to me like that? Because I'm Spanish." | 2 A. | Yes. |
| 3 | Nobody ask me of what I wanted born or | 3 Q. | Did you read that employee handbook? |
| 4 | what color I want to be. That I fell bad because | 4 A. | Mm-hmm. |
| 5 | she's the first one, and she made me, like, I'm | 5 Q. | You have to say yes? |
| 6 | feel like I'm nothing. | 6 A. | Yes. |
| 7 Q. | And when did that happen? | 7 Q. | As we sit here today, do you know that there's an |
| 8 A. | I was not even a year at Whitney Place. | 8 | English language rule at Whitney Place? |
| 9 Q. | You had not been there a year? | 9 A. | In the book? |
| 10 A. | I'm there not even one year. | 10 Q. | Do you know if there is? |
| 11 Q. | So that would be approximately sometime between | 11 A. | I don't read it anywhere. |
| 12 | 1997 and 1998? | 12 Q. | Okay. Have you recently read the employee handbook |
| 13 A. | Yes. And then my boss at that time is Bob. He | 13 | of Whitney Place? |
| 14 | asked us, "What she said to you? She's screaming." | 14 A. | No. |
| 15 | I said, "Yeah. She screaming. She say don't speak | 15 Q. | Okay. When you started at Whitney Place, what year |
| 16 | Spanish." | 16 | was that? |
| 17 | He said, "Why she do that? Why she don't | 17 A. | 1996. |
| 18 | told me? I'm the boss. And I call you to the | 18 Q. | Who did you work with? |
| 19 | office. Not in front of people." So he get mad, | 19 A. | The boss? |
| 20 | and he talked to Kate. | 20 Q. | No. I'm sorry. Did you work with a team or with |
| 21 Q. | Bob? | 21 | another person? |
| 22 A. | Bob. At that time the boss is Bob. | 22 A. | I think every housekeeping have a floor. Is that |
| 23 Q. | And do you know what Bob's last name is? | 23 | what you mean? Yeah, is like a team anyway. |
| 24 A. | I forget. But he work in Westboro. | 24 Q. | Who did you work with? |

8 (Pages 26 to 29)

Myrna J. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

---

30

1  A.   In my floor?

2  Q.   Yes.

3  A.   I'm the only one I'm working Beaumont. At that

4      time I went in Beaumont, because I'm in

5      housekeeping.

6  Q.   And how did you become a PCA?

7  A.   How?

8  Q.   What caused you to become a PCA?

9  A.   Because they told me that because I'm a good

10     worker. They saw me there doing good work. I

11     don't call out. I'm happy with the residents.

12        One day I'm in housekeeping, and a

13     resident is smell, and the other resident is

14     laughing, and woman say, "I like you. Why don't

15     you come in here and give me a shower?" So they

16     did shower, and they know that I'm doing my work,

17     and then maybe they see I can be a PCA.

18  Q.   Okay. When you started your employment at Whitney

19     Place, how much money were you making per hour?

20  A.   I think is 7.50.

21  Q.   Okay. And before you became a PCA in 2000, how

22     much money were you making at Whitney Place?

23  A.   When I started, 7.50.

24  Q.   And that was in 1996?

---

31

1  A.   Mm-hmm.

2  Q.   Did you receive a raise in 1997?

3  A.   No.

4  Q.   Did you receive a raise in 1998?

5  A.   No.

6  Q.   Did you receive any raise in 1999?

7  A.   '99. Let me see, no. Because they don't give me

8     raise every year.

9  Q.   Okay. And once you were given the position as a

10     PCA, what was your hourly rate?

11  A.   She give me 50 cents.

12  Q.   So you were making $8 an hour as a PCA?

13  A.   Yes. I'm sorry.

14  Q.   And what is your hourly rate today?

15  A.   Now, is 11.75.

16  Q.   And when did you get that increase?

17  A.   Couple of months ago they give me $1.25, and then

18     before they give me one quarter, and then I take

19     the class for PCA.

20        I went to Westboro, and they gave me a

21     quarter and 50 cents, and then now they give me

22     1.25.

23  Q.   Were you given any type of employee review along

24     with that raise?

---

32

1  A.   (With translation.) Well, Heather told me that

2     Bill gave me a raise, 1.25, so I give a hug, and I

3     think she said don't tell anybody, so I don't tell

4     anybody, because the other one come and give me

5     raise. Maybe they give a raise to everybody.

6     Because Heather is nice.

7        MS. ALTAMORE: I have nothing further.

8        MR. WAYNE: Can I have that marked.

9        (Exhibit No. 2, Acknowledgement of

10     Employment Handbook, marked for identification.)

11        EXAMINATION

12     BY MR. WAYNE:

13  Q.   I want to show you a document that's marked as

14     Exhibit 2. Across the top it says,

15     "Acknowledgement and Receipt of Employee Handbook,"

16     and there's a signature line. Is that your

17     signature?

18  A.   Yes.

19  Q.   And above it says, "I acknowledge receipt of the

20     Salmon Family of Services employee handbook." Did

21     you receive a copy of the handbook at that time?

22  A.   They give me a book.

23  Q.   Do you recall reading that book?

24  A.   Excuse me?

---

33

1  Q.   Do you recall reading that book?

2  A.   Yes. But I never seen in the book says, don't

3     speak Spanish.

4  Q.   Now, in regard to Kate Salmon, how did you know

5     that she was the owner?

6  A.   Because I work in Whitney Place Natick, that's why

7     I know she's the owner.

8  Q.   Did she tell you that she was the owner?

9  A.   No. Maybe the father is the owner, but if she's

10     his daughter, she's the owner, too.

11  Q.   How did you find out that she was the owner?

12  A.   How did I find out? I don't remember.

13  Q.   Now, do you remember the year that Ms. Salmon told

14     you that you shouldn't be speaking Spanish in that

15     location?

16  A.   Because that happened in '96. I no even one year

17     in Whitney Place when she said that to me. She the

18     first one.

19  Q.   So that was said to you in the first year that you

20     were employed by Whitney Place?

21  A.   The first year. I know no even a year.

22  Q.   After that first year, did Kate Salmon ever say

23     that to you again?

24  A.   That's the first time.

---

9 (Pages 30 to 33)

Myrna J. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

34

1  Q.  But did Kate Salmon ever say that to you again?
2  A.  No.
3  Q.  Now, in regard to where you were speaking at the
4      time --
5  A.  When Kate Salmon -- I'm already punched. I'm going
6      home with my friend.
7  Q.  Okay. Now, the punch clock is on the first floor?
8  A.  Yes.
9  Q.  And when you enter the building to get to where the
10     punch clock is, you have to go through a door?
11 A.  Yes.
12         MS. ALTAMORE: But she was exiting the
13     building.
14 A.  Yeah. I leaving the building. It's three o'clock.
15     I'm already punched. I'm going home.
16 Q.  And when you exit the door from where the punch
17     clock is to get into the lobby, you were in the
18     lobby at that time, correct?
19 A.  Yes.
20 Q.  Did Bob take any action against you because you
21     spoke Spanish?
22 A.  Bob, no. Very nice person. He never bother.
23 Q.  And did Jack take any action against you because
24     you spoke Spanish?

35

1  A.  No. He help people. Because they have --
2      housekeeping everybody is without paper. They
3      don't speak English, and then he talk to a lawyer
4      to give a number to the office people, so that
5      people can use that.
6          And the Social Security send everybody a
7      letter that the Social Security is no good, and
8      then he tried to help.
9  Q.  Jack tried to help you?
10 A.  Not me. I have paper, but the other people in
11     housekeeping.
12 Q.  You have papers because you're a United States
13     Citizen?
14 A.  Yes.
15 Q.  But other persons in housekeeping were not United
16     States Citizens?
17 A.  No. They come from different -- Mexico,
18     El Salvador, Honduran.
19 Q.  Did any of these people come from Asia?
20 A.  (With translation.) No.
21 Q.  Did any come from Haiti?
22 A.  (With translation.) Well, PCA, but she no work
23     anymore. Housekeeping at that time, no.
24 Q.  Were there ever Haitians employed while you were

36

1      employed?
2  A.  (With translation.) There was one PCA from Haiti,
3      but she doesn't work anymore.
4  Q.  And were there any Africans?
5  A.  African, yeah.
6  Q.  And were there any persons who came from Europe?
7  A.  Like housekeeping? No.
8  Q.  Or PCA?
9  A.  No.
10 Q.  Were there any persons from Poland?
11 A.  One. She's new.
12 Q.  Are there any persons from Russia?
13 A.  I don't think so.
14         MR. WAYNE: I have no further questions.
15         MS. ALTAMORE: I just have --
16
17             EXAMINATION
18 BY MS. ALTAMORE:
19 Q.  Did Kate Salmon know that you were an employee of
20     Whitney Place?
21 A.  Yeah. Because she saw me with the uniform.
22         MS. ALTAMORE: I have nothing further.
23         MR. WAYNE: I have no further questions.
24

37

1          (Whereupon the Deposition of
2      Myrna J. Famania concluded at 1:05 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

10 (Pages 34 to 37)

Myrna J. Famania 1-23-2006
Jose Famania, et al. v. Whitney Place at Natick, Inc.

|  | 38 |
|---|---|
| 1 | ERRATA SHEET DISTRIBUTION INFORMATION |
| 2 | DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS |
| 3 |  |
| 4 | ERRATA SHEET DISTRIBUTION INFORMATION |
| 5 | DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS |
| 6 |  |
| 7 | ERRATA SHEET DISTRIBUTION INFORMATION |
| 8 | The original of the Errata Sheet has been |
| 9 | delivered to Joan M. Altamore, Esquire. |
| 10 | When the Errata Sheet has been completed |
| 11 | by the deponent and signed, a copy thereof should |
| 12 | be delivered to each party of record and the |
| 13 | ORIGINAL forwarded to Richard D. Wayne, Esquire, to |
| 14 | whom the original deposition transcript was |
| 15 | delivered. |
| 16 | INSTRUCTIONS TO DEPONENT |
| 17 | After reading this volume of your |
| 18 | deposition, please indicate any corrections or |
| 19 | changes to your testimony and the reasons therefor |
| 20 | on the Errata Sheet supplied to you and sign it. |
| 21 | DO NOT make marks or notations on the transcript |
| 22 | volume itself.  Add additional sheet if necessary. |
| 23 | Please refer to the above instructions for errata |
| 24 | sheet distribution information. |

|  | 39 |
|---|---|
| 1 | PLEASE ATTACH TO THE DEPOSITION OF |
| 2 | MYRNA J. FAMANIA        DATE TAKEN: 01/23/2006 |
| 3 | ERRATA SHEET |
| 4 | Please refer to page 38 for errata sheet |
| 5 | instructions and distribution instructions. |
| 6 | PAGE    LINE    CHANGE         REASON |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 | I have read the foregoing transcript of |
| 16 | my deposition and except for any corrections or |
| 17 | changes noted above, I hereby subscribe to the |
| 18 | transcript as an accurate record of the statements |
| 19 | made by me. |
| 20 | Executed this      day of        , 2006. |
| 21 |  |
| 22 |  |
| 23 | Myrna J. Famania |
| 24 |  |

|  | 40 |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 |  |
| 3 | COMMONWEALTH OF MASSACHUSETTS |
| 4 |  |
| 5 |  |
| 6 | I, Elizabette M. Afonso, a Professional |
| 7 | Shorthand Reporter and Notary Public in and for the |
| 8 | Commonwealth of Massachusetts, do hereby certify |
| 9 | that the following transcript of the deposition of |
| 10 | Myrna J. Famania, having been duly sworn through |
| 11 | interpretation, is true and accurate to the best of |
| 12 | my knowledge, skill, and ability. |
| 13 | IN WITNESS WHEREOF, I have hereunto set |
| 14 | my hand and seal this 26th day of January, 2006. |
| 15 |  |
| 16 |  |
| 17 |  |
|  | Elizabette M. Afonso |
| 18 | Notary Public |
| 19 |  |
| 20 | My commission expires: |
|  | November 10, 2006 |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

11 (Pages 38 to 40)